

Michael J. Frevola
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
COSCO SHIPYARD (GROUP) CO., LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

COSCO SHIPYARD (GROUP) CO., LTD.,

      Plaintiff,

      -against-

BULK CONTAINER SHIPPING INC., and
COMMODITY UNIVERSAL LTD.,

      Defendants.

---

08 Civ. _____

**VERIFIED
COMPLAINT**

---

Plaintiff, COSCO Shipyard (Group) Co. Ltd. ("COSCO" or "Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Bulk Container Shipping Inc. ("BCS") and Commodity Universal Ltd. ("Commodity") (collectively "Defendants"), alleges, upon information and belief, as follows:

1.     This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      At all times material herein, plaintiff COSCO was and is a business entity organized and existing under the laws of the People's Republic of China and maintains a place of business at 13th Floor International Shipping & Finance Center, 720 Pudong Avenue, 200120, Shanghai, China.

3.      Upon information and belief, at all times material herein, defendant Bulk Container Shipping Inc. ("BCS") is and was a business entity organized and existing under the laws of the Bahamas with an address at Bahamas International Trust Building, Bank Lane, Nassau, Bahamas.

4.      Upon information and belief, at all times material herein, defendant Commodity Universal Ltd. ("Commodity") is and was a business entity organized and existing under the laws of the United Kingdom with an address at 14 Cambridge Court, London, W6 7NJ.

5.      In late June or early July of 2006, BCS contacted COSCO for ship repair and dry-docking on its vessel, the M/V UNIVERSAL CHALLENGER (the "Vessel").  A true copy of BCS's work order (the "Work Order") forwarded to COSCO is annexed as Exhibit 1.

6.      On or about July 3, 2006, COSCO informed BCS that COSCO's shipyard would be available to accommodate the Vessel's dry-docking based on her preliminary arrival date which was scheduled to be approximately July 23, 2006, and provided the terms and conditions under which the dry-docking and repairs to Vessel would performed by COSCO (the "COSCO Repair Contract") under cover of e-mail and letter correspondence dated July 3, 2006.  True and correct copies of the COSCO Repair Contract and the accompanying e-mail and cover letter correspondence are annexed as Exhibit 2.

2

7.    On July 6, 2006, BCS's vessel managers confirmed that the Vessel's arrival would be in the range of July 25-27, 2006.   In connection with that confirmation, BCS's vessel managers provided a dry-docking award letter that incorporated the COSCO Repair Contract and proposed other terms.   True and correct copies of BCS's manager's dry-docking award letter dated July 6, 2006 (the "Dry-Docking Award Letter") and the cover e-mail to that Dry-Docking Award Letter are annexed as Exhibit 3.

8.    The Vessel arrived at COSCO's shipyard in late July 2006, subsequent to which COSCO performed the requested repairs on the Vessel as defined by the parties' Work Order, the COSCO Repair Contract and the Dry-Docking Award Letter.

9.    Under the terms of payment agreed between the parties, COSCO was to be paid a portion of its invoice prior to the Vessel's departure from the shipyard and the balance within a defined period thereafter.   The balance presently remaining on the COSCO invoice for repairs is in the amount of US$1,910,787.00.

10.    BCS has not paid the balance of the COSCO invoice for repairs in the amount of US$1,910,787.00, although the time for BCS to pay the remaining amount has expired.   BCS, rather than agreeing to pay that invoice, has alleged counterclaims against COSCO based on the repair work performed on the Vessel.

11.    On August 1, 2007, counsel for BCS demanded arbitration of its claims against COSCO and took the position that its claims were to be arbitrated in London under English law according to the terms of the Work Order.   A true and correct copy of that arbitration demand is annexed as Exhibit 4.

12.    COSCO has responded to BCS's arbitration demand by contesting London as the venue for arbitration.  The COSCO Repair Contract provides that disputes concerning the repairs are to be arbitrated before the China Maritime Arbitration Commission under the laws of the People's Republic of China.

**Commodity's Role as Alter-Ego or Paying Agent**

13.    The director and sole shareholder of Commodity is also the director of BCS.  True copies of corporate filing documents for both Commodity and BCS, showing Mr. Mohammad Najib Assaf as the president and/or director of both companies, are annexed as Exhibit 5.

14.    During the course of the Vessel's repairs, representatives from Commodity visited the COSCO shipyard on numerous occasions holding themselves out as the "boss/owner" of Commodity and of the Vessel.

15.    One of the representatives from Commodity who visited the shipyard is a Mr. Michael Fordham.  A true and correct copy of Mr. Fordham's business card provided to COSCO representatives when he visited the COSCO shipyard is annexed as Exhibit 6.

16.    Mr. Fordham exchanged a series of emails with COSCO in which he claimed to be arranging payment to the yard.  True and correct copies of several email exchanges between Mr. Fordham and the COSCO shipyard discussing further payments promised to be arranged by Fordham are annexed as Exhibit 7.

17.    Upon information and belief, not only did Commodity promise to make payments to COSCO in partial satisfaction of COSCO's repair invoice to BCS, but also Commodity did pay COSCO in partial satisfaction of COSCO's repair invoice.  A true and correct copy of a

notification of initial payment to COSCO, which lists the address of the payor as 14 Cambridge Court, London, W6 7NJ (which is Commodity's address), is annexed as Exhibit 8.

18.    Based on the foregoing circumstances, defendant BCS uses Commodity as an agent for payment by which Commodity makes payments on behalf of BCS without Commodity having received any consideration or benefit.    Alternatively, BCS and Commodity have commingled funds and/or otherwise are failing to observe corporate formalities by allowing Commodity to pay for services which were provided to BCS.

19.    In sum, it appears as if Commodity is acting as the *de facto* owner of the Vessel even though it was not Commodity who engaged COSCO to repair the Vessel.    Commodity is the alter-ego of BCS because it disregards BCS's corporate form and dominates BCS to the extent that Commodity is actually carrying on the business operations of BCS as owner of the Vessel as if they same were its own or vice versa.

**The Reported Imminent Sale of the Vessel**

20.    COSCO recently learned through industry sources that the Vessel reportedly is to be sold after its present voyage to Brazil.

21.    Upon information and belief, BCS is a "single ship company" which has no assets other than the Vessel itself.

22.    The Bahamian ship registry, which is the registry in which the Vessel is registered, has two mortgages recorded against the Vessel.    True copies of the Vessel's mortgages are annexed as Exhibit 9.

23.    If the Vessel is sold, it is likely that the purchaser of the Vessel will convey a portion of the purchase price to the two lenders possessing mortgages on the Vessel, which

conveyance will be the payment of consideration on behalf of BCS but which possibly would not mention BCS in the payment details.

**Requested Relief**

24.     COSCO is owed US$1,910,787.00 from BCS as the balance of monies owed under COSCO's repair invoice.

25.     Upon information and belief, it will take four years for COSCO to prosecute this claim against BCS to its completion.  The Work Order and the Dry-Docking Award Letter state that disputes between the parties are to be governed by English law.  While COSCO has disputed the applicability of the English law and English arbitration provision, BCS has initiated arbitration in England.

26.     Under English law, if the arbitration goes forward in England, COSCO is entitled to receive its interest, expenses and reasonable attorneys' fees for prosecuting its claims to completion, which amount is estimated to be US$973,236 as set forth below:

| | | |
|---|---|---|
| Interest: | $ | 573,236 ($1,910,787 x 0.075/year x 4 years) |
| Attorneys' fees | $ | 400,000 |
| Total Principal Claim: | $ 1,910,787 | |
| Total Sought: | **$ 2,884,023** | |

27.     Therefore, as a result of the foregoing and BCS's failure to pay COSCO's repair invoice, COSCO has suffered damages in the amount of US$2,884,023, including estimated interest, attorneys' fees and expenses.

28.     Neither BCS nor Commodity is found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the names of Bulk Container Shipping Inc. and/or Commodity Universal Ltd. with, upon

information and belief, the following financial institutions:  Bank of America, N.A.; Bank of China; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; or any other financial institution within the Southern District of New York.

29.     As mentioned above in paragraphs 11 and 12, the repair proposals exchanged by the parties have conflicting arbitration clauses.  COSCO reserves its right under 9 U.S.C. § 8 to request this Court to direct the parties to arbitrate this dispute in either England or China (depending on the resolution of the arbitration venue issue).

**WHEREFORE**, plaintiff COSCO Shipyard (Group) Co., Ltd. prays:

1.     That a summons with process of attachment and garnishment may issue against the Defendants Bulk Container Shipping Inc. and Commodity Universal Ltd.; and if Defendants cannot be found, then their goods, chattels and credits within the district, and particularly all bank accounts and other property of Bulk Container Shipping Inc. and Commodity Universal Ltd. with the financial institutions noted above in paragraph 28, may be attached in an amount sufficient to answer Plaintiff's claim;

2.     That defendants Bulk Container Shipping Inc. and Commodity Universal Ltd. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.      That judgment be entered in favor of COSCO Shipyard Group Co. Ltd. and against Bulk Container Shipping Inc. and Commodity Universal Ltd. in the amount of US$2,884,023 (including estimated interest, expenses and attorneys' fees); and,

4.      That this Court grant  COSCO Shipyard (Group) Co., Ltd. such other and further relief which it may deem just and proper.

Dated: New York, New York
      January 17, 2008

HOLLAND & KNIGHT LLP

By: _____
           Michael J. Frevola
           Lissa Schaupp
           195 Broadway
           New York, NY 10007-3189
           Tel:    (212) 513-3200
           Fax:    (212) 385-9010

*Attorneys for Plaintiff*
*COSCO Shipyard (Group) Co., Ltd.*

## VERIFICATION

STATE OF NEW YORK        )

                                   :ss.:

COUNTY OF NEW YORK     )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for COSCO Shipyard (Group) Co., Ltd. ("COSCO"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by COSCO and corresponded with COSCO's representatives regarding this matter. I am authorized by COSCO to make this verification, and the reason for my making it as opposed to an officer or director of COSCO is that there are none within the jurisdiction of this Honorable Court.

_____
Michael J. Frevola

Sworn to before me this
17th day of January, 2008

_____
Notary Public

DIALYZ E. MORALES
Notary Public, State Of New York
No. 01MO6059215
Qualified In New York County
Commission Expires June 25, 2011

# 5034532_v1

# EXHIBIT 1

| M/V UNIVERSAL CHALLENGER |
|---|

V.Ships

# DRYDOCK & REPAIR SPECIFICATION

**PREPARED BY : Christopher J Burton**

**APPROVED BY : S. RAJAN**

**DATE :   23rd January 2005**

The Manager's Office address:

The Owners of m.v. Universal Challenger: Bulk Container Shipping .
c/o V. Ships Ltd
13, Omonia Avenue
P.O.Box 57115
3312, Limassol Cyprus

Tel :   +357 25 848400
Fax :   +357 25 560170
Tlx :   4707 VSHIPS CY

Email: fleete.cyprus@vships.com

V.Ships

| M/V UNIVERSAL CHALLENGER |
|---|

# DRYDOCK & REPAIR
# SPECIFICATION

### MAIN INDEX

Part I          Ship Repair Agreement
Part II         Specification

Section
1.0             Standard Terms & Conditions
2.0             Vessel's Particulars & Survey Dates
3.0             Unit Prices
4.0             Services
5.0             Drydocking
6.0             Hull Painting
7.0             Tailshaft & Stern Tube
8.0             Propeller
9.0             Rudder & Steering Gear
10.0            Bow Thruster, Stern Thruster & Stabiliser
11.0            Sea Valves & Chests
12.0            Cathodic Protection
13.0            Anchors & Cables, Chain Lockers
1000.0    Deck Repairs
2000.0    Cargo Systems
3000.0    Hull Structures, Steel Renewals & Tank Coatings
4000.0    Engine & Boiler Repairs
5000.0    Pipework
6000.0    Electrical / Electronic / Radio & Navigation Repairs
7000.0    Miscellaneous (Modifications, Damage Claims and Guarantee Items)


Part III        Reference Drawings:
♦    Docking plan          ____
♦    Capacity plan         ____
♦    Shell Expansion       ____
♦    Midship Section       ____
♦    Rudder                ____
♦    Propeller             ____
♦    Tailshaft             ____

2

| M/V UNIVERSAL CHALLENGER |
|---|

V.Ships

## PART I - *SHIP REPAIR AGREEMENT*

| Box 1 - Owner | Box 11 – Contractor |
|---|---|
| Name Bulk ContainerShipping<br>Address Bahamas International Trust Building<br>          Bank Lane, Nassau<br>          Bahamas<br><br>Telex/fax | Name<br>Address<br><br>Telex/fax |
| **Box 2 - Owner's Representative**<br>          TBA | **Box 12 -  Contractor's Representative** |
| **Box 3 – Ship Management Office**<br><br>Name  V Ships Ltd<br>Address 13 Omonia Avenue<br>          PO BO x 57115, Limassol<br>          3312 Cyprus<br>Telex/fax 00 357 25 848400 | **Box 13 – Repair Facility**<br><br>Name<br>Address<br><br>Telex/fax |
| **Box 4 - Date of Invitation to Tender**<br><br>Owners Reference Nr : | **Box 14 – Date of Tender**<br><br>Contractor's Ref Nr : |
| **Box 5 – Closing Date for Tender**<br>          15th December  2005 | **Box 15 – Estimated Total Repair time** |
| **Box 6 – Estimated Arrival Date** | **Box 16 – Estimated Repair Time in Drydock** |
| **Box 7 – Payment Terms**<br>30% on departure<br>30% after 60 days<br>Balance after 120 days | **Box  17  –  Confirmed  Date  of  Drydock**<br>          **Availability** |
| **Box 8 – Liquidated Damages / day**<br><br>**USD 10,000** | **Box 18 – Level of Contractor's insurance cover** |
| **Box 9 - Governed by & construed with**<br>          **'English Law'** | **Box 19 – Date of Completion** |
| **Box 10 - Date of Order** | **Box 20 – Date of Acceptance** |

It is mutually agreed between Manager, as agent for and on behalf of the Owner,
and the Contractor, that the Contractor will carry out the Work, and any
Additional Work, for the Owner in accordance with the terms and conditions
specified in this Drydock & Repair Specification, consisting of Parts 1 to III
inclusive and the conditions stated in the Invitation to Tender [see Box 4].

For and on behalf of                    For and on behalf of
the Manager as agent                    the Contractor
for and on behalf of
the Owner



Signature                               Signature

3

V.Ships

| | |
|---|---|
| Name: | Name |
| Title: | Title: |
| Date | Date |

## PART II – *SPECIFICATION*

### SECTION 1 : GENERAL TERMS & CONDITIONS

1.  **Definitions and Interpretation**

1.1    In this Drydock & Repair Specification, save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them.

"Additional Work" means all work in addition to or modification of the Specification agreed between the Parties.

"Classification Society" means the Vessel's classification society, named in Section 2.

"Contractor", means the Company named in Box 11 of the Part I - Ship Repair Agreement.

"Contractor's Representative" means the person(s) named in Box 12 appointed by the Contractor to manage the Work and any Additional Work, or any substitute(s) nominated in writing from time to time.

"Drydock Estimator" is the person appointed by the Manager to assist the Owner's Representative to manage the contract negotiation with the contractor for the Work and any additional Work.

"Invitation to Tender" means the invitation to tender referred to in Box 4 issued on behalf of the Owners to the Contractor which contains the instructions given by the Manager to all tenderers included with the Tender Documents and to be taken into account whilst tendering.

"Manager" means the Owner's manager named in Box 3.

"Owner" means the registered Owner of the Vessel named in Box 1.

"Owner's Representative" means the person(s) named in Box 2 appointed by the Manager to represent the Owner's interests in overseeing that the contracted repairs are performed in accordance with this Drydock & Repair Specification or any substitute(s) nominated in writing from time to time.

"Parties" means the Owner and the Contractor.

"Specification" means the Drydock & Repair Specification detailing the Ship Repair Agreement, the Work attached hereto and the Reference Drawings comprising Parts I to III.

"Subcontractor" means any firm other than the Contractor engaged to perform any service to the Vessel whether or not hired by the Contractor or by the Owner.

"Tender Documents" means the documents which accompanied the Invitation to Tender.

"Vessel" means the Vessel named in the header of the Specification.

"Work" means the work specified in the Specification.

"Yard", "Repair Facility" and "Shipyard" mean the Contractor's repair facility named in Box 13.

1.2   Clause Headings are inserted for convenience and shall be ignored in construing this Ship Repair Agreement; words denoting the singular number shall include the plural number and *vice versa*; references to Parts are to Parts and sections of this Drydock & Repair Specification including the Ship Repair Agreement; references to a Box number means the relevant Box in Part I; references to Clauses are, unless otherwise stated, to Clauses of Part II.

4

M/V UNIVERSAL CHALLENGER

V.Ships

**2.    Performance of Work**

2.1    The Contractor shall carry out the Work and any Additional Work put in hand during the repair period in accordance with first class international ship repair standards, to the satisfaction of the Owner, the Parties' regulatory bodies and the rules of the Class Society . Decisions of the Class Society as to compliance or non-compliance with the classification rules shall be final and binding upon the Parties. The Work and any Additional Work shall also comply with all rules, regulations and requirements of other regulatory bodies which apply to the Work and any Additional Work whether or not specifically referred to in the Specification in order that the Vessel will retain and/or obtain all approvals and/or licences required thereby. Each such decision shall constitute a determination that such repair, replacement or material meets the requirements of this Drydock & Repair Specification, except to the extent that this Specification exceeds the Classification Society standards.

2.2    It is agreed by the Contractor that all workmanship and materials used in performing the Work and any Additional Work shall be the best quality throughout and conform to those now in the Vessel, except where otherwise mentioned and shall also meet the requirements of the Specification and/or rules of the Classification Society. Any dispute that may arise during the progress of the repairs as to the meaning of the Specification and Work to be done, or to the materials and/or workmanship, shall be left to the decision of the Owner's Representative.

2.3    Any particulars of the Work specified herein are given only for the guidance of the Contractor, who will be held responsible for securing all necessary dimensions and details from the Vessel, as may be required to carry out the specified Work. Should the Contractor discover any workmanship, material or performance which is not in conformity with this Ship Repair Agreement or the Specification (in which event, the Contractor shall promptly notify the Owner of such discovery), the Contractor shall promptly take effective measures to correct such conditions

2.4    All new work (piping, steel plates and shapes, brackets, etc.) alterations, repairs, modifications, etc in cargo holds, on deck or other areas which are to be coated (or being coated during this drydocking) are to be suitably prepared and after approval by the Owner's Representative, coated with the same type coatings as have been or are being applied to the balance of these areas it being the intention of the Owner that all steel surfaces of such areas be coated. All adjacent coated areas disturbed during the foregoing work shall be similarly prepared and coated.   The Contractor shall ensure that the Vessel is maintained in a reasonable state of cleanliness throughout the repair period in order not to affect adversely the quality of paint work.

2.5    The Contractor must provide for good communications between the Owner's and Contractor's Representatives. A meeting is to be held with the Owner's Representative/s, Contractor's Representative and responsible staff from the Yard before the arrival of the Vessel to plan the details of the Work, clarify problem areas in the specification, agree work programme with time bar chart and establish points of contact, followed by a Daily Work Planning Meeting held onboard the Vessel to -

    - assess the progress bar chart and any issues thereof, discuss change orders.

    - Risk, Safety, Quality, Weather, Security, Technical and/or Commercial issues.

**3.    Approval and Certification**

3.1    The Contractor shall be responsible for obtaining and maintaining all necessary approvals and certificates of whatsoever nature relating to the Work as required by the Contractor's Regulatory Bodies, whether or not specifically stated in the Specification. The Owner shall provide any reasonable assistance that may be required in this respect.

3.2    All fees and charges incidental to the classification and with respect to compliance with the above referred rules, regulations and requirements shall be for the account of the Contractor.

| M/V UNIVERSAL CHALLENGER |
| --- |

V.Ships

4.    **Tendered Costs**

4.1    The Contractor has to furnish individual costs in the Tender for all work items contained in the Specification. All costs including but not limited to removing and refitting of parts obstructing access, cleaning, de-rusting, reconnecting and testing components, material, machinery and outfitting, temporary lighting, ventilation, staging, inspection, certification, erection and assembling aids of any kind are to be included in the tendered price. Where a fixed price has not been quoted for any item in the Specification or for any Additional Work, the price shall be by reference to the agreed tariff, or in its absence, reasonable current rates applying in the location of the Repair Facility.

4.2    Where the Specification requires the opening of machinery, piping, fittings, etc it is intended that the costs quoted include the renewal of all disturbed gaskets, packing and the repair or renewal of insulation damaged in carrying out the work. Wherever the term "overhaul" is used in the Specification, and no other specific requirements are mentioned, the Contractor shall allow for dismantling, removal to workshop, opening up, cleaning, de-rusting, painting, inspection, reassembling in good working order using new bolts, nuts, joints and packings, reinstalling on board and testing to Owner's Representative's satisfaction.

4.3    All costs including but not limited to fitting, connecting, grit blasting, painting and testing new components, material, machinery and outfitting, removal of liquids from engine room and pump room, holds, upper/lower stools water and oil tanks and other spaces in which the Contractor performed work are to be for Contractor's account.

4.4    The Contractor is responsible for payment of all costs and expenses of wharfage, towage, dockage including, if relevant, costs of undocking and re-docking, dock trials, shifting and mooring, pilotage, boat hire, dry and wet dock charges, waste, garbage, sewage and scrap disposal and supply of fresh/ballast water and shore power, unless stated otherwise in the Specification or Price or mutually agreed upon in writing between the Contractor and the Owner.

4.5    Where the Specification refers to one (1) unit to be repaired and upon investigation it is determined that a second or more duplicate units require similar repairs, the price quoted for the first unit shall apply to each additional unit. The cost of the additional unit shall take into consideration the cost of removals and replacements that are common to the first unit. Likewise where a fewer number of units are dealt with than stated in the specification the cost shall be reduced in proportion to the price stated in the Tender.

4.6    The Contractor shall use all reasonable endeavours to perform Additional Work as requested by the Owners within the Completion Date specified in Box 19. No extra compensation or added time for any additions, repairs or alterations will be allowed without approval in writing by the Owner's Representative for such additions or alterations before same are commenced. Upon completion of the Additional Work, the cost of any additions, reductions or alterations properly authorised as indicated above shall in the absence of an agreed quotation, be calculated by reference to the agreed tariff, or in its absence, reasonable current rates applying in the location of the Repair Facility.

| M/V UNIVERSAL CHALLENGER |
|---|

V.Ships

4.7   The Work and any Additional Work shall be performed within normal time. No overtime shall be worked for the Owners account unless the Owner's Representative has approved the items to be worked on, the maximum number of overtime hours, the department(s) authorised to perform the overtime and the resultant costs. It is understood that if no Work is carried out on Sundays and holidays, Drydocking or Repair Berth will not be charged for.

4.8   When technical problems or major change orders occur during the repairs, the Owner's Representative will be entitled immediately to initiate a meeting with Contractor's Representative and Shipboard Management Team to clear the problems and evaluate possible consequences. Change orders/additional work from the original Specification will be likely to occur, and it is imperative for project control that the Owner receives quotes for all altered / additional items from the Yard or sub contractor within 24 hours after order. Additional Work / change orders are to be presented to the Yard in writing or as minutes of meeting - and quotes conveyed to the Manager by fax.

5.    **Repair Schedule**

5.1   The total time required by the Contractor, in number of consecutive running days to complete the repairs itemized in the Specification is as stated in the Tender and in Box 15, including working days, holidays, planned stoppages, restrictions applicable to weekend or overtime working, and based on the Repair Facility's regular and overtime shift timings as stated in the Tender. If the Vessel is to be drydocked during the repair period the number of days the Vessel is to be held in the drydock to carry out the work outlined in the Specification is as specified in the Tender and stated in Box 16. The Contractor shall prepare and submit to the Owner's Representative, prior to the commencement of the Work and during the period of Work, a detailed production schedule in the form of a bar chart showing details of the Work and any Additional Work through to completion and redelivery.

5.2   If the Vessel is being drydocked and the total repair days stated in Box 15 is in excess of the scheduled days in drydock stated in Box 16, the Vessel shall be drydocked immediately on arrival at the Shipyard, unless stipulated otherwise by the Owners or mutually agreed between the Contractor and the Owner. When drydocking is for regular periodic maintenance, the Contractor shall allow sufficient time in drydock to properly apply paint or carry out other work as called for in the Specification. Additional time in dock for work not mentioned in the Specification shall be mutually agreed upon between the Contractor and the Owners. Should the Contractor request an interruption of drydocking, any cost involved relative to undocking, shifting, mooring, re-docking, interruption of repairs, etc, either direct or indirect, are to be borne by the Contractor. If our vessel is being drydocked together with another ship in the same drydock, this must be notified in the tender.

5.3   Time shall be of the essence in the performance of the Contractor's obligations under this agreement. The Contractor represents and warrants that it has no commitments which will prevent it from putting the vessel into drydock on the date in Box 17 and completing the Work timeously [Box 19] and agrees that it will not undertake any such commitments. The Contractor undertakes that it shall give the highest priority to the Work and any Additional Work and shall not assign a higher priority to any other work which may interfere with its diligent prosecution of Work and any Additional Work. Should the Contractor become aware of any pending go-slow, strike or other industrial action, this must be immediately brought to the Owner's attention in good time. If the Contractor falls behind the progress indicated by the schedules described above, for reasons for which the Contractor is responsible, the Contractor shall present to the Owner a recovery plan and shall take all steps required (for instance, working overtime or on double shifts), at its sole cost, to accelerate the work to ensure that the Contractual Delivery Date [Box 19] is met. A notification by the Owner's Representative to the Shipyard to comply with this Clause shall not constitute a change order or modification to the Contract.

5.4   In the event that any of the materials required by the Specification or otherwise under this agreement cannot be procured in time or are in short supply to maintain the Date of Completion stated in Box 19, the Contractor may, with the prior written agreement of the Owner, supply other materials capable of meeting the requirements of the Classification Society and of the rules, regulations and requirements with which the Work and any Additional Work must comply

5.5   Any delay in readiness of the drydock for accepting the vessel on the confirmed date of drydock availability shall be subject to the liquidated damages stated in Box 8 independently of any other clause in this agreement.

| M/V UNIVERSAL CHALLENGER |
| --- |

V.Ships

**6.    Contractor's Right to Subcontract**

6.1    The Contractor may, with the prior written consent of the Owner, such consent not be unreasonably withheld, subcontract any part of the Work or any Additional Work to good quality repairers/suppliers. The Contractor shall give prior notice of such intention to the Owner, together with the name of the subcontractor; should the Owner reject the subcontractor, the Contractor shall itself perform such part of the Work or service or engage a subcontractor acceptable to the Owner. In general, no subcontractor will be accepted for main engine works apart from the engine manufacturer or their licensee. The use of subcontractors by the Contractor shall in no way alter or diminish the Contractor's responsibilities and obligations under these Standard terms and Conditions

**7.    Owner's Right to Subcontract and Use of Ship's Staff**

7.1    Owner reserves the right to engage subcontractors to perform Owner's own work, furnish services and/or materials. The Contractor will permit Owner's subcontractors free access to the Shipyard and the Vessel and will give them such assistance as may be required by the Owner's Representative. Any services supplied to subcontractors, including by way of illustration, craneage, use of welding sets etc, shall be at the Yard's tendered tariff rates. The Owner reserves the right for Vessel's staff to perform overhauls, repairs onboard the Vessel while the Vessel is in the Shipyard, provided such work does not interfere with or delay the progress or completion of the Work, and complies with Yard safety regulations.

**8.    Supervision & Owner's Work**

8.1    The supervision of the Work will be carried out by the Owner's Representative or delegate, who will attend at the Shipyard throughout the repair period.

8.2    The Owner's Representative shall at all times provide reasonable assistance to facilitate timely and efficient completion of the Work and shall, without limit to the generality of the foregoing, promptly bring to the attention of the Contractor any aspects of the Work which to his knowledge does not comply to the terms of this Ship Repair Agreement.

8.3    The Contractor shall, at its own expense, provide the Owner's Representative with reasonable accommodation and office facilities (including communication facilities), provided the Owner shall bear the costs of all communications by the Owner's representative. The Contractor shall grant the Owner's Representative reasonable access to the Vessel, the Contractor's Workshops and any other premises or site where the Work is being carried out, during normal working hours and whenever Work is being carried out outside such hours.

8.4    The Shipyard shall give the Owner's Representative(s) twenty-four (24) hours notice in writing in advance of the date, time and nature of all tests, inspections and trials of the Vessel or its machinery.

8.5    For the avoidance of doubt, the Contractor acknowledges that the Manager is agent for and on behalf of the Owner and that the Manager shall not be under any liability to the Contractor hereunder whatsoever or howsoever arising.

**9.    Safety**

9.1    On Vessel's arrival, a Safety Meeting with the Yard's Safety Officer and Vessel's Senior Officers must be held, followed by regular Safety Meetings throughout repair period to discuss Safety and Accident Prevention issues.

**10.    Gas Free Certification**

10.1    It shall be the responsibility of the Contractor to ascertain by actual tests made by a qualified chemist that spaces where repairs and/or hot work will be performed are gas free for man-entry and fit for hot work (as applicable), along with adjacent spaces where required as a safety precaution in line with best industry practice. The Contractor is to clean, gas free and to obtain gas free certificates for the respective spaces in which, and adjacent to where, hot work will be performed.

| M/V UNIVERSAL CHALLENGER |
| --- |

V.Ships

**11.    Hotwork and Tank Entry**

11.1    Authorisation for Hot work to be done by the Contractor's personnel will be subject to:

- Written notification from the Contractor's Representative to the Master of the area/spaces in which the work will be carried out.

- The Chief Officer accompanying the Repair Facility chemist on all of his inspections to ensure that all the necessary spaces are monitored.

- All the requisite Gas Free Certificates being passed to the Chief Officer, such certificates to be sighted and signed by the Master to verify that the proposed area/spaces where hot work is to be performed are gas free.

- Organisation of Yard's Fire watch as applicable.

11.2    No hot work or risk-related works by Crew, Owner's employed SGM (Sea going maintenance team) or Sub contractors shall be permitted during the repair period without specific written approval from the Contractor, all company safety procedures shall also apply.

**12.    Lighting, Access & Stability**

12.1    The Contractor shall be responsible at his own expense for the provision of sufficient lighting and safe access for work on deck, tanks, cargo spaces, machinery spaces and wherever required for the entire duration of repairs.

12.2    Sufficient lighting shall be provided by the Contractor in and around the Vessel to facilitate personnel movement, access, emergency escapes and fire watch. The Vessel is to be maintained, whilst in Contractor's hands in a safe condition regarding fire and accidents risk. Safe stability and adequate shoring of the Vessel in a floating dock is the responsibility of the Contractor

**13.    Hull Integrity**

13.1    When the Work requires the opening of machinery, piping, heat exchangers, fittings etc which are directly or indirectly connected to a source of possible leakage into the Vessel, such as sea chests, over board discharge valves, crossovers, connections to the shell of Vessel, tanks or pipe lines containing liquid of any other source of leakage it shall be the responsibility of the Contractor to fit blanks as necessary to eliminate the possibility of leakage into any space or equipment of the Vessel and/or to remove the liquids ashore at his own expense. Upon completion of any such repairs, all blanks fitted shall be removed and after reassembly, these items shall be proven tight. These precautions shall be taken as necessary to prevent any damage to the Vessel whether it is afloat or in drydock. All the foregoing shall be for the account of the Contractor including any damage resulting in the course of performance of the Work.

**14.    Delivery of Vessel**

14.1    The Vessel shall be considered tendered for Works when she is off the Contractors' Repair Facility ready to be secured at the wharf.

14.2    The Owner shall keep the Contractor advised of any changes in the Vessel's expected delivery date being on or around the date stated in Box 19.

14.3    Before arrival of the Vessel at the Repair Facility, no work in connection with any of the Specification is to begin without the permission of the Owner who also has the right to cancel any of the specified items against respective credit, if such cancellation has been confirmed in writing prior to commencement of the job. Following the arrival of the Vessel at the Repair Facility, no work exceeding the scope of the Specifications to be commenced without the written confirmation of the Owner's Representative.

9

| M/V UNIVERSAL CHALLENGER |
|---|

V.Ships

**15.    Redelivery of Vessel**

15.1    The Vessel will be redelivered on or prior to the Date of Completion stated in Box 19 and accepted safely afloat by the Owner upon completion of all repairs, renewals, replacements, and system flushing and testing as applicable; after all of Yard's equipment, tools, appliances, dirt, debris and all old material have been removed and the Vessel is brought to an acceptable state of cleanliness. The Yard must provide the Owner with 3 days' prior notice of intended completion of repairs, with an estimated cost of repairs and planned schedule of payments thereof.

15.2    The Contractor shall not be entitled to any lien, charge or other maritime claim over the Vessel or any material, machinery, equipment, components, appurtenances or outfit added to or placed on board the Vessel or otherwise in the Shipyard in the course of and for the purposes of the Work and/or any Additional Work.

15.3    The Contractor warrants that upon completion of the Work and any Additional Work the Vessel shall be re-delivered to the Owner free and clear of any liens, charges, claims or other encumbrance, and, in particular, but without limitation, the Vessel will be absolutely free of all burdens in the nature of governmental imposts, taxes or charges as well as of all liabilities of the Contractor to its subcontractors, employees, suppliers and agents.

**16.    Tests, Trials and Acceptance of Work**

16.1    Upon completion of the Work the Vessel is to sail from the Repair Facility in a safe condition as soon as possible. The Contractor must discuss with Owner's Representative adequate function tests and inspections under supervision of Vessel's Master after completing repairs, during flooding and if applicable, in the post repair period before loading/sailing.  The Contractor in co-operation with Owner's Representative, will evaluate the need for Yard staff to join the Vessel for Sea Trials or completing system testing on the first voyage and/or until the first cargo has been lifted. Defects and defaults in the performance of Work are to be recorded in the work done report. Any defects coming to the knowledge of the Contractor must be discussed with the Owners Representative.

**17.    Calibration Reports, Drawings, etc.**

17.1    The Contractor shall maintain complete records of the Work and any Additional Work and shall make them available to the Owner at all reasonable times during the repairs and for a period of 1 (one) year, keeping the confidentiality of records for the Owner.

17.2    After completion of the Work and prior to departure of Vessel from the Repair Facility, Contractor shall supply Work Done Reports and Record of Inspections in duplicate giving all measurements taken and drawings of any modifications performed. These shall be presented to the Master, Chief  Engineer and Owner's Representative for their comments and approval.

**18    Scrap Materials, Parts and Equipment**

18.1 All scrap and old material will become the property of the Contractor for which a suitable credit will be given to the Owner. Such credits are to be indicated in the Tender if called for in the Specification. However, heavy scrap, old material such as heavy machinery parts, propeller, tail shaft and other items specially mentioned (or repair items covered by insurance) will always remain property of the Owner and can be acquired by the Contractor subject to agreement on terms with the Owner.

18.2    The Shipyard is to accept the delivery of any Owner's supplied materials and shall ensure that they are kept in a safe and secure place and in good order and condition until the time of installation. The Shipyard is to transport all such items to the point of installation aboard the Vessel, whether stored aboard the Vessel or delivered to the Shipyard. Any unused materials, as designated by the Owner's Representative, are to be removed and held for Owners disposition. Any costs in connection with the foregoing are to be included in the tendered price of any such items in the Specification.

| M/V UNIVERSAL CHALLENGER |
|---|

V.Ships

19    **Payment**

19 1    Separate invoices may be required by the Owner's Representative for

- General Services

- Owner's Repairs

- Insurance Damage Repairs

- Guarantee Claims Repairs

19.2    Nearing the completion of the Work, the Contractor is to present a 'Work Done Report' to the Owner's Representative – who will verify with his staff and comment upon it to the Yard, and allocate the jobs to one of the above accounts, respectively.

19.3    Thereafter, pro forma invoices are to be forwarded to the Drydock Estimator at the address specified in the Tender Documents for verification, negotiation and final approval by the Manager as agent for and on behalf of Owner. In certain cases the Invoice may be settled locally or by alternate method if specified in the Tender and agreed by the Owner.

19.4    Payment shall be made by the Owner in accordance with the contractor's price schedule, which forms an integral part of the "Contract Price" and shall be subject to adjustment, if any, as hereinafter described. The Contractor shall give the Owner full credit without any deduction whatsoever for any Work or Additional Work not carried out and the Contractor will account to the Owner for all price reductions relating to the Work and any Additional Work taking into account the owners representative's comments on work done report

19.5    Payment terms will be 30% on departure from the Repair Facility, 30% Sixty (60) days after departure, and the balance One hundred and twenty (120) days after departure.

20    **Contractor's Liability Insurance**

20.1    Without affecting its rights and obligations under this agreement, the Contractor shall provide, effect and maintain at no cost to the Owners, Shiprepairers' Liability Insurance and Comprehensive General Liability (Third Party) Insurance, for not less than the amount stated in Box 18, providing full coverage for such loss and damage for which the Contractor may be held liable to the Owner under this Ship Repair Agreement. The Contractor will maintain such insurance in place for a period of two years after completion of the Work.

20.2    Prior to the date of delivery of the Vessel to the Repair Facility, the Contractor shall supply the Owner with a Certificate of Coverage certifying that coverage has been obtained and giving reasonable details as to the coverage, the insurers, limits of liability and any endorsements to the cover.

20.3    If the Contractor fails to provide insurance or evidence of same in conformity with Clause 20.1 and 20.2, the Owner may do so and recover the cost from the Shipyard, together with interest thereon.

20.4    The insurance to be provided under Clause 20.1 and 20.2 will include cover for pollution, loss of hire and consequential damages and will name as insured the Contractor, Owner and Manager, however with a provision that the insurance will not preclude a claim of the Owner against the Contractor, to the extent otherwise consistent with this Ship Repair Agreement.

20.5    Partial loss    In the event that the Vessel shall be damaged by any insured cause whatsoever prior to redelivery to and acceptance by the Owner and in the further event that such damage shall not constitute an actual or a constructive total loss of the Vessel, the Contractor shall apply the amount recovered by it under the insurance policy referred to in this clause to the repair of such damage satisfactory to the Classification Society and regulatory bodies, and the Owner shall accept the Vessel under this Ship Repair Agreement if so repaired and completed.

20.6    However in the event that the Vessel is determined to be an actual or constructive total loss and such loss arose from or was caused by the negligence of the Contractor, its affiliates, their officers, employees, agents or sub-contractors, the Contractor shall refund, or cause the Insurer to directly pay immediately to the Owner, free of exchange/tax/deductions controls, an amount equal to the sum specified in Box 18 and this Ship Repair

| M/V UNIVERSAL CHALLENGER |
| --- |

V.Ships

Agreement, upon receipt by the Owner of such termination payment, shall at the Owner's option, be deemed to be terminated. No such termination shall affect or prejudice any other rights of either party accrued due under this Ship Repair Agreement.

**21.    Liabilities and Indemnities**

**Liability for Loss or Damage**

21.1    Save as otherwise provided in this Clause, the Contractor shall have no liability to the Owner for any loss, damage or expense of whatsoever nature and howsoever arising. For the purpose of this Clause the Owner's property, in addition to the Vessel, shall be deemed to include also cargo, machinery and equipment removed from/or delivered for the Vessel and / or parts removed from the Vessel for the purpose of being worked upon or prefabricated for installation in the Vessel.

21.2    The Contractor (which expression shall for the purpose of this Clause be deemed to include the Contractor's employees, servants, agents or sub-contractors acting within the scope of their employment) shall only be liable to the Owners to the extent that loss or damage has been caused by the negligence of the Contractor.

21.3    The Contractor's total liability in respect of loss or damage to the Owner's property, shall be limited to the amount stated in Box 18.

**Liability for Late Redelivery**

21.4    Unless otherwise agreed in writing by the parties, the Work and any Additional Work shall be complete in all respects on or before the "Completion Date". In the event of any delay, the Contract Price shall be reduced by deducting therefrom as follows (it being understood by the parties that any reduction of the Contract Price is by way of liquidated damages and not by way of penalty and that the Contractor shall give the Owner full credit hereunder without any deduction whatsoever). The Contractor shall pay to the Owner liquidated damages at the rates specified in Box 8 per day or pro rata for part of a day commencing on the Contractual Redelivery Date or the Final Contractual Redelivery Date, as the case may be, for every day or part thereof the Vessel is delayed as aforesaid. The total liquidated damages due under this Clause shall not be more than Twenty per cent **(20 %)** of **the final estimated repair invoice.**

**Indemnities**

21.5    The Contractor hereby agrees to defend, indemnify and hold harmless the Owner, its affiliates, the Manager, subcontractors and their respective employees, officers and agents (including but not limited to the Owner's Representative) against all actions, proceedings, claims, demands or liabilities whatsoever or howsoever arising which may be brought against them by third parties (including, for the avoidance of doubt, but without limitation, subcontractors, employees, suppliers and agents of the Contractor) or incurred or suffered by them arising directly or indirectly out of or in connection with the performance of the Work and any Additional Work, and against and in respect of all loss, damages, costs and expenses (including legal costs and expenses on a full indemnity basis) which the Owner and each other party aforesaid may suffer or incur (either directly or indirectly) in defending or settling the same.

**22.    Guarantee**

22.1    The Contractor guarantees on the conditions set forth in Clause 23 hereof for a period of 180 days following redelivery and acceptance by the Owner of the Vessel, all machinery, materials and equipment to the extent repaired, installed or replaced by the Contractor as part of the Work and any Additional Work against all defects due to faulty design, defective material (other than the Owner's Supplies), testing and/or poor workmanship by The Contractor, its suppliers, subcontractors, agents or employees and not due to the negligence or other improper acts or omissions on the part of the Owner, its employees or agents.

```
┌─────────────────────────────────────────┐
│        M/V UNIVERSAL CHALLENGER          │
└─────────────────────────────────────────┘
```

V.Ships

## 23　Remedy of defects

23.1　The Contractor shall remedy, at its expense, or reimburse the Owner for the costs, subject, where applicable, to the provisions of Clause 23.3 hereof, of the repair incurred to remedy any defects against which the Vessel is guaranteed under Clause 22.

23.2　If, after consultation with the Contractor, it is in the opinion of the Owner convenient, then such work required under this guarantee shall be made at the Repair Facility; however, if, in the opinion of the Owner, it is inconvenient to bring the Vessel to the  Repair Facility, the Contractor will be liable for the costs, subject, where applicable, to the provisions of Clause 23.3 hereof, of the repair incurred by the Owner, including labour and materials in having repairs made at another yard, provided that, in such event, the Contractor may forward or supply replacement parts or materials to the Vessel, unless forwarding or supplying thereof to the Vessel would, in the opinion of the Owner, impair or delay the operation or working schedule of the Vessel.

23.3　In all cases in which repairs, installations or replacements are effected elsewhere than at the Repair Facility, the Contractor shall remit the actual cost thereof to or as directed by the Owner upon receipt of the Owner's demand therefor, provided that the liability of the Contractor under this Clause shall not exceed the price that the Contractor would charge for making similar repairs or replacements. In the event of the Shipyard's failure to remit in full such actual cost within fifteen (15) days of the Owner's written and reasonably complete and detailed demand therefor, the Shipyard shall be liable for interest on all such overdue amounts, at the rate of twelve percent (12%) per annum (hereinafter referred to as the "Interest Rate"), until payment in full.

23.4　In the event of any repairs or replacement effected under this guarantee, the terms of this guarantee shall be applicable to such repair or replacement for a period of sixty (60) days from the time the Vessel re-enters service following completion of same, provided that, as long as the Contractor shall have complied with its obligations under this Ship Repair Agreement it shall have no further obligations hereunder after one hundred and eighty (180) days of the redelivery of the Vessel.

## 24.　Force Majeure

24.1　The Contractor shall notify the Owner in writing within 24 hours from the occurrence of the commencement of an event of Force Majeure. For the purpose of this agreement, the term Force Majeure shall mean -

any government requisition, control, intervention or requirement or interference arising out of war or preparation for war or the consequences thereof;

warlike operations, mobilization, riots, civil commotion, blockades, embargoes;

vandalism, sabotage, malicious damage;

epidemics or abnormal sickness;

illegal strikes, fire, explosion or other damage affecting the Vessel or works of the Shipyard by any mechanical breakdown of machinery or plant (if the Shipyard shows that the occurrence, as the case may be, of illegal strikes, fire, explosion, damage affecting the Vessel or other work of the Shipyard or mechanical breakdowns could not have been avoided through reasonable precaution);

earthquakes, landslides, floods, severe abnormal weather conditions for the area as declared by any authority;

restrictions as to import or export;

delay in approval of plans or any other matters where such approval is required to be given by the Owner or by the Classification Society or other bodies whose approval is required;

or any other events or circumstances beyond the Contractor's control  which cannot be avoided or guarded against by the exercise of due diligence, always provided that such events or circumstances directly affects the Work.

13

┌──────────────────────────────────────────────────────────────────────┐
│ Issued : 06/01      DRYDOCK & REPAIR SPECIFICATION      Page 13  of 60 │
└──────────────────────────────────────────────────────────────────────┘

| M/V UNIVERSAL CHALLENGER |
|---|

V.Ships

24.2  Failure to notify the Owner in accordance with the requirements of Clause 24.1 shall preclude the Contractor from claiming any extension of time required for the Work and any Additional Work due to Force Majeure

**25.    Termination**

**Contractor's Default**

25.1  The Contractor shall be considered to be in default of its obligations under this Ship Repair Agreement if:

(a)     redelivery of the Vessel is, in the reasonable opinion of the Owner, unlikely to be effected or is not effected by the Date of Completion stated in Box 19; or

(b)     the vessel is unable to enter the drydock on the specified date in Box 17 due to the contractor's issues

(c)     for any reason, the Contractor shall be in breach of its obligations under this Ship Repair Agreement; or

(d)     the Contractor becomes insolvent, bankrupt, enter into a composition with its creditors or fail generally to pay all its debts as they become due; or

(e)     for any reason, the Contractor shall fail to maintain the insurances referred to in Clause 20 hereof or any assignment of insurances

25.2  If any of the foregoing events occur and, in each such event, the Owner shall, at its option, be entitled to terminate this Ship Repair Agreement without prejudice to the Owner's rights in law or in equity.

25.3  Subject to any agreement in writing by the Parties to the contrary, if there is a delay in completion, for any reason whatsoever, and this continues for a period of more than two [2] days from midnight on the agreed Completion Date, the Owner may at his option treat such delay as a repudiatory breach of contract and remove the Vessel from the Shipyard.

**26.    Assignment**

26.1  The Contractor shall not be entitled to assign or transfer this agreement or any part of it or any of its rights, duties or obligations hereunder without the prior written consent of the Owner

**27.    Intellectual Property**

27.1  The Owner retains all rights to the Specification and underlying drawings / records prepared from the Specification. The Contractor agrees to keep the Specification and working plans confidential at all times and acknowledges that it shall not be entitled to use, sell, manufacture or reproduce all or any part thereof without the Owner's written consent.

**28.    Third Party Rights**

28.1  Any person (other than the Owner and the Contractor) who is given any rights or benefits under this Ship Repair Agreement (a "Third Party") shall be entitled to enforce those rights or benefits against the Parties in accordance with the Contracts (Rights of Third Parties) Act 1999.

28.2  Save as provided in Clause 28.1 above the operation of the Contracts (Rights of Third Parties) Act 1999 is hereby excluded.

28.3  The Parties may amend vary or terminate this Ship Repair Agreement in such a way as may affect any rights or benefits of any Third Party which are directly enforceable against the parties under the Contracts (Rights of Third Parties) Act 1999 without the consent of any such Third Party.

28.4  Any Third Party entitled pursuant to the Contracts (Rights of Third Parties) Act 1999 to enforce any rights or benefits conferred on it by this Ship Repair Agreement may not veto any amendment, variation or termination of this Ship Repair Agreement which is proposed by the parties and which may affect the rights or benefits of any such Third Party.

---

**M/V UNIVERSAL CHALLENGER**

V.Ships

**29.**   **Governing Law & Arbitration**

29.1   This Agreement shall be governed by English law and any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof for the time being in force.

29.2   The arbitration shall be conducted in accordance with the London Maritime Arbitrators' (LMAA) Terms current at the time when the arbitration is commenced.

29.3   Save as after mentioned, the reference shall be to three arbitrators, one to be appointed by each party and the third by the two so appointed.   A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment to the other party requiring the other party to appoint its arbitrator within 14 days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and give notice that it has done so within the 14 days specified.  If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring the dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly.   The award of a sole arbitrator shall be as binding as if he had been appointed by agreement.

29.4   In cases where neither the claim nor any counterclaim exceeds the sum of US$ 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

**30.**   **Notices**

30.1   Any notice or other communication under or in relation to this Agreement (a "Communication") may be sent by fax, telex, registered or recorded mail or by personal delivery.

30.2   The addresses of the parties for service of a Communication shall be as stated in Box 4 in the case of the Contractor.  Notices to the Owner shall be given to the Owner care of the Manager as stated in Box 7.

30.3   Subject to Clause 30.4, a Communication shall be deemed to have been delivered and shall take effect:
   (i)   in the case of telex, when the recipient's answerback is received by the sender;
   (ii)   in the case of a fax, when the sender receives one or more transmission reports showing the whole of the Communication to have been transmitted to the correct fax number; and
   (iii)   if delivered personally or sent by registered or recorded mail at the time of delivery.

30.4   If under Clause 30.3 a Communication would be deemed to have been delivered on a day which is not a business day in the place of receipt or after 18.00 (local time in the place of receipt) it will be deemed to have been delivered, and shall take effect, at 09.00 (local time in the place of receipt) on the next such business day.

30.5   The Contractor hereby irrevocably appoints the agent stated on the summary to accept service of all proceedings whatsoever on its behalf and agrees that service upon the party so stated at the address given shall be deemed for all purposes to be service upon the Contractor and the Owner hereby irrevocably appoints Marine Legal Services Limited of Gate House, 1 Farringdon Street, London EC4M 7NS (tel: (020) 7329 2422, fax: (020) 7236 2894) to accept service of all proceedings whatsoever on its behalf and agrees that service upon Marine Legal Services Limited shall be deemed for all purposes to be service upon the Owner.

# EXHIBIT 1

| M/V UNIVERSAL CHALLENGER |
|---|

V.Ships

# DRYDOCK & REPAIR
# SPECIFICATION

**PREPARED BY : Christopher J Burton**

**APPROVED BY : S. RAJAN**

**DATE :  23rd January 2005**

The Manager's Office address:

The Owners of m.v. Universal Challenger: Bulk Container Shipping .
c/o V. Ships Ltd
13, Omonia Avenue
P.O.Box 57115
3312, Limassol Cyprus

Tel :   +357 25 848400
Fax :   +357 25 560170
Tlx :   4707 VSHIPS CY

Email: fleete.cyprus@vships.com

V.Ships

```
┌──────────────────────────────────────────┐
│        M/V UNIVERSAL CHALLENGER           │
└──────────────────────────────────────────┘
```

# DRYDOCK & REPAIR
# SPECIFICATION

## MAIN INDEX

| Part I | Ship Repair Agreement |
| Part II | Specification |

Section
| 1.0 | Standard Terms & Conditions |
| 2.0 | Vessel's Particulars & Survey Dates |
| 3.0 | Unit Prices |
| 4.0 | Services |
| 5.0 | Drydocking |
| 6.0 | Hull Painting |
| 7.0 | Tailshaft & Stern Tube |
| 8.0 | Propeller |
| 9.0 | Rudder & Steering Gear |
| 10.0 | Bow Thruster, Stern Thruster & Stabiliser |
| 11.0 | Sea Valves & Chests |
| 12.0 | Cathodic Protection |
| 13.0 | Anchors & Cables, Chain Lockers |
| 1000.0 | Deck Repairs |
| 2000.0 | Cargo Systems |
| 3000.0 | Hull Structures, Steel Renewals & Tank Coatings |
| 4000.0 | Engine & Boiler Repairs |
| 5000.0 | Pipework |
| 6000.0 | Electrical / Electronic / Radio & Navigation Repairs |
| 7000.0 | Miscellaneous (Modifications, Damage Claims and Guarantee Items) |

Part III    Reference Drawings:
- Docking plan ____
- Capacity plan ____
- Shell Expansion ____
- Midship Section ____
- Rudder ____
- Propeller ____
- Tailshaft ____

2

V.Ships

| M/V UNIVERSAL CHALLENGER |
|---|

## PART I - *SHIP REPAIR AGREEMENT*

| Box 1 - Owner | Box 11 – Contractor |
|---|---|
| Name Bulk ContainerShipping<br>Address Bahamas International Trust Building<br>Bank Lane, Nassau<br>Bahamas<br><br>Telex/fax | Name<br>Address<br><br>Telex/fax |
| Box 2 - Owner's Representative<br>TBA | Box 12 - Contractor's Representative |
| Box 3 – Ship Management Office<br><br>Name V Ships Ltd<br>Address 13 Omonia Avenue<br>PO BO x 57115, Limassol<br>3312 Cyprus<br>Telex/fax 00 357 25 848400 | Box 13 – Repair Facility<br><br>Name<br>Address<br><br>Telex/fax |
| Box 4 - Date of Invitation to Tender<br><br>Owners Reference Nr : | Box 14 – Date of Tender<br><br>Contractor's Ref Nr : |
| Box 5 – Closing Date for Tender<br>15th December 2005 | Box 15 – Estimated Total Repair time |
| Box 6 – Estimated Arrival Date | Box 16 – Estimated Repair Time in Drydock |
| Box 7 – Payment Terms<br>30% on departure<br>30% after 60 days<br>Balance after120 days | Box 17 – Confirmed Date of Drydock Availability |
| Box 8 – Liquidated Damages / day<br><br>USD 10,000 | Box 18 – Level of Contractor's insurance cover |
| Box 9 – Governed by & construed with<br>'English Law' | Box 19 – Date of Completion |
| Box 10 - Date of Order | Box 20 – Date of Acceptance |

It is mutually agreed between Manager, as agent for and on behalf of the Owner, and the Contractor, that the Contractor will carry out the Work, and any Additional Work, for the Owner in accordance with the terms and conditions specified in this Drydock & Repair Specification, consisting of Parts 1 to III inclusive and the conditions stated in the Invitation to Tender [see Box 4].

For and on behalf of
the Manager as agent
for and on behalf of
the Owner

For and on behalf of
the Contractor

Signature

Signature

3

| M/V UNIVERSAL CHALLENGER |
|---|

V.Ships

| Name: | Name |
|---|---|
| Title: | Title: |
| Date | Date |

# PART II – *SPECIFICATION*

## SECTION 1 : GENERAL TERMS & CONDITIONS

1.    **Definitions and Interpretation**

1.1    In this Drydock & Repair Specification, save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them.

"Additional Work" means all work in addition to or modification of the Specification agreed between the Parties.

"Classification Society" means the Vessel's classification society, named in Section 2.

"Contractor", means the Company named in Box 11 of the Part I - Ship Repair Agreement.

"Contractor's Representative" means the person(s) named in Box 12 appointed by the Contractor to manage the Work and any Additional Work, or any substitute(s) nominated in writing from time to time.

"Drydock Estimator" is the person appointed by the Manager to assist the Owner's Representative to manage the contract negotiation with the contractor for the Work and any additional work.

"Invitation to Tender" means the invitation to tender referred to in Box 4 issued on behalf of the Owners to the Contractor which contains the instructions given by the Manager to all tenderers included with the Tender Documents and to be taken into account whilst tendering.

"Manager" means the Owner's manager named in Box 3.

"Owner" means the registered Owner of the Vessel named in Box 1.

"Owner's Representative" means the person(s) named in Box 2 appointed by the Manager to represent the Owner's interests in overseeing that the contracted repairs are performed in accordance with this Drydock & Repair Specification or any substitute(s) nominated in writing from time to time.

"Parties" means the Owner and the Contractor.

"Specification" means the Drydock & Repair Specification detailing the Ship Repair Agreement, the Work attached hereto and the Reference Drawings comprising Parts I to III.

"Subcontractor" means any firm other than the Contractor engaged to perform any service to the Vessel whether or not hired by the Contractor or by the Owner.

"Tender Documents" means the documents which accompanied the Invitation to Tender.

"Vessel" means the Vessel named in the header of the Specification.

"Work" means the work specified in the Specification.

"Yard", "Repair Facility" and "Shipyard" mean the Contractor's repair facility named in Box 13.

1.2    Clause Headings are inserted for convenience and shall be ignored in construing this Ship Repair Agreement; words denoting the singular number shall include the plural number and *vice versa*; references to Parts are to Parts and sections of this Drydock & Repair Specification including the Ship Repair Agreement; references to a Box number means the relevant Box in Part I; references to Clauses are, unless otherwise stated, to Clauses of Part II.

## M/V UNIVERSAL CHALLENGER

V.Ships

**2.    Performance of Work**

2.1    The Contractor shall carry out the Work and any Additional Work put in hand during the repair period in accordance with first class international ship repair standards, to the satisfaction of the Owner, the Parties' regulatory bodies and the rules of the Class Society . Decisions of the Class Society as to compliance or non-compliance with the classification rules shall be final and binding upon the Parties. The Work and any Additional Work shall also comply with all rules, regulations and requirements of other regulatory bodies which apply to the Work and any Additional Work whether or not specifically referred to in the Specification in order that the Vessel will retain and/or obtain all approvals and/or licences required thereby. Each such decision shall constitute a determination that such repair, replacement or material meets the requirements of this Drydock & Repair Specification, except to the extent that this Specification exceeds the Classification Society standards.

2.2    It is agreed by the Contractor that all workmanship and materials used in performing the Work and any Additional Work shall be the best quality throughout and conform to those now in the Vessel, except where otherwise mentioned and shall also meet the requirements of the Specification and/or rules of the Classification Society. Any dispute that may arise during the progress of the repairs as to the meaning of the Specification and Work to be done, or to the materials and/or workmanship, shall be left to the decision of the Owner's Representative.

2.3    Any particulars of the Work specified herein are given only for the guidance of the Contractor, who will be held responsible for securing all necessary dimensions and details from the Vessel, as may be required to carry out the specified Work. Should the Contractor discover any workmanship, material or performance which is not in conformity with this Ship Repair Agreement or the Specification (in which event, the Contractor shall promptly notify the Owner of such discovery), the Contractor shall promptly take effective measures to correct such conditions

2.4    All new work (piping, steel plates and shapes, brackets, etc.) alterations, repairs, modifications, etc in cargo holds, on deck or other areas which are to be coated (or being coated during this drydocking) are to be suitably prepared and after approval by the Owner's Representative, coated with the same type coatings as have been or are being applied to the balance of these areas it being the intention of the Owner that all steel surfaces of such areas be coated. All adjacent coated areas disturbed during the foregoing work shall be similarly prepared and coated.   The Contractor shall ensure that the Vessel is maintained in a reasonable state of cleanliness throughout the repair period in order not to affect adversely the quality of paint work.

2.5    The Contractor must provide for good communications between the Owner's and Contractor's Representatives. A meeting is to be held with the Owner's Representative/s, Contractor's Representative and responsible staff from the Yard before the arrival of the Vessel to plan the details of the Work, clarify problem areas in the specification, agree work programme with time bar chart and establish points of contact, followed by a Daily Work Planning Meeting held onboard the Vessel to -

- assess the progress bar chart and any issues thereof, discuss change orders.

- Risk, Safety, Quality, Weather, Security, Technical and/or Commercial issues.

**3.    Approval and Certification**

3.1    The Contractor shall be responsible for obtaining and maintaining all necessary approvals and certificates of whatsoever nature relating to the Work as required by the Contractor's Regulatory Bodies, whether or not specifically stated in the Specification. The Owner shall provide any reasonable assistance that may be required in this respect.

3.2    All fees and charges incidental to the classification and with respect to compliance with the above referred rules, regulations and requirements shall be for the account of the Contractor.

| M/V UNIVERSAL CHALLENGER |
| --- |

V.Ships

4. **Tendered Costs**

4.1 The Contractor has to furnish individual costs in the Tender for all work items contained in the Specification. All costs including but not limited to removing and refitting of parts obstructing access, cleaning, de-rusting, reconnecting and testing components, material, machinery and outfitting, temporary lighting, ventilation, staging, inspection, certification, erection and assembling aids of any kind are to be included in the tendered price. Where a fixed price has not been quoted for any item in the Specification or for any Additional Work, the price shall be by reference to the agreed tariff, or in its absence, reasonable current rates applying in the location of the Repair Facility.

4.2 Where the Specification requires the opening of machinery, piping, fittings, etc it is intended that the costs quoted include the renewal of all disturbed gaskets, packing and the repair or renewal of insulation damaged in carrying out the work.  Wherever the term "overhaul" is used in the Specification, and no other specific requirements are mentioned, the Contractor shall allow for dismantling, removal to workshop, opening up, cleaning, de-rusting, painting, inspection, reassembling in good working order using new bolts, nuts, joints and packings, reinstalling on board and testing to Owner's Representative's satisfaction.

4.3 All costs including but not limited to fitting, connecting, grit blasting, painting and testing new components, material, machinery and outfitting, removal of liquids from engine room and pump room, holds, upper/lower stools water and oil tanks and other spaces in which the Contractor performed work are to be for Contractor's account.

4.4 The Contractor is responsible for payment of all costs and expenses of wharfage, towage, dockage including, if relevant, costs of undocking and re-docking, dock trials, shifting and mooring, pilotage, boat hire, dry and wet dock charges, waste, garbage, sewage and scrap disposal and supply of fresh/ballast water and shore power, unless stated otherwise in the Specification or Price or mutually agreed upon in writing between the Contractor and the Owner.

4.5 Where the Specification refers to one (1) unit to be repaired and upon investigation it is determined that a second or more duplicate units require similar repairs, the price quoted for the first unit shall apply to each additional unit. The cost of the additional unit shall take into consideration the cost of removals and replacements that are common to the first unit. Likewise where a fewer number of units are dealt with than stated in the specification the cost shall be reduced in proportion to the price stated in the Tender.

4.6 The Contractor shall use all reasonable endeavours to perform Additional Work as requested by the Owners within the Completion Date specified in Box 19. No extra compensation or added time for any additions, repairs or alterations will be allowed without approval in writing by the Owner's Representative for such additions or alterations before same are commenced. Upon completion of the Additional Work, the cost of any additions, reductions or alterations properly authorised as indicated above shall in the absence of an agreed quotation, be calculated by reference to the agreed tariff, or in its absence, reasonable current rates applying in the location of the Repair Facility.

> ## M/V UNIVERSAL CHALLENGER

V.Ships

4.7    The Work and any Additional Work shall be performed within normal time. No overtime shall be worked for the Owners account unless the Owner's Representative has approved the items to be worked on, the maximum number of overtime hours, the department(s) authorised to perform the overtime and the resultant costs. It is understood that if no Work is carried out on Sundays and holidays, Drydocking or Repair Berth will not be charged for.

4.8    When technical problems or major change orders occur during the repairs, the Owner's Representative will be entitled immediately to initiate a meeting with Contractor's Representative and Shipboard Management Team to clear the problems and evaluate possible consequences. Change orders/additional work from the original Specification will be likely to occur, and it is imperative for project control that the Owner receives quotes for all altered / additional items from the Yard or sub contractor within 24 hours after order. Additional Work / change orders are to be presented to the Yard in writing or as minutes of meeting - and quotes conveyed to the Manager by fax.

5.    Repair Schedule

5.1    The total time required by the Contractor, in number of consecutive running days to complete the repairs itemized in the Specification is as stated in the Tender and in Box 15, including working days, holidays, planned stoppages, restrictions applicable to weekend or overtime working, and based on the Repair Facility's regular and overtime shift timings as stated in the Tender. If the Vessel is to be drydocked during the repair period the number of days the Vessel is to be held in the drydock to carry out the work outlined in the Specification is as specified in the Tender and stated in Box 16. The Contractor shall prepare and submit to the Owner's Representative, prior to the commencement of the Work and during the period of Work, a detailed production schedule in the form of a bar chart showing details of the Work and any Additional Work through to completion and redelivery.

5.2    If the Vessel is being drydocked and the total repair days stated in Box 15 is in excess of the scheduled days in drydock stated in Box 16, the Vessel shall be drydocked immediately on arrival at the Shipyard, unless stipulated otherwise by the Owners or mutually agreed between the Contractor and the Owner. When drydocking is for regular periodic maintenance, the Contractor shall allow sufficient time in drydock to properly apply paint or carry out other work as called for in the Specification. Additional time in dock for work not mentioned in the Specification shall be mutually agreed upon between the Contractor and the Owners. Should the Contractor request an interruption of drydocking, any cost involved relative to undocking, shifting, mooring, re-docking, interruption of repairs, etc, either direct or indirect, are to be borne by the Contractor. If our vessel is being drydocked together with another ship in the same drydock, this must be notified in the tender.

5.3    Time shall be of the essence in the performance of the Contractor's obligations under this agreement. The Contractor represents and warrants that it has no commitments which will prevent it from putting the vessel into drydock on the date in Box 17 and completing the Work timeously [Box 19] and agrees that it will not undertake any such commitments. The Contractor undertakes that it shall give the highest priority to the Work and any Additional Work and shall not assign a higher priority to any other work which may interfere with its diligent prosecution of Work and any Additional Work. Should the Contractor become aware of any pending go-slow, strike or other industrial action, this must be immediately brought to the Owner's attention in good time. If the Contractor falls behind the progress indicated by the schedules described above, for reasons for which the Contractor is responsible, the Contractor shall present to the Owner a recovery plan and shall take all steps required (for instance, working overtime or on double shifts), at its sole cost, to accelerate the work to ensure that the Contractual Delivery Date [Box 19] is met. A notification by the Owner's Representative to the Shipyard to comply with this Clause shall not constitute a change order or modification to the Contract.

5.4    In the event that any of the materials required by the Specification or otherwise under this agreement cannot be procured in time or are in short supply to maintain the Date of Completion stated in Box 19, the Contractor may, with the prior written agreement of the Owner, supply other materials capable of meeting the requirements of the Classification Society and of the rules, regulations and requirements with which the Work and any Additional Work must comply

5.5    Any delay in readiness of the drydock for accepting the vessel on the confirmed date of drydock availability shall be subject to the liquidated damages stated in Box 8 independently of any other clause in this agreement.

7

> M/V UNIVERSAL CHALLENGER

V.Ships

**6.  Contractor's Right to Subcontract**

6.1  The Contractor may, with the prior written consent of the Owner, such consent not be unreasonably withheld, subcontract any part of the Work or any Additional Work to good quality repairers/suppliers. The Contractor shall give prior notice of such intention to the Owner, together with the name of the subcontractor; should the Owner reject the subcontractor, the Contractor shall itself perform such part of the Work or service or engage a subcontractor acceptable to the Owner. In general, no subcontractor will be accepted for main engine works apart from the engine manufacturer or their licensee. The use of subcontractors by the Contractor shall in no way alter or diminish the Contractor's responsibilities and obligations under these Standard terms and Conditions.

**7.  Owner's Right to Subcontract and Use of Ship's Staff**

7.1  Owner reserves the right to engage subcontractors to perform Owner's own work, furnish services and/or materials. The Contractor will permit Owner's subcontractors free access to the Shipyard and the Vessel and will give them such assistance as may be required by the Owner's Representative. Any services supplied to subcontractors, including by way of illustration, craneage, use of welding sets etc, shall be at the Yard's tendered tariff rates. The Owner reserves the right for Vessel's staff to perform overhauls, repairs onboard the Vessel while the Vessel is in the Shipyard, provided such work does not interfere with or delay the progress or completion of the Work, and complies with Yard safety regulations.

**8.  Supervision & Owner's Work**

8.1  The supervision of the Work will be carried out by the Owner's Representative or delegate, who will attend at the Shipyard throughout the repair period.

8.2  The Owner's Representative shall at all times provide reasonable assistance to facilitate timely and efficient completion of the Work and shall, without limit to the generality of the foregoing, promptly bring to the attention of the Contractor any aspects of the Work which to his knowledge does not comply to the terms of this Ship Repair Agreement.

8.3  The Contractor shall, at its own expense, provide the Owner's Representative with reasonable accommodation and office facilities (including communication facilities), provided the Owner shall bear the costs of all communications by the Owner's representative. The Contractor shall grant the Owner's Representative reasonable access to the Vessel, the Contractor's Workshops and any other premises or site where the Work is being carried out, during normal working hours and whenever Work is being carried out outside such hours.

8.4  The Shipyard shall give the Owner's Representative(s) twenty-four (24) hours notice in writing in advance of the date, time and nature of all tests, inspections and trials of the Vessel or its machinery.

8.5  For the avoidance of doubt, the Contractor acknowledges that the Manager is agent for and on behalf of the Owner and that the Manager shall not be under any liability to the Contractor hereunder whatsoever or howsoever arising.

**9.  Safety**

9.1  On Vessel's arrival, a Safety Meeting with the Yard's Safety Officer and Vessel's Senior Officers must be held, followed by regular Safety Meetings throughout repair period to discuss Safety and Accident Prevention issues.

**10.  Gas Free Certification**

10.1  It shall be the responsibility of the Contractor to ascertain by actual tests made by a qualified chemist that spaces where repairs and/or hot work will be performed are gas free for man-entry and fit for hot work (as applicable), along with adjacent spaces where required as a safety precaution in line with best industry practice. The Contractor is to clean, gas free and to obtain gas free certificates for the respective spaces in which, and adjacent to where, hot work will be performed.

| M/V UNIVERSAL CHALLENGER |
| --- |

V.Ships

**11.    Hotwork and Tank Entry**

11.1    Authorisation for Hot work to be done by the Contractor's personnel will be subject to:

- Written notification from the Contractor's Representative to the Master of the area/spaces in which the work will be carried out.

- The Chief Officer accompanying the Repair Facility chemist on all of his inspections to ensure that all the necessary spaces are monitored.

- All the requisite Gas Free Certificates being passed to the Chief Officer, such certificates to be sighted and signed by the Master to verify that the proposed area/spaces where hot work is to be performed are gas free.

- Organisation of Yard's Fire watch as applicable.

11.2    No hot work or risk-related works by Crew, Owner's employed SGM (Sea going maintenance team) or Sub contractors shall be permitted during the repair period without specific written approval from the Contractor, all company safety procedures shall also apply.

**12.    Lighting, Access & Stability**

12.1    The Contractor shall be responsible at his own expense for the provision of sufficient lighting and safe access for work on deck, tanks, cargo spaces, machinery spaces and wherever required for the entire duration of repairs.

12.2    Sufficient lighting shall be provided by the Contractor in and around the Vessel to facilitate personnel movement, access, emergency escapes and fire watch. The Vessel is to be maintained, whilst in Contractor's hands in a safe condition regarding fire and accidents risk. Safe stability and adequate shoring of the Vessel in a floating dock is the responsibility of the Contractor

**13.    Hull Integrity**

13.1    When the Work requires the opening of machinery, piping, heat exchangers, fittings etc which are directly or indirectly connected to a source of possible leakage into the Vessel, such as sea chests, over board discharge valves, crossovers, connections to the shell of Vessel, tanks or pipe lines containing liquid of any other source of leakage it shall be the responsibility of the Contractor to fit blanks as necessary to eliminate the possibility of leakage into any space or equipment of the Vessel and/or to remove the liquids ashore at his own expense. Upon completion of any such repairs, all blanks fitted shall be removed and after reassembly, these items shall be proven tight. These precautions shall be taken as necessary to prevent any damage to the Vessel whether it is afloat or in drydock. All the foregoing shall be for the account of the Contractor including any damage resulting in the course of performance of the Work.

**14.    Delivery of Vessel**

14.1    The Vessel shall be considered tendered for Works when she is off the Contractors' Repair Facility ready to be secured at the wharf.

14.2    The Owner shall keep the Contractor advised of any changes in the Vessel's expected delivery date being on or around the date stated in Box 19.

14.3    Before arrival of the Vessel at the Repair Facility, no work in connection with any of the Specification is to begin without the permission of the Owner who also has the right to cancel any of the specified items against respective credit, if such cancellation has been confirmed in writing prior to commencement of the job. Following the arrival of the Vessel at the Repair Facility, no work exceeding the scope of the Specifications to be commenced without the written confirmation of the Owner's Representative.

| M/V UNIVERSAL CHALLENGER |
|---|

V.Ships

**15.    Redelivery of Vessel**

15.1    The Vessel will be redelivered on or prior to the Date of Completion stated in Box 19 and accepted safely afloat by the Owner upon completion of all repairs, renewals, replacements, and system flushing and testing as applicable; after all of Yard's equipment, tools, appliances, dirt, debris and all old material have been removed and the Vessel is brought to an acceptable state of cleanliness. The Yard must provide the Owner with 3 days' prior notice of intended completion of repairs, with an estimated cost of repairs and planned schedule of payments thereof.

15.2    The Contractor shall not be entitled to any lien, charge or other maritime claim over the Vessel or any material, machinery, equipment, components, appurtenances or outfit added to or placed on board the Vessel or otherwise in the Shipyard in the course of and for the purposes of the Work and/or any Additional Work.

15.3    The Contractor warrants that upon completion of the Work and any Additional Work the Vessel shall be re-delivered to the Owner free and clear of any liens, charges, claims or other encumbrance, and, in particular, but without limitation, the Vessel will be absolutely free of all burdens in the nature of governmental imposts, taxes or charges as well as of all liabilities of the Contractor to its subcontractors, employees, suppliers and agents.

**16.    Tests, Trials and Acceptance of Work**

16.1    Upon completion of the Work the Vessel is to sail from the Repair Facility in a safe condition as soon as possible. The Contractor must discuss with Owner's Representative adequate function tests and inspections under supervision of Vessel's Master after completing repairs, during flooding and if applicable, in the post repair period before loading/sailing.    The Contractor in co-operation with Owner's Representative, will evaluate the need for Yard staff to join the Vessel for Sea Trials or completing system testing on the first voyage and/or until the first cargo has been lifted. Defects and defaults in the performance of Work are to be recorded in the work done report. Any defects coming to the knowledge of the Contractor must be discussed with the Owners Representative.

**17.    Calibration Reports, Drawings, etc.**

17.1    The Contractor shall maintain complete records of the Work and any Additional Work and shall make them available to the Owner at all reasonable times during the repairs and for a period of 1 (one) year, keeping the confidentiality of records for the Owner.

17.2    After completion of the Work and prior to departure of Vessel from the Repair Facility, Contractor shall supply Work Done Reports and Record of Inspections in duplicate giving all measurements taken and drawings of any modifications performed. These shall be presented to the Master, Chief Engineer and Owner's Representative for their comments and approval.

**18    Scrap Materials, Parts and Equipment**

18.1 All scrap and old material will become the property of the Contractor for which a suitable credit will be given to the Owner. Such credits are to be indicated in the Tender if called for in the Specification. However, heavy scrap, old material such as heavy machinery parts, propeller, tail shaft and other items specially mentioned (or repair items covered by insurance) will always remain property of the Owner and can be acquired by the Contractor subject to agreement on terms with the Owner.

18.2    The Shipyard is to accept the delivery of any Owner's supplied materials and shall ensure that they are kept in a safe and secure place and in good order and condition until the time of installation. The Shipyard is to transport all such items to the point of installation aboard the Vessel, whether stored aboard the Vessel or delivered to the Shipyard. Any unused materials, as designated by the Owner's Representative, are to be removed and held for Owners disposition. Any costs in connection with the foregoing are to be included in the tendered price of any such items in the Specification.

| M/V UNIVERSAL CHALLENGER |
|---|

V.Ships

19    Payment

19 1    Separate invoices may be required by the Owner's Representative for

- General Services

- Owner's Repairs

- Insurance Damage Repairs

- Guarantee Claims Repairs

19.2    Nearing the completion of the Work, the Contractor is to present a 'Work Done Report' to the Owner's Representative -- who will verify with his staff and comment upon it to the Yard, and allocate the jobs to one of the above accounts, respectively.

19.3    Thereafter, pro forma invoices are to be forwarded to the Drydock Estimator at the address specified in the Tender Documents for verification, negotiation and final approval by the Manager as agent for and on behalf of Owner. In certain cases the Invoice may be settled locally or by alternate method if specified in the Tender and agreed by the Owner.

19.4    Payment shall be made by the Owner in accordance with the contractor's price schedule, which forms an integral part of the "Contract Price" and shall be subject to adjustment, if any, as hereinafter described.  The Contractor shall give the Owner full credit without any deduction whatsoever for any Work or Additional Work not carried out and the Contractor will account to the Owner for all price reductions relating to the Work and any Additional Work taking into account the owners representative's comments on work done report

19.5    Payment terms will be 30% on departure from the Repair Facility, 30% Sixty (60) days after departure, and the balance One hundred and twenty (120) days after departure.

20    Contractor's Liability Insurance

20.1    Without affecting its rights and obligations under this agreement, the Contractor shall provide, effect and maintain at no cost to the Owners, Shiprepairers' Liability Insurance and Comprehensive General Liability (Third Party) Insurance, for not less than the amount stated in Box 18, providing full coverage for such loss and damage for which the Contractor may be held liable to the Owner under this Ship Repair Agreement. The Contractor will maintain such insurance in place for a period of two years after completion of the Work.

20.2    Prior to the date of delivery of the Vessel to the Repair Facility, the Contractor shall supply the Owner with a Certificate of Coverage certifying that coverage has been obtained and giving reasonable details as to the coverage, the insurers, limits of liability and any endorsements to the cover.

20.3    If the Contractor fails to provide insurance or evidence of same in conformity with Clause 20.1 and 20.2, the Owner may do so and recover the cost from the Shipyard, together with interest thereon.

20.4    The insurance to be provided under Clause 20.1 and 20.2 will include cover for pollution, loss of hire and consequential damages and will name as insured the Contractor, Owner and Manager, however with a provision that the insurance will not preclude a claim of the Owner against the Contractor, to the extent otherwise consistent with this Ship Repair Agreement.

20.5    Partial loss    In the event that the Vessel shall be damaged by any insured cause whatsoever prior to redelivery to and acceptance by the Owner and in the further event that such damage shall not constitute an actual or a constructive total loss of the Vessel, the Contractor shall apply the amount recovered by it under the insurance policy referred to in this clause to the repair of such damage satisfactory to the Classification Society and regulatory bodies, and the Owner shall accept the Vessel under this Ship Repair Agreement if so repaired and completed.

20.6    However in the event that the Vessel is determined to be an actual or constructive total loss and such loss arose from or was caused by the negligence of the Contractor, its affiliates, their officers, employees, agents or sub-contractors, the Contractor shall refund, or cause the Insurer to directly pay immediately to the Owner, free of exchange/tax/deductions controls, an amount equal to the sum specified in Box 18 and this Ship Repair

11

┌─────────────────────────────────────┐
│       M/V UNIVERSAL CHALLENGER       │
└─────────────────────────────────────┘

V.Ships

Agreement, upon receipt by the Owner of such termination payment, shall at the Owner's option, be deemed to be terminated. No such termination shall affect or prejudice any other rights of either party accrued due under this Ship Repair Agreement.

21.    **Liabilities and Indemnities**

**Liability for Loss or Damage**

21.1    Save as otherwise provided in this Clause, the Contractor shall have no liability to the Owner for any loss, damage or expense of whatsoever nature and howsoever arising. For the purpose of this Clause the Owner's property, in addition to the Vessel, shall be deemed to include also cargo, machinery and equipment removed from/or delivered for the Vessel and / or parts removed from the Vessel for the purpose of being worked upon or prefabricated for installation in the Vessel.

21.2    The Contractor (which expression shall for the purpose of this Clause be deemed to include the Contractor's employees, servants, agents or sub-contractors acting within the scope of their employment) shall only be liable to the Owners to the extent that loss or damage has been caused by the negligence of the Contractor.

21.3    The Contractor's total liability in respect of loss or damage to the Owner's property, shall be limited to the amount stated in Box 18.

**Liability for Late Redelivery**

21.4    Unless otherwise agreed in writing by the parties, the Work and any Additional Work shall be complete in all respects on or before the "Completion Date". In the event of any delay, the Contract Price shall be reduced by deducting therefrom as follows (it being understood by the parties that any reduction of the Contract Price is by way of liquidated damages and not by way of penalty and that the Contractor shall give the Owner full credit hereunder without any deduction whatsoever). The Contractor shall pay to the Owner liquidated damages at the rates specified in Box 8 per day or pro rata for part of a day commencing on the Contractual Redelivery Date or the Final Contractual Redelivery Date, as the case may be, for every day or part thereof the Vessel is delayed as aforesaid. The total liquidated damages due under this Clause shall not be more than Twenty per cent **(20 %) of the final estimated repair invoice.**

**Indemnities**

21.5    The Contractor hereby agrees to defend, indemnify and hold harmless the Owner, its affiliates, the Manager, subcontractors and their respective employees, officers and agents (including but not limited to the Owner's Representative) against all actions, proceedings, claims, demands or liabilities whatsoever or howsoever arising which may be brought against them by third parties (including, for the avoidance of doubt, but without limitation, subcontractors, employees, suppliers and agents of the Contractor) or incurred or suffered by them arising directly or indirectly out of or in connection with the performance of the Work and any Additional Work, and against and in respect of all loss, damages, costs and expenses (including legal costs and expenses on a full indemnity basis) which the Owner and each other party aforesaid may suffer or incur (either directly or indirectly) in defending or settling the same.

22.    **Guarantee**

22.1    The Contractor guarantees on the conditions set forth in Clause 23 hereof for a period of 180 days following redelivery and acceptance by the Owner of the Vessel, all machinery, materials and equipment to the extent repaired, installed or replaced by the Contractor as part of the Work and any Additional Work against all defects due to faulty design, defective material (other than the Owner's Supplies), testing and/or poor workmanship by The Contractor, its suppliers, subcontractors, agents or employees and not due to the negligence or other improper acts or omissions on the part of the Owner, its employees or agents.

| M/V UNIVERSAL CHALLENGER |
| --- |

V.Ships

23    Remedy of defects

23.1    The Contractor shall remedy, at its expense, or reimburse the Owner for the costs, subject, where applicable, to the provisions of Clause 23.3 hereof, of the repair incurred to remedy any defects against which the Vessel is guaranteed under Clause 22.

23.2    If, after consultation with the Contractor, it is in the opinion of the Owner convenient, then such work required under this guarantee shall be made at the Repair Facility; however, if, in the opinion of the Owner, it is inconvenient to bring the Vessel to the Repair Facility, the Contractor will be liable for the costs, subject, where applicable, to the provisions of Clause 23.3 hereof, of the repair incurred by the Owner, including labour and materials in having repairs made at another yard, provided that, in such event, the Contractor may forward or supply replacement parts or materials to the Vessel, unless forwarding or supplying thereof to the Vessel would, in the opinion of the Owner, impair or delay the operation or working schedule of the Vessel.

23.3    In all cases in which repairs, installations or replacements are effected elsewhere than at the Repair Facility, the Contractor shall remit the actual cost thereof to or as directed by the Owner upon receipt of the Owner's demand therefor, provided that the liability of the Contractor under this Clause shall not exceed the price that the Contractor would charge for making similar repairs or replacements. In the event of the Shipyard's failure to remit in full such actual cost within fifteen (15) days of the Owner's written and reasonably complete and detailed demand therefor, the Shipyard shall be liable for interest on all such overdue amounts, at the rate of twelve percent (12%) per annum (hereinafter referred to as the "Interest Rate"), until payment in full.

23.4    In the event of any repairs or replacement effected under this guarantee, the terms of this guarantee shall be applicable to such repair or replacement for a period of sixty (60) days from the time the Vessel re-enters service following completion of same, provided that, as long as the Contractor shall have complied with its obligations under this Ship Repair Agreement it shall have no further obligations hereunder after one hundred and eighty (180) days of the redelivery of the Vessel.

24.    Force Majeure

24.1    The Contractor shall notify the Owner in writing within 24 hours from the occurrence of the commencement of an event of Force Majeure. For the purpose of this agreement, the term Force Majeure shall mean -

any government requisition, control, intervention or requirement or interference arising out of war or preparation for war or the consequences thereof;

warlike operations, mobilization, riots, civil commotion, blockades, embargoes;

vandalism, sabotage, malicious damage;

epidemics or abnormal sickness;

illegal strikes, fire, explosion or other damage affecting the Vessel or works of the Shipyard by any mechanical breakdown of machinery or plant (if the Shipyard shows that the occurrence, as the case may be, of illegal strikes, fire, explosion, damage affecting the Vessel or other work of the Shipyard or mechanical breakdowns could not have been avoided through reasonable precaution);

earthquakes, landslides, floods, severe abnormal weather conditions for the area as declared by any authority;

restrictions as to import or export;

delay in approval of plans or any other matters where such approval is required to be given by the Owner or by the Classification Society or other bodies whose approval is required;

or any other events or circumstances beyond the Contractor's control which cannot be avoided or guarded against by the exercise of due diligence, always provided that such events or circumstances directly affects the Work.

13

| M/V UNIVERSAL CHALLENGER |
| --- |

V.Ships

24.2    Failure to notify the Owner in accordance with the requirements of Clause 24.1 shall preclude the Contractor from claiming any extension of time required for the Work and any Additional Work due to Force Majeure

25.    **Termination**

**Contractor's Default**

25.1    The Contractor shall be considered to be in default of its obligations under this Ship Repair Agreement if:

(a)    redelivery of the Vessel is, in the reasonable opinion of the Owner, unlikely to be effected or is not effected by the Date of Completion stated in Box 19; or

(b)    the vessel is unable to enter the drydock on the specified date in Box 17 due to the contractor's issues

(c)    for any reason, the Contractor shall be in breach of its obligations under this Ship Repair Agreement; or

(d)    the Contractor becomes insolvent, bankrupt, enter into a composition with its creditors or fail generally to pay all its debts as they become due; or

(e)    for any reason, the Contractor shall fail to maintain the insurances referred to in Clause 20 hereof or any assignment of insurances.

25.2    If any of the foregoing events occur and, in each such event, the Owner shall, at its option, be entitled to terminate this Ship Repair Agreement without prejudice to the Owner's rights in law or in equity.

25.3    Subject to any agreement in writing by the Parties to the contrary, if there is a delay in completion, for any reason whatsoever, and this continues for a period of more than two [2] days from midnight on the agreed Completion Date, the Owner may at his option treat such delay as a repudiatory breach of contract and remove the Vessel from the Shipyard.

26.    **Assignment**

26.1    The Contractor shall not be entitled to assign or transfer this agreement or any part of it or any of its rights, duties or obligations hereunder without the prior written consent of the Owner

27.    **Intellectual Property**

27.1    The Owner retains all rights to the Specification and underlying drawings / records prepared from the Specification. The Contractor agrees to keep the Specification and working plans confidential at all times and acknowledges that it shall not be entitled to use, sell, manufacture or reproduce all or any part thereof without the Owner's written consent.

28.    **Third Party Rights**

28.1    Any person (other than the Owner and the Contractor) who is given any rights or benefits under this Ship Repair Agreement (a "Third Party") shall be entitled to enforce those rights or benefits against the Parties in accordance with the Contracts (Rights of Third Parties) Act 1999.

28.2    Save as provided in Clause 28.1 above the operation of the Contracts (Rights of Third Parties) Act 1999 is hereby excluded.

28.3    The Parties may amend vary or terminate this Ship Repair Agreement in such a way as may affect any rights or benefits of any Third Party which are directly enforceable against the parties under the Contracts (Rights of Third Parties) Act 1999 without the consent of any such Third Party.

28.4    Any Third Party entitled pursuant to the Contracts (Rights of Third Parties) Act 1999 to enforce any rights or benefits conferred on it by this Ship Repair Agreement may not veto any amendment, variation or termination of this Ship Repair Agreement which is proposed by the parties and which may affect the rights or benefits of any such Third Party.

┌─────────────────────────────────┐
│     M/V UNIVERSAL CHALLENGER     │
└─────────────────────────────────┘

V.Ships

29.    **Governing Law & Arbitration**

29.1    This Agreement shall be governed by English law and any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof for the time being in force.

29.2    The arbitration shall be conducted in accordance with the London Maritime Arbitrators' (LMAA) Terms current at the time when the arbitration is commenced.

29.3    Save as after mentioned, the reference shall be to three arbitrators, one to be appointed by each party and the third by the two so appointed.  A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment to the other party requiring the other party to appoint its arbitrator within 14 days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and give notice that it has done so within the 14 days specified.  If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring the dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly.  The award of a sole arbitrator shall be as binding as if he had been appointed by agreement.

29.4    In cases where neither the claim nor any counterclaim exceeds the sum of US$ 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

30.    **Notices**

30.1    Any notice or other communication under or in relation to this Agreement (a "Communication") may be sent by fax, telex, registered or recorded mail or by personal delivery.

30.2    The addresses of the parties for service of a Communication shall be as stated in Box 4 in the case of the Contractor. Notices to the Owner shall be given to the Owner care of the Manager as stated in Box 7.

30.3    Subject to Clause 30.4, a Communication shall be deemed to have been delivered and shall take effect:
  (i)      in the case of telex, when the recipient's answerback is received by the sender;
  (ii)     in the case of a fax, when the sender receives one or more transmission reports showing the whole of the Communication to have been transmitted to the correct fax number; and
  (iii)    if delivered personally or sent by registered or recorded mail at the time of delivery.

30.4    If under Clause 30.3 a Communication would be deemed to have been delivered on a day which is not a business day in the place of receipt or after 18.00 (local time in the place of receipt) it will be deemed to have been delivered, and shall take effect, at 09.00 (local time in the place of receipt) on the next such business day.

30.5    The Contractor hereby irrevocably appoints the agent stated on the summary to accept service of all proceedings whatsoever on its behalf and agrees that service upon the party so stated at the address given shall be deemed for all purposes to be service upon the Contractor and the Owner hereby irrevocably appoints Marine Legal Services Limited of Gate House, 1 Farringdon Street, London EC4M 7NS (tel: (020) 7329 2422, fax: (020) 7236 2894) to accept service of all proceedings whatsoever on its behalf and agrees that service upon Marine Legal Services Limited shall be deemed for all purposes to be service upon the Owner.

# EXHIBIT 2

页码、1/1

发件人: yanchongyu <yanchongyu@cosco-shipyard.com>
收件人: gregory@psbpapadakis.gr <gregory@psbpapadakis.gr>
technical@psbpapadakis.gr <technical@psbpapadakis.gr>
抄送: lirong@cosco-shipyard.com <lirong@cosco-shipyard.com>
tom_xu@cosco-shipyard.com <tom_xu@cosco-shipyard.com>
xiaozijian@cosco-shipyard.com <xiaozijian@cosco-shipyard.com>
主    题: M.V. UNIVERSAL CHALLENGER
日    期: 2006-07-03 22:23:45
附    件: Quotation of M.V. UNIVERSAL CHALLENGER.xls

Dear Mr.Gregory Papadakis, good day!

Further to the exchanges and correspondence between us on the captioned vessel,
please be kindly advised that our COSCO Zhou Shan Shipyard  can squeeze a
dockspace for her on her ETA 23rd to 25th July as per your indication a while
ago.

In this connection, appreciate your prompt action for placing the firm order to
us in order to secure the dockspace accordingly, in general, the price level of
HRDD is accepted, and the general terms should be applied on COSCO's Additional,
if the final amount is over 1 million, there will be 2% discount on the final
figure; if the final amount is over 1.5 million, the discount will be 3% on the
final figure.

Pls. kindly find the attached our quotation for you/owners approval.

Looking forward to hearing from you.




Best regards

Yan Chongyu
D.Manager of Overseas Dept. III
CHQ of COSCO Shipyard Group

Add: 13/F, International Shipping & Finance Center,
     720 Pu Dong Avenue, Shanghai 200120, China
Tel: +86-21-5036 6383//+86-21-50366565 ex 866
Fax: +86-21-5036 8592
Mobile: +86-136 61 897 612
E-mail: yanchongyu@cosco-shipyard.com



# 中远船务工程集团有限公司
## COSCO SHIPYARD GROUP CO.,LTD.

SHIPYARD    (Nantong,Dalian,Zhoushan,Guangzhou,Shanghai)
COMMERCIAL HEADQUARTERS

TO:    **PSB & CO. S. A.**
EMAIL                                              DATE: 2006-7-3
ATTN:  Mr.Gregory Papadakis              PAGE: 6+12
RE:    M.V."UNIVERSAL CHALLENGER"    CC:

Dear Sirs,

We are pleased to confirm that our cosco Zhoushan shipyard is available to accommodate A M vessel drydocking based on her preliminary ETA around 23rd July 2006.

Base on A M vessel's repair spec.,enclosed please kindly find A M vessel's Quotation along with ou standard General Terms and Conditions of Contract of Shiprepairs , which is provided  for and on behalf of our Cosco Shipyard Co.,Ltd's Subsidiary Shipyard.

Pls. Kindly acknowledge safe receipt of our quotation and look forward to hearing from you in due time.

Best regards,

Xiao Zijian                              Wang Jianxin
Manager of Overseas Dept.3              Project Manager of Overseas Dept.3
On behalf of the Subsidiary Shipyard    On behalf of the Subsidiary Shipyard
Tel:+86 21 50368904                    Tel:+86 21 5036 6565-811
Mobile:+86 13917999156                 Mobile:+86 13817839713
E-mail: xiaozijian@cosco-shipyard.com   E-mail:wangjianxin@cosco-shipyard.com



Add.: Unit B-G,13/F, International Shipping & Finance Center,
720 Pu Dong Avenue, Shanghai 200120, China    Post:200120
Tel:+86-21-50366565  (8 lines)Fax:+86-21-50368592/50366211
Website:www.cosco-shipyard.com  Email:biz@cosco-shipyard.com

## M.V."UNIVERSAL CHALLENGER"

H|060584

| | |
|---|---|
| 1 | Total repair period: 38 running days included 5 days in dock,base on 500MT steel work and 4400m2 blasting and painting . |
| 2 | Discount:we would offer 40% discount gross items,except net items. |
| 3 | Payment: 30% to be paid before sailing,30% to be paid within 60 days,balance to be paid withi 120 days after vessel's departure. |
| 4 | Penalty:USD10000 per day for delay due to yard's reason,but limited to 10% on the final invoic cost. |
| 5 | The work-done bill to be checked, confirmed and signed before ship departure; the work-done to be checked, confirmed and signed before owners' attending superintendent leaving the ship accordingly; |
| 6 | All of the "units" in the following are for quotation only, to be verified according to the actual on |
| 7 | For the detailed conditions and terms of this quotation please refer to the attached GENERAL AND CONDITIONS OF CONTRACT FOR SHIPREPAIRS which as an attachment is an indisp part of this quotation.The acceptance and signature of this quotation shall be treated as full ad of the GENERAL TERMS AND CONDITIONS OF CONTRACT FOR SHIPREPAIRS which wo therefore be binding to both parties. |
| 8 | Following price quoted in US$. |

Owners / Management: INTERORIENT NAVIGATION CO.,LTD

Ship's main particulars:

| | | |
|---|---|---|
| LOA:225.00m | Breadth:32.24m | Recommended draft: meters |
| GRT:35809MT | | Recommended trim for docking:1% of LOA |

### *GENERAL TERMS AND CONDITIONS OF CONTRACT FOR SHIPREPAIRS*

DEFINITION

"Contractor", means the COSCO Zhoushan Shipyard Co., Ltd.

"Customer", means shipowners, ship manager, demise charterer of M.V."UNIVERSAL CHALLENGER", the party signatory to this Agreement with the Contractor.

"Work", means any and all works and services for and relating to shiprepairs,docking or conversion.

PAYMENT

1. Unless otherwise expressly agreed between and by both parties, all outstanding accounts for and relating to the Work shall be paid in full by the Customer in U.S. Dollars or any other foreign currency acceptable to the Contractor before the ship's departure from the Contractor's shipyard. Where payments are disputed the Customer must provide security acceptable to the Contractor for the same amount of outstanding accounts before the ship retained may leave the yard.

2. Should any variation in the specifications and /or additional work be required, the Customer shall truly give the Contractor sufficient written notice of such requirements; and if the Contractor at its option agrees to effect the said variation or additional works, the Contractor shall be entitled to adjust the repairing time period and the costs

for such additional works and/or variation of specifications accordingly.

3. Where the payment to be made in several instalments, if the Customer is in default of the payment of one of the instalments, then all the following instalments shall be regarded as to have been fallen due, and interests on all the amount due but not paid shall accrue from the day after the due date up to and including the day when full payment is made, at a rate of __2__ percent per month, and the Customer shall be liable to pay such interests.

## REPAIR PERIOD

The Repair Period of the Work agreed in Quotation shall be counted from 0800 hours on the next day after the ship's arrival at the Contractor's shipyard, or in the event of any dispute arising or something unconfirmed in relation to the Working Items, Specification, Workmanship, or requirement, from the date when both parties have reached agreement in writing on the main part of such, whichever is later. Should the Customer fail to fulfil any of his contractual obligations in the course of the Work, the Contractor is entitled to suspend the Work and the Repair Period of the Work shall also be suspended until such obligations are fulfilled, without any liability or responsibility for maintenance of the ship and/or any part of the Work already executed and furthermore without prejudice to the Contractor's claim against the Customer for any loss or damage.

## CONTRACTOR'S LIABILITY

1. The Contractor shall not be liable for any loss or damage to the ship or cargo on board, or any property of the Customer and/or its employees, unless such loss or damage is caused directly by gross negligence of the Contractor or its employees or subcontractors acting within the course and scope of their employment and authority.

2. Upon completion of the Work, any and all responsibility whatsoever on the Contractor shall cease save as provided for in the following Paragraph 3.

3. Any claim/objection concerning quality of the Work including but not limited to any defectiveness in workmanship or equipments, parts or materials supplied by the Contractor shall be made in writing by the Customer within 90__ days after completion of the Work or the ship's departure from the Contractor's shipyard, whichever is the earlier; the failure to lodge such claim/objection within the aforesaid period will result in a deemed unconditional and complete acceptance of quality of the Work done. Where such claim/objection is raised during the aforesaid period, the Contractor shall undertake, free of charge, to repair or replace, at its shipyard, any such defective part of Work or material, or to rectify such workmanship, provided however the Customer shall prove that the defectiveness thereof existed at the time of completion of the Work is entirely due to the Contractor's negligence. If it is inconvenient for the Customer to bring the ship to the Contractor's shipyard, the Customer may cause the necessary repairs or replacement to be made elsewhere at the Customer's discretion and the Contractor should, subject to all the foregoing conditions and upon the Customer's request, reimburse a sum equivalent to the cost of making the same repairs or replacement at the Contractor's shipyard.

4. Sea trials of the ship shall be at the Customer's sole risk in every respect.

5. Except otherwise agreed or stipulated in this Agreement, the Contractor shall not be liable for any loss of profit, loss of use, loss of charter, or damages consequential upon all such losses.

6. The maximum liability of the Contractor to the Customer under this Agreement shall in any event be limited as the sum of U.S. Dollars _500,000.00_____.

## CUSTOMER'S OBLIGATIONS

1. The Customer shall ensure that adequate insurance will be maintained during the currency of this Agreement for the ship, hull and machinery, stores and equipment on board, and the crew.

2. Prior to arrival at the shipyard, the Customer shall keep the ship ready for safe commencement of Works in every respect including making the ship gas-freed, slop, sludge and/or dirty ballast to the satisfaction of the Contractor in respect of the cargo tanks or holds, and likewise make the ship completely discharged of any cargo of dangerous nature such as explosive, harmful or ill-healthy cargo.

3. Before any of the Work in connection with ship's safety and fire protection is carried out, the Customer's authorized Supervisor(s)/Representative(s) shall on behalf of the Customer sign an Agreement of General Safety, Environment Protection and Regulations of Shipyard with the Contractor, otherwise the Contractor is entitled to suspend the Work until such agreement is signed

4. The Customer shall appoint and despatch its authorized Supervisor(s)/Representative(s) with Power of Attorney at its expense to the places where the Contractor is to carry out the Work, unless otherwise agreed by the Contractor in writing. The authorized Supervisor(s)/Representative(s) shall submit the Power of Attorney to the Contractor; and in case of any failure to do so, the Supervisor(s)/Representative(s) shall be deemed to have been duly authorized by the Customer.

Upon the completion of the Work and production of the Work Done List, the authorized Supervisor(s)/Representative(s) shall on behalf of the Customer confirm the work done and sign the Work Done List provided by the Contractor, otherwise the Contractor is entitled to exercise lien on the ship until such Work Done List is signed. If no dispute, the authorized Supervisor(s)/Representative(s) shall also confirm and sign the Final Invoice for the work done submitted by the Contractor before his departure from the Contractor's shipyard. In the event that any dispute arises in relation to the Final Invoice, such dispute should be settled before the Supervisor(s)/Representative(s)' departure from the Contractor's shipyard; or alternatively, a written agreement is reached between both parties, otherwise the Work Done List and the Final Invoice shall be deemed to have been accepted by the Customer.

5. If the Customer intends to entrust any other company, units / persons whatsoever apart from the Contractor to perform any repairing work in Contractor's shipyard during shiprepairing period, a prior written approval by the Contractor shall be obtained, and the Customer's authorized representative, master together with the entrusted

Company, units / persons shall sign an 'Agreement on Repair Projects' with the Contractor before commencement of any repairing work.

Before execution of the aforesaid 'Agreement on Repair Projects', the Contractor is entitled to reject any company, units / persons to enter into the shipyard for carrying out any repairing work, and the Contractor shall also not be liable for any delay whatsoever caused thereby, and shall be entitled to claim against the Customer for any economic loss consequently occurred.

## CUSTOMER'S SUPPLY

1. If there is anything to be supplied by the Customer, the Customer shall deliver it to the Contractor in time as requested by the Contractor. In the event that the Customer's such supply affects the Work time, the time shall be so extended as to meet the Contractor's requirements and the Customer shall be responsible for any loss or damages sustained by the Contractor as the consequence thereof. The Contractor reserves the right to decline any particular work, to which the delayed Customer's supply is prerequisite.

2. All of the Customer's supplies held under custody by Contractor at Customer's request and/or arrangements in Contractor's store or other premises shall be at the sole risk and responsibility of the Customer, provided always that the Contractor shall perform proper duty of care.

3. The Contractor shall not be liable for any faults, defects, breakdown and/or whatsoever occurrences in the course of or after completion of the Work insofar as they are attributable to the Customer's supply.

## CANCELLATION CLAUSE

In case that one party unilaterally cancels this Agreement after acceptance hereof, the said party shall be liable to compensate any and all reasonable losses sustained by the other party as a result of such cancellation.

## CONTRACTOR'S LIEN

The Contractor will have a lien on the ship and all her equipments (whether installed on board or not) whenever the same may come into the Contractor's possession for the unpaid cost of Work and additional work; if any, together with interests accrued and any other expenses or outstanding whatsoever occurred in pursuance of this Agreement without assuming any liability or responsibility for maintenance of the ship and without prejudice to the Contractor's claim against the Customer for any expenses, losses and/or damages sustained by the Contractor through exercising such lien or right of retention.

## FORCE MAJEURE

1. In the event of Acts of God, accidents, epidemic, disasters, earthquake, typhoon, unusual bad weather affecting normal painting or other work, strikes, sabotage, lock-out and any other cause whatsoever beyond control of the Contractor or its sub-contractors whenever or wherever occurring or in the event of delay of inspection by the Customer or other authorized parties concerned, by which or by the consequence of which the Work is prevented, it shall be considered as force majeure.

2. Should any such force majeure occur, the Contractor shall promptly notify in writing the Customer of such occurrence and the repair period shall be so extended as to meet the Contractor's requirements, and the Contractor shall not be liable for any loss or damage arising out of such force majeure.

DISPUTE SETTLEMENT AND GOVERNING LAW

Acceptance of this tender shall constitute acceptance of these terms, and all disputes arising out of or in connection with this Agreement shall be submitted to China Maritime Arbitration Commission for arbitration in accordance with the existing arbitration rules of the Commission. This Agreement shall be governed and construed by the laws of People's Republic of China.

Contractor:

Signed On behalf of the Contractor by

Date:

Customer:

Singed On behalf of the Customer by

Date:

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---|---|---|---|---|---|---|---|
| | [illegible] | | | | | | |
| | **SECTION 3 UNIT PRICES** | | | | | - | |
| 3.1 | Staging for outside repairs ( On hull & Deck ) | m3 | 4 | | 40% | - | |
| | Staging for inside repairs ( In the E/R/Cargo tanks/Cargo holds ) | m3 | 5 | | 40% | - | |
| | | | | | | - | |
| 3.2 | Steel work renewal ( Mild Steel ) | | | | | - | |
| | up to 100 ton | kg | 1.5 | | 0% | - | |
| | up to 200 ton | kg | 1.5 | | 0% | - | |
| | up to 300 ton | kg | 1.45 | | 0% | - | |
| | over 300 ton | kg | 1.4 | | 0% | - | |
| | Note: | | | | | - | |
| | 1.Single curvature to be surcharged 10% | | | | | - | |
| | 2.Double curvature to be surcharged 20% | | | | | - | |
| | 3.Bulbous bow to be surcharged 150% | | | | | - | |
| | 4.High tensile steel to be surcharged 15% | | | | | - | |
| | 5.Small piece under 8kg/pc to be charged 20/pc (NET) | | | | | - | |
| | 6.Internal member to be surcharged 10% | | | | | - | |
| | 7.Removal, fairing up and refitting to be charged as 80% of above price | | | | | - | |
| | 8.Fairing up in place to be charged as 50% of above price | | | | | - | |
| | 9.Staging to be extra | m3 | 2.5 | | 0% | - | |
| | 10.Renewal of rails and stanchions ( Dia.<25mm ) | m | 17 | | 40% | - | |
| | | | | | | - | |
| 3.3 | Grit blasting and power tools surface preparation tank | | | | | - | |
| | Power tool | m2 | 2 | | 0% | - | |
| | Outside shell SA 2.5 | m2 | 6.5 | | 0% | - | |
| | Outside shell SA 2.0 | m2 | 5.2 | | 0% | - | |
| | Outside shell SA 1.0 | m2 | 3 | | 0% | - | |
| | Inside Cargo Tanks SA2.5 | m2 | 24 | | 0% | - | |
| | Inside Cargo Tanks SA2.0 | m2 | 20 | | 0% | - | |
| | Inside Cargo Tanks SA1.0 | m2 | 12 | | 0% | - | |
| | Inside Ballast Tanks( DB ) SA2.5 | m2 | 24 | | 0% | - | |
| | Inside Ballast Tanks( DB ) SA2.0 | m2 | 20 | | 0% | - | |
| | Inside Ballast Tanks( DB ) SA1.0 | m2 | 12 | | 0% | - | |
| | Inside Peak&Wing Tanks SA2.5 | m2 | 22 | | 0% | - | |
| | Inside Peak&Wing Tanks SA2.0 | m2 | 18 | | 0% | - | |
| | Inside Peak&Wing Tanks SA1.0 | m2 | 11 | | 0% | - | |
| | Note:the blasting area in tanks at least 60% of total area. | | | | | - | |
| | | | | | | - | |
| 3.4 | Painting&hard scraping costs per sq.metre | | | | | - | |
| | Outside Hull hard scraping | m2 | 1.5 | | 0% | - | |
| | Inside Cargo Tanks scraping | m2 | 6 | | 0% | - | |
| | Inside Ballast tank ( DB ) scraping | m2 | 6 | | 0% | - | |
| | Inside Peak&Wing Tanks scraping | m2 | 5 | | 0% | - | |
| | Outside Hull touch up with owner supplied paint | m2/coat | 0.35 | | 0% | - | |
| | Outside Hull full coat with owner supplied paint | m2/coat | 0.3 | | 0% | - | |
| | Note:SPC and epoxy paint to be surcharged 50% | | | | | - | |
| | Inside Cargo tanks/Ballast tank/Peak&Wing tanks touch up with owner supplied paint | m2/coat | 0.55 | | 0% | - | |
| | Inside Cargo tanks/Ballast tank/Peak&Wing tanks full coat with owner supplied paint | m2/coat | 0.5 | | 0% | - | |
| | | | | | | - | |
| 3.5 | Gouging and re-welding | m | 33 | | 40% | - | |
| | Staging if required | m3 | 4 | | 40% | - | |
| | X-rays | pc | 40 | | 40% | - | |
| | | | | | | - | |
| 3.6 | Cleaning the fresh water tanks by mopping | m3 | 2 | | 40% | - | |
| | Scraping | m2 | 2 | | 40% | - | |
| | Applying of one coat owner supplied paint | m2/coat | 0.55 | | 0% | - | |
| | | | | | | - | |
| 3.7 | Initial inspection | time | 400 | | 40% | - | |
| | Additional inspection | time/piece | 40 | | 40% | - | |
| | Cargo tanks cleaning | m2 | 8 | | 0% | - | |
| | Slop tanks cleaning | m3 | 8 | | 0% | - | |
| | Wing tanks cleaning | m3 | 2.2 | | 40% | - | |
| | DB tank cleaning | m3 | 2.2 | | 40% | - | |
| | Settling tank/service ( Fuel Oil ) tanks cleaning | m3 | 9.5 | | 40% | - | |
| | | | | | | - | |
| 3.8 | Removal and disposal of oil scale/slops | ton | 90 | | 40% | - | |
| | Removal and disposal of ballast water | ton | 30 | | 40% | - | |
| | Removal and disposal of sludge | ton | 180 | | 40% | - | |
| | Removal and disposal of mud | ton | 60 | | 40% | - | |
| | | | | | | - | |
| 3.9 | Clean & make dry for survey tank top bilge wells & oil gutters in engine rm | pc | 160 | | 40% | - | |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---|---|---|---|---|---|---|---|
| 3.10 | Renewal of steel straight pipes pls refer to our attached pipings | | | | | - | |
| 3.11 | Prices for insulations renewal for pipes pls refer to our attached pipings tariff. | | | | | - | |
| | - for flat surfaces | m2 | 70 | | 40% | - | |
| | - for curved surfaces | m2 | 90 | | 40% | - | |
| 3.12 | Renewal of flanges pls refer to our attached pipings tariff. | | | | | - | |
| 3.13 | Prices for opening up valves,clean and check for survey in place,grind in and close as original,using new gaskets,packing and studs/nuts as necessary. | | | | | - | |
| | Pls refer to our attached valves tariff | | | | | - | |
| 3.14 | Prices for complete overhaul of above including removal to workshop and reinstallation.Allow for machining faces. | | | | | - | |
| | Pls refer to our attached valves tariff. | | | | | - | |
| 3.15 | Renewal of valves including supply for types and sizes in 3.13 - To be quoted. | | | | | - | |
| 3.16 | Opening/closing of manhole with new packing | pc | 60 | | 40% | - | |
| | Renewal of stainless steel studs,nuts and washers | set | 3 | | 40% | - | |
| 3.17 | Packing renewal with owner supply | m | 6 | | 40% | - | |
| | Packing channel derusting | m | 7 | | 40% | - | |
| 3.18 | Renewal of gaskets for entrance hatches and for watertight doors with materials of contractor's supply | door | 120 | | 40% | - | |
| | Packing channel derusting | m | 7 | | 40% | - | |
| 3.19 | Renewal of while vitreous china basin with hot and cold water self-closing taps. | pc | 234 | | 0% | - | Made in China. |
| 3.20 | Electrical motors overhauling pls refer to out attached motors tariff. | | | | | - | |
| 3.21 | Renewal of armoured cable pls advise further details. | | | | | - | |
| 3.22 | Untrasonic thickness gauging | point | 1.2 | | 0% | - | Min 50 points |
| 3.23 | Cleaning labor | manhour | 5.8 | | 0% | - | |
| 3.24 | Hydrostatic testing of double bottom ballast tanks ( Sea water ) | m3 | 1.2 | | 40% | - | |
| 3.25 | Air pressure testing of double bottom ballast tanks | m3 | 1 | | 40% | - | |
| | | | | | | - | |
| | SECTION 4 GENERAL SERVICES | | | | | - | |
| | | | | | | - | |
| 4.1 | Provide and removal of gangway | time | 400 | | 40% | - | |
| 4.2 | Fire watchman | day/man | 120 | | 40% | - | |
| 4.3 | Maintaining pressure in ships fire main or alternatively keep on board pressurised line | day/line | 20 | | 40% | - | |
| | Connection/Disconnection | time/line | 40 | | 40% | - | |
| 4.4 | Supply of electric current per kwh | kwh | 0.4 | | 40% | - | |
| | Connection/Disconnection | time/line | 100 | | 40% | - | |
| 4.5 | Garbage removal from vessel | day | 30 | | 40% | - | |
| 4.6 | Supply of steam for domestic and engine room requirements | | | | | - | N/A |
| | Supply of steam per hour | | | | | - | |
| | Connection and disconnection | | | | | - | |
| 4.7 | Supply of fridge cooling water | day/line | 40 | | 40% | - | |
| | Connection and disconnection | time/line | 40 | | 40% | - | |
| 4.8 | Supply of fresh water for domestic use | ton | 2 | | 40% | - | |
| | Connection and disconnection | time/line | 40 | | 40% | - | |
| 4.9 | Supply of compressed air for all purposes per day ( 8 hour per day ) | day/line | 40 | | 40% | - | |
| | Connection and disconnection | time/line | 40 | | 40% | - | |
| 4.10 | Supply of ballast water | ton | 0.4 | | 40% | - | |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---|---|---|---|---|---|---|---|
| | Connection and disconnection | time/time | 40 | | 40% | - | |
| 4.11 | Draining of ballast tanks | ton | 2 | | 40% | - | |
| | Removal and refiting of DB tank drain plug | pc | 35 | | 40% | - | |
| 4.12 | Initial gas free inspection | time | 400 | | 40% | - | |
| | Additional inspection | time/place | 40 | | 40% | - | |
| 4.13 | Use of contractor's crane for ship's use | hour | 60 | | 40% | - | |
| 4.14 | Installation of phone on board | time/set | 30 | | 40% | - | |
| | Yard local services | day/set | 6 | | 40% | - | |
| 4.15 | Hire of electric cabin heaters | day/set | 15 | | 40% | - | |
| | Hire of heating lamps | day/set | 15 | | 40% | - | |
| | Engine room space heaters | day/set | 15 | | 40% | - | |
| 4.16 | Arranging and removal of temporary ventilation fans | day/set | 15 | | 40% | - | |
| 4.17 | Cost for 6 hours sea trials | hour | 480 | 6 | 40% | 1,728 | Tugboat assistant to be extra. |
| 4.18 | Supply of portable electric pump | set/day | 15 | | 40% | - | |
| 4.19 | Supply of high pressure water jet for hull water blasting. | m2 | 0.48 | | 0% | - | |
| | | | | | | - | |
| | SECTION 5 DRYDOCKING | | | | | - | |
| 5.1 | Noted. | | | | | - | |
| 5.2 | Docking/undocking first and last day | day | 7249 | 2 | 40% | 8,699 | |
| | Additional day in drydock | day | 3662 | 3 | 40% | 6,592 | |
| 5.3 | Tugboat for docking/undocking | shift | 3520 | | 40% | - | |
| | Escort from anchorage to yard | shift | 3000 | | 40% | - | |
| | Pilotage | shift | 1000 | | 40% | - | |
| | Riggers | shift | 380 | | 40% | - | |
| 5.4 | Wharfage | day | 816 | | 40% | - | |
| 5.5 | Removal of keel block | pc | 150 | | 40% | - | |
| | Removal of side block | pc | 100 | | 40% | - | |
| 5.6 | Removal/refit of bottom plugs | pc | 35 | | 40% | - | |
| 5.7 | Fit Kraft paper on alleyways in accommodation to protect from dirty shoes. | job | 420 | 1 | 40% | 252 | |
| | | | | | | - | |
| | SECTION 6 PAINTING | | | | | - | |
| 6.1 | H.P WASHING 250KG/CM2 | m2 | 0.48 | 13400 | 0% | 6,432 | |
| | Removal oil stains | m2 | 4 | 200 | 0% | 800 | |
| | Hard scraping | m2 | 1.5 | 100 | 0% | 150 | |
| 6.2 | TOPSIDES 2600M2 | | | | | - | |
| | Spot blast to SA2.5 | m2 | 6.5 | | 0% | - | |
| | Grit sweep to SA1.0 | m2 | 3 | | 0% | - | |
| | 1 T/U coats of anticorrosive primer to bare spots | m2/coat | 0.35 | | 0% | - | |
| | One full coat finish black DFT 80 mic | m2/coat | 0.3 | 2500 | 0% | 750 | |
| 6.3 | SIDES UP TO L.L.L. 5360M2 | | | | | - | |
| | Spot blast to SA2.5 | m2 | 6.5 | | 0% | - | |
| | Grit sweep to SA1.0 | m2 | 3 | | 0% | - | |
| | Hard Scraping | m2 | 1.5 | | 0% | - | |
| | 2 T/U coats of anticorrosive primer to bare spots | m2/coat | 0.35 | | 0% | - | |
| | Two full coat of tin free SPC dft 55 mic. | m2/coat | 0.45 | 10720 | 0% | 4,824 | |
| 6.4 | FLAT BOTTOM 5870 M2 | | | | | - | |
| | Grit blast to SA2.5 | m2 | 6.5 | | 0% | - | |
| | 2 T/U coats of anticorrosive primer to bare spots | m2/coat | 0.35 | | 0% | - | |
| | One full coat tin free SPC 100 mic | m2/coat | 0.45 | 5870 | 0% | 2,642 | |
| 6.5 | SHIP'S NAME - MARKS | | | | | - | |
| | Ship's name, Port of Registry, Draft Marks, Tank Marks, bow/stern thrusters to be repainted | job | 725 | 1 | 40% | 435 | |
| | | | | | | - | |
| 6.5A | SHIP IDENTIFICATION NUMBER (IMO No.) | | | | | | |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub. Total | Remarks |
|---------|-------------------|------|-----------|-----|----------|-----------|---------|
| | Ships's IMO No. painted and permanently marked as such "IMO 8801282" on center of transom and according to SOLAS regulations, "shall not be less than 200mm in height". Actual size to | job | 1200 | 1 | 0% | 1,200 | |
| 6.6 | HARD SCRAPE( Flat bottom ) | m2 | 1.5 | 300 | 0% | 450 | |
| | Grit sweep to SA1.0 | m2 | 3 | | 0% | - | |
| 6.7 | Bow Thruster Aperture - Not applicable | | | | | - | |
| 6.8 | SCUPPER PLUGS | pc | 20 | 12 | 40% | 144 | |
| 6.9 | Spent Grit/Drums Disposal and general cleaning | | | | | - | |
| | Cost to be inclusive of quotes. | | | | | - | |
| 6.10 | Staging or cherry picker for above works | vessel | 4000 | 1 | 0% | 4,000 | |
| | Hull blasting min 1500m2; | | | | | - | |
| | SECTION 7 TAILSHAFT SEALS | | | | | - | |
| 7.1 | Take and record top and bottom wear down of: tailshaft | time | 418 | | 40% | - | |
| | Oil for outer sealing box to be refreshed with owner supplied oil | job | 132 | 1 | 40% | 79 | |
| 7.2 | Remove/refit rope guard plate | pc | 120 | 1 | 40% | 72 | |
| | Welding 4 pcs net-cutter blades to the rope guard ( Owner supply ) | pc | 30 | 4 | 40% | 72 | |
| 7.3 | Tail shaft to be withdrawn for inspection and reinstalled in place | lumpsum | 5433 | 1 | 40% | 3,260 | |
| | removal/refitting propeller according to makers instructions | job | 2310 | | 40% | - | |
| | open up, clean for class survey, bearing top and bottom halves of intermediate shaft half bearing and close up in good order as | time | 429 | 1 | 40% | 257 | |
| | Thrust shaft bearing:Open up top half of bearing shell, checking and cleaning thrust block and  bearing measurement clearance and record | job | 594 | 1 | 40% | 356 | |
| 7.4 | Quote for removal/refit of stern tube seals insitu by bonding only | ring | 1200 | | 0% | - | |
| 7.5 | Quote for same job as above but with tailshaft withdrawal job | box | 1200 | | 40% | - | |
| 7.6 | Quote for machining of both ford and aft stern tube chrome liners | pc | 363 | | 40% | - | |
| | SECTION 8 PROPELLER | | | | | - | |
| 8.1 | To normal polish propeller boss and blades | time | 1478 | 1 | 40% | 887 | |
| 8.2 | To remove propeller and fit back in place after renewal of stern tube  outside seals | job | 2310 | | 40% | - | Repairs to be charged extra. |
| | SECTION 9 RUDDER | | | | | - | |
| 9.1 | The clearances of the rudder pintle bushes top and bottom are to be measured. Rudder drop clearance to be recorded also in presence of Chief Engineer. | time | 385 | 1 | 40% | 231 | |
| 9.2 | The rudder drain plug is to be removed the rudder drained only in the presence of the owners representative. Airtest the rudder and refit plug on completion. | pc | .44 | | 40% | - | |
| 9.3 | The rudder stock neck bush  & Carrier bearing clearances are to be measured and reported to the attending superintendent. Trunk space to be cleaned and painted. | job | 245 | 1 | 40% | 147 | |
| | Access manholes removal/refit with new gaskets. Packing size 40 x 40 mm x 5 rings | pc | 160 | | 40% | - | |
| | Rudder stock gland packing to be removed and gland repacked using appropriate soft new packing of yard supply. | job | 735 | 1 | 40% | 441 | |
| 9.4 | Quote for removal / refit of the rudder | lumpsum | 6182 | | 40% | - | |
| 9.5 | Release rudder stock from steering gear and remove completely. Refit on completion of repairs to rudder horn | job | 2650 | | 40% | - | |
| | Renewal of the pintle bushes with owner supply | pc | 2460 | | 40% | - | |
| | SECTION 10 HULL ANODES&SEA CHESTS | | | | | - | |
| 10.1 | HULL ANODES | | | | | - | |
| 10.2 | SEA CHESTS & ANODES | | | | | | |
| | Grids to be removed/ installed, sea chests and grids to be HP cleaned and scraped clean, then blasted and painted with same coating as the hull 'sides to d/r specs. | pc | 130 | | 40% | - | |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---|---|---|---|---|---|---|---|
| 10.3 | New Aluminium Sacrificial anodes are to be fitted innside all sea chests 16 pcs of 30mmx150mmx150mm dimension | pc | 16 | 16 | 40% | 154 | Owner supply |
| 10.4 | Supply and fitting of a round saf log anode approx 200mm OD x 100mm ID 25mm thick | pc | 60 | | 0% | - | |
| | | | | | | - | |
| | **SECTION 11 SEA VALVES** | | | | | - | |
| | | | | | | - | |
| | **E/R SEA VALVES :** | | | | | - | |
| | | | | | | - | |
| | Turbo aft SW suction 250A Butterfly | pc | 238 | 1 | 40% | 143 | |
| | No.1 fire pump sea suction 150A Butterfly | pc | 158 | 1 | 40% | 95 | |
| | Ballast pump port sea suction 350A Angle | pc | 192 | 1 | 40% | 115 | |
| | Ballast pump overboard 350 Butterfly | pc | 316 | 1 | 40% | 190 | |
| | Sludge pump overboard 65A Gate | pc | 66 | 1 | 40% | 40 | |
| | Bilge pump discharge 150A Butterfly | pc | 158 | 1 | 40% | 95 | |
| | Auxiliary boiler blow down 40A cock | pc | 39 | 1 | 40% | 23 | |
| | Main SW high suction 300A Angle | pc | 168 | 1 | 40% | 101 | |
| | Main SW low suction 300A Angle | pc | 168 | 1 | 40% | 101 | |
| | Ballast pump starboard suction 350A Angle | pc | 192 | 1 | 40% | 115 | |
| | No.2 fire pump suction 150A Butterfly | pc | 158 | 1 | 40% | 95 | |
| | FW generator suction 150A Angle | pc | 96 | 1 | 40% | 58 | |
| | Main SW discharge 300A Butterfly | pc | 277 | 1 | 40% | 166 | |
| | Ballast pump discharge 350A Butterfly | pc | 316 | 1 | 40% | 190 | |
| | FW generator overboard 150A Gate | pc | 144 | 1 | 40% | 86 | |
| | Turbo aft Sw overboard 250A Gate | pc | 216 | 1 | 40% | 130 | |
| | Sanitary discharge overboard 150A Flap | pc | 144 | 1 | 40% | 86 | |
| | Bilge overboard 50A Gate | pc | 55 | 1 | 40% | 33 | |
| | Emergency fire pump suction 150A Globe | pc | 96 | 1 | 40% | 58 | |
| | NO.4 Cargo hold overboard port 300A Gate | pc | 252 | 1 | 40% | 151 | |
| | NO.4 Cargo hold overboard stbd 300A Gate | pc | 252 | 1 | 40% | 151 | |
| | Deweeeding valves each sea chest | pc | | 1 | 40% | - | |
| | Vent valves each sea chest | pc | | 1 | 40% | - | |
| | | | | | | - | |
| | | | | | | - | |
| | **SECTION 13 ANCHORS AND CHAINS** | | | | | - | |
| | | | | | | - | |
| 13.0.1 | Range out both port and stbd chains on bottom of drydock, clean with high pressure jet and shake free of rust. Mark cables with seizing wire and white paint each end of 15 fathoms. Gauge chains and record along with previous readings and submit to owner's representative. On completion the chains are to be stowed in chain locker | vessel | 1800 | 1 | 40% | 1,080 | |
| 13.0.2 | Quote separately for disconnecting two outboard chain lengths at anchor swivel end and exchanging end for end with inboard side, reconnecting in good order | vessel | 480 | 1 | 40% | 288 | |
| 13.0.3 | Quote for ring welding each loose stud. | pc | 15 | | 40% | - | |
| 13.0.4 | Quote for supplying and welding studs which found missing  Cable dia  78 mm | pc | 120 | | 0% | - | |
| 13.0.5 | Quote for weight check of all anchors as per Class requirements. | | | | | - | To be inclu. |
| 13.0.6 | Spare forward anchor to be lifted off ship and ensure free movement of pins and shackles Anchor to be cleaned of any scale and painted with owner supplied protective block paint. | pc | 380 | | 40% | - | |
| | | | | | | - | |
| 13.1 | **CHAIN LOCKERS** | | | | | - | |
| | Port & Stbd Chain Lockers to be opened & cleaned after anchor chains are ranged out. Lift up & cleaned below bottom strainer plates of each locker.Open up manhole cover, clean, brush and paint with contractor's bitumastic solution and close up in good | vessel | 1690 | 1 | 40% | 1,014 | |
| | Carry out ultrasonic thickness gauging of 10 points each locker bottom plate | pons | 1.2 | | 0% | - | Min.50 points |
| | Remove and disposal muddy water | ton | 30 | | 40% | - | |
| | Remove and  disposal mud | ton | 60 | | 40% | - | |
| | | | | | | - | |
| | **1000.0 DECK REPAIRS** | | | | | - | |
| | | | | | | - | |
| 1000.1 | ULTRA SONIC THICKNESS GAUGING | point | 1.2 | | 0% | - | Min 50 points |
| | Cherry picker if required | hour | 60 | | 40% | - | |
| | | | | | | - | |
| 1000.2 | ANCHOR BOX PORT AND STARBOARD | | | | | - | |
| | Staging if required | m3 | 5 | | 40% | - | |
| 1000.2.1 | Cracks to be ground out and rewelding | m | 33 | | 40% | - | |
| | To access inside the box an aperture to be cropped on the outer plate of the box. | kg | 1.2 | | 0% | - | |
| 1000.2.2 | Vacuum test on completion | m | 4 | | 40% | - | |
| | | | | | | - | |
| 1000.3 | HATCH COVER HYDRAULIC MOTOR | | | | | - | |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---|---|---|---|---|---|---|---|
| 1000.3.1 | Remove and blank each hydraulic motor and lift from ship transport ashore for overhaul with owner supply spares. | pc | 980 | 14 | 40% | 8,232 | |
| 1000.3.2 | On completion of verhaul motors to be returned to ship and refitted.- to be incl. | | | | | - | |
| 1000.3.3 | Hydraulic system to be flushed and air removed Each motor to be fully tested under load.Any oil leaks to be made good. | sum/sum | 1180 | | 40% | - | |
| 1000.3.4 | In workshop clean motor of any scale and rust.Dismantle and check the shaft for damage in way of seal.Refit with new seals and parts as required with owner supplied spares. Note: To be incl. Welding shaft and machine to be extra. | | | | | - | |
| 1000.3.5 | Bedplate to be fitted as required.( Mild Steel ) | kg | 1.6 | 200 | 0% | 320 | |
| | | | | | | - | |
| 1000.4.1 | FAIRLEAD ROOLERS | | | | | | |
| | Crop off full assembly of fairlead rooler sufficient to remove all four roolers.Allow fro cropping off the securing bolts of the roolers | pc | 160 | 4 | 40% | 384 | |
| | Supply material for new Teflon bushes,allow two bushes per roller. Return roller and refit.Prove freedom of movement on completion. | | | | | - | To be quoted on spot. |
| | Staging if required | m3 | 4 | | 40% | - | |
| | | | | | | - | |
| 1000.5 | WINDLASS BRAKE LININGS | | | | | - | |
| | Brake lining renewal including brake band cleaning | sum | 1150 | | 40% | - | |
| | | | | | | - | |
| 1000.7 | WINDLASS WARPING DRUM BRAKESS | | | | | - | |
| | Brake lining renewal including brake band cleaning | sum | 1050 | | 40% | - | |
| | | | | | | - | |
| 1000.8 | ACCOMMODATION ALLEYWAYS | | | | | - | |
| | Lower deck thwart ship accommodation alleyway in way of damaged compound to be repaired.Old composite floor to be removed in way of damaged sections approx 150 mm deep.New compound to be prepared and laid.Allow to set and coated as per the remainder of the deep. | m3 | 60 | 20 | 0% | 1,200 | |
| | | | | | | - | |
| 1000.9 | BATHROOM TILES | | | | | - | |
| | Total of 50 sqm tiles to be replaced | m2 | 40 | 50 | 0% | 2,000 | |
| | | | | | | - | |
| 1000.10 | PUBLIC ROOM FLOORING | | | | | - | |
| | Removal and replacement of linoleum flooring | m2 | 60 | 20 | 0% | 1,200 | Made in China. |
| | | | | | | - | |
| 1000.11 | CREW CHANGE ROOM | | | | | - | |
| | Crew change room flooring to lift and old composite to be removed. | m2 | 60 | | 0% | - | |
| | Steel deck to be checked with UT gauging | point | 1.2 | | 0% | - | Min 50 points |
| | Renewal of steel plates | kg | 1.6 | | 0% | - | |
| | | | | | | - | |
| 1000.12 | ACCOMMODATION INNER PANEL DOORS | | | | | - | |
| | Inner panel doors on accommodation decks are corroded and require lower sections to be cropped and new section fabricated | door | 180 | 9 | 0% | 1,620 | |
| | | | | | | - | |
| 1000.13 | FIRE DOORS | | | | | - | |
| | Fire doors not closing due to distorted and weakened frames in way of hinges.Frame section in way of hingers to be reinforced and doors refitted. | door | 160 | 4 | 0% | 640 | |
| | | | | | | - | |
| 1000.14 | INNER PORTHOLE FRAMES | | | | | - | |
| | Inner porthole frames to be repaired | pc | 120 | 10 | 0% | 1,200 | |
| | | | | | | - | |
| 1000.15 | LIFEBOAT LOAD TEST | | | | | - | |
| | Taken ashore | boat | 480 | 2 | 0% | 960 | |
| | Both davits checked and load test | boat | 580 | 2 | 0% | 1,160 | |
| | | | | | | - | |
| | 2000.0 CARGO SYSTEM REPAIRS | | | | | - | |
| | | | | | | - | |
| 2000.1 | TST TANK BLASTING AND COATING | | | | | - | |
| | Manholes to be opened and refitted with new packing | pc | 60 | | 40% | - | |
| | Cleaning of four TST tanks with HP fresh water 250kg/cm2 | m2 | 0.6 | | 0% | - | |
| | Grit blasting to SA1.0 | m2 | 9 | | 0% | - | |
| | Grit blasting to SA2.0 | m2 | 15 | 3000 | 0% | 45,000 | |
| | Coating with owner supplied paint 200micron | m2/coat | 0.6 | | 0% | - | |
| | Rental of dehumidifier | day | 3800 | | 0% | - | |
| | Staging if required | m3 | 5 | | 40% | - | |
| | | | | | | - | |
| | 3000.0 HULL STRUCTURE,STEEL RENEWALS&TANK | | | | | | |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---|---|---|---|---|---|---|---|
| 3000.1 | MOORING WINCHES AND WINDLASS SYSTEMS | | | | | - | |
| | Mooring winches to be checked for performance.Seals checked on operating levers and shafts if necessary new seals to be fitted with owner supply.Bearings to be checked by condition monitoring device and changed if found beyond limits(Owner supply) | set | 1280 | | 40% | - | |
| | Windlass to be checked as above | set | 2860 | | 40% | - | |
| | | | | | | - | |
| 3000.2 | BALLAST TANKS AIR PIPES | | | | | - | |
| | Double bottom,air pipes passing through top side tanks to be renewed.Sch 40 | | | | | - | |
| | Top side tank manholes to be opened for access | pc | 30 | | 40% | - | |
| | DB tank 1 p&s: | | | | | - | |
| | Pipe OD 300mm,length 4.8 mtrs x 2 pcs | pc | 688 | 2 | 40% | 1,066 | |
| | Pipe OD 300mm,height 0.80 mtrs x 2 pcs | pc | 185 | 2 | 40% | 222 | |
| | Pipe OD 300mm,length 3.65 mtrs x 2 pcs | pc | 675 | 2 | 40% | 810 | |
| | Air pipe cover lower lip to repair/crop&renew,Pipe OD | pc | 190 | 2 | 40% | 228 | |
| | Flange/cover seat to renew,OD 480mm,ID 300 mm x 8 mm,with 3 lugs for securing the covers | pc | 120 | 2 | 40% | 144 | |
| | | | | | | - | |
| | DB tank 2-3 p&s: | | | | | - | |
| | Pipe OD 300mm,length 3.65 mtrs x 2 pcs | pc | 675 | 2 | 40% | 810 | |
| | Pipe OD 300mm,length 4.40 mtrs x 2 pcs | pc | 814 | 2 | 40% | 977 | |
| | Bends | pc | 74 | | 40% | - | |
| | Pipe OD 300mm,height 0.80 mtrs x 2 pcs | pc | 185 | 2 | 40% | 222 | |
| | Air pipe cover lower lip to repair/crop&renew,Pipe OD | pc | 190 | 2 | 40% | 228 | |
| | Flange/cover seat to renew,OD 480mm,ID 300 mm x 8 mm,with 3 lugs for securing the covers | pc | 120 | 2 | 40% | 144 | |
| | | | | | | - | |
| | DB tank 4-5 p&s: | | | | | - | |
| | Pipe OD 300mm,length 4.40 mtrs x 2 pcs | pc | 814 | 2 | 40% | 977 | |
| | Bends | pc | 74 | | 40% | - | |
| | Pipe OD 300mm,height 0.80 mtrs x 2 pcs | pc | 185 | 2 | 40% | 222 | |
| | Pipe OD 300mm,length 4.40 mtrs x 2 pcs | pc | 814 | 2 | 40% | 977 | |
| | Bends | pc | 74 | | 40% | - | |
| | Pipe OD 300mm,height 0.80 mtrs x 2 pcs | pc | 185 | 2 | 40% | 222 | |
| | Air pipe cover lower lip to repair/crop&renew,Pipe OD | pc | 190 | 4 | 40% | 456 | |
| | Flange/cover seat to renew,OD 480mm,ID 300 mm x 8 mm,with 3 lugs for securing the covers | pc | 120 | 4 | 40% | 288 | |
| | | | | | | - | |
| | | | | | | - | |
| | DB tank 6-7 p&s: | | | | | - | |
| | Pipe OD 300mm,length 4.40 mtrs x 2 pcs | pc | 814 | 2 | 40% | 977 | |
| | Bends | pc | 74 | | 40% | - | |
| | Pipe OD 300mm,height 0.80 mtrs x 2 pcs | pc | 185 | 2 | 40% | 222 | |
| | Pipe OD 300mm,length 3.65 mtrs x 1 pcs | pc | 675 | 1 | 40% | 405 | |
| | Pipe OD 300mm,height 0.80 mtrs x 2 pcs | pc | 185 | 2 | 40% | 222 | |
| | Air pipe cover lower lip to repair/crop&renew,Pipe OD | pc | 190 | 4 | 40% | 456 | |
| | Flange/cover seat to renew,OD 480mm,ID 300 mm x 8 mm,with 3 lugs for securing the covers | pc | 120 | 4 | 40% | 288 | |
| | | | | | | - | |
| 3000.3 | NO.3 HOLD AFT BULKHEAD | | | | | - | |
| | No.3 hold aft bulkhead is cracked in way of the weld connection to the tank top approx. 2 meters | | | | | - | |
| | UT checked | point | 1.2 | | 0% | - | Min 50 points |
| | Gouged out and rewelded | m | 33 | | 40% | - | |
| | Vacuum test | m | 4 | | 40% | - | |
| | Crop the section out and putting an insert in place and rewelding | kg | 1.6 | | 0% | - | Mild steel |
| | | | | | | - | |
| 3000.4 | MAIN DECK PLATE | | | | | - | |
| | Area of main deck aft of No.7 hatch forward of accommodation bulkhead is thinned and grooved.Area to be renewed as required | kg | 1.8 | 288 | 0% | 518 | |
| | Staging if required | m3 | 5 | | 40% | - | |
| | No.7 port fuel oil tank to be cleaning | m3 | 9.5 | | 40% | - | |
| | Gas free | time/once | 40 | | 40% | - | |
| | | | | | | - | |
| 3000.5 | AFT PEAK TANK COATING | | | | | - | |
| | Manholes to be opened and refitted | pc | 30 | | 40% | - | |
| | Mud removal and disposal | ton | 80 | | 40% | - | |
| | Access hole to be cut for service and access | pc | 120 | | 40% | - | |
| | Grit sweep to SA1.5 | m2 | 14 | 1400 | 0% | 19,600 | |
| | On completion the area is to be painted to 400 micron owner | m2 | 0.5 | | 0% | - | |
| | Tank to be closed and pressure tested( air test ) | m3 | 1 | | 0% | - | |
| | Staging if required | m3 | 5 | | 40% | - | |
| | | | | | | - | |
| 3000.6 | CARGO HOLD NO.4 HYDRAULIC AND MANUAL VALVES | | | | | - | |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---|---|---|---|---|---|---|---|
| | Cargo hold No.4,ballast gravity overboard hydraulic and manual gate valves leaking.Both valves to be dismantled overhauled and pressure tested.Size 300 nominal dia. | pc | 328 | 4 | 40% | 787 | |
| | Ballast valve from ballast line on port side has been removed and blanked.The old valve/butterfly hydraulic to be overhauled with owner supplied spares | pc | 277 | | 40% | - | |
| | The ballast/bilge change over covers seats worn out and tends to leak,the seating lip to be built up,covers to recondition,water tight gasket on the covers to be replaced. | | | | | - | To be quoted on spot |
| | | | | | | - | |
| 3000.7 | AFT PEAK STEEL REPAIRS: | | | | | - | |
| | Rudder trunk discharge line passing through aft peak tank corroded and wasted.Wasted section to crop and renew.Sch80,75mm dia x 5 mtrs | m | 52 | 5 | 40% | 156 | Flanges and bends to be extra. |
| | After peak tank&rudder trunk to be cleaned | m3 | 2.2 | | 40% | - | |
| | Gas free | timerspace | 40 | | 40% | - | |
| | The manholes to be boxed up with new gasket | pc | 60 | 3 | 40% | 108 | |
| | Aft peak tank forward bulkhead to crop and insert 1600 x 300 x 10 | kg | 1.6 | 15 | 0% | 24 | Mild steel |
| | Aft peak tank forward bulkhead to crop and insert 500 x 300 x 10 | kg | 1.6 | 12 | 0% | 19 | Mild steel |
| | The insulation in the work shop adjacent to the bulkhead to be removed and refitted | m2 | 60 | | 40% | - | |
| | Aft peak tank top plating in engine room holed in four places to cropped and inserts fitted 500x500x10mm x 2 pcs | kg | 1.6 | 40 | 0% | 64 | Mild steel |
| | 300 x 300 x 10 x 2 pcs | pc | 20 | 2 | 0% | 40 | Mild steel |
| | The racks in store space to be shifted,hydrophore pumps/tanks to be removed and refitted. | | | | | - | To be quoted on spot. |
| | Air pressure test | m3 | 1 | | 40% | - | |
| | Manholes to be opened and refitted | pc | 30 | | 40% | - | Renewal of packing to be extra. |
| | | | | | | - | |
| 3000.8 | DECK CRANE JIB | | | | | - | |
| | Crane jib No.2,3,4,5&6 to be examined in way of the jib for corrosion in way of the area around resting point to the crutch on the lower two support. | set | 180 | 5 | 40% | 540 | |
| | Jib pipes are 10mm thick and 265mm dia and length to change will be approx 1 meters per section. | m | 360 | | 40% | - | |
| | Cherry picker if required | hour | 60 | | 40% | - | |
| | Staging if required | m3 | 4 | | 40% | - | |
| | On completion all cranes to be load tested 30mt | pc | 980 | | 40% | - | |
| | On completion all cranes to be load tested 40mt | pc | 1280 | | 40% | - | |
| | | | | | | - | |
| 3000.9 | HATCH COVER AND COAMING REPAIRS | | | | | - | |
| | UT gauging | point | 1.2 | | 0% | - | Min 50 points. |
| | Steel to be cropped from the covers | | | | | - | Pls refer to our steel |
| | Note:Hatch cover removal to be extra.Packing channel and drain channel 1.8/kg,Compressed bar 2/kg. | | | | | - | |
| | | | | | | - | |
| 3000.10 | HATCH COVER WHEELS AND TRACKS | | | | | - | |
| | Hatch cover small wheels and mounting side plates are weakened and distorted and need to be cropped and replaced or stiffened | | | | | - | Pls refer to our steel tariff. |
| | Hatch cover wheels to be removed and refitted | pc | 120 | 28 | 40% | 2,016 | |
| | | | | | | - | |
| 3000.11 | CARGO GRAB SUPPORT | | | | | - | |
| | New securing brackets to be fabricated and installed as per dimensions in sketch provided: | | | | | - | |
| | Supporting plate and C section channel plate | kg | 1.6 | | 0% | - | Mild steel |
| | Installation of wood 3030mm x 160mm x 160mm | pc | 90 | | 0% | - | |
| | | | | | | - | |
| 3000.12 | STEEL REPAIRS | | | | | - | |
| | Steel repairs on deck and in tanks.Estimate of total weight will be 70mt tons. | kg | 1.6 | 70000 | 0% | 112,000 | |
| | UT gauging | point | 1.2 | | 0% | - | Min 50 points |
| | Note:Steel repairs pls refer to our steel tariff below. | | | | | - | |
| | STEEL WORKS | | | | | - | |
| | Steel renewal (Mild steel) | | | | | - | |
| | up to 100 ton | kg | 1.6 | | 0% | - | |
| | up to 200 ton | kg | 1.5 | | 0% | - | |
| | up to 300 ton | kg | 1.45 | | 0% | - | |
| | over 300 ton | kg | 1.4 | | 0% | - | |
| | Note: | | | | | - | |
| | 1) Single curvature to be surcharged 10% | | | | | - | |
| | 2) Double curvature to be surcharged 50% | | | | | - | |
| | 3) Bulbous bow to be surcharged 150% | | | | | - | |
| | 4) High tensile steel to be surcharged 15% | | | | | - | |
| | 5) Small piece under 8kg/pc to be charged 20/pc (NET) | | | | | - | |
| | 6) Internal member to be surcharged 10% | | | | | - | |
| | 7) Removal, fairing up and refitting to be charged as 50% of above price | | | | | - | |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---|---|---|---|---|---|---|---|
| | 8) Fairing up in place to be charged as 60% of above price | | | | | - | |
| | 9) Above price including lighting, ventilation, steel shop primer, staging, but excluding tank cleaning, gas free, x-ray check, tank pressure testing etc. | | | | | - | |
| | 10) Staging if required | m3 | 2.5 | | 0% | - | |
| | 11) X-ray | pc | 40 | | 40% | - | |
| | | | | | | - | |
| | **4000.0 ENGINE,BOILER&PIPING REPAIRS** | | | | | - | |
| | | | | | | - | |
| 4000.1 | Main Engine B&W 5L80 GFCA | | | | | - | |
| | Quote for opening and overhauling one ME unit including liner | | | | | - | |
| | Cylinder head dismantling, cleaning, dye checking and P.R. test | unit | 1080 | | 40% | - | |
| | Piston removal to workshop, dismantling, cleaning and P.R. test | unit | 985 | | 40% | - | |
| | Renewal piston ring with owner supply, measurement cylinder liner | unit | 450 | | 40% | - | |
| | Drawing out cylinder liner, cleaning cooling water surface and scavenging port grinding if necessary | unit | 910 | | 40% | - | |
| | Removal stuff box of piston rod, cleaning, inspection and fitting | unit | 290 | | 40% | - | |
| | | | | | | - | |
| 4000.2 | M/E Air Cooler | | | | | - | |
| | Remove interferences and disconnect piping, remove air cooler ashore. Chemical cleaning air and water sides, Pressure test to 3 kg/cm2 to satisfaction of owner's representative. Replace onboard and reinstall using new gaskets, leave ready for use | set | 3250 | | 40% | - | Ultrasonic cleaning N/A |
| | Plug tube with copper & stainless USD10/pc | | | | | - | |
| | | | | | | - | |
| 4000.3 | M/E Turbo Charger -MAN NA 700 | | | | | - | |
| | Dismantling and overhauling of complete unit.Nozzle ring to remove and land ashore with rotor for ash blasting.Rotor to be dynamically balanced.Bearings to be checked with a Go/No go tool(Onboard).Thrust surfaces to be checked for damages.Worn parts to be renewed with new parts(Owner supply).Refit all parts back and take all required calibrations.The casing to be examined. | set | 4450 | 1 | 0% | 4,450 | The work to be carried out by our sub-contractor NanTong. |
| | | | | | | - | |
| 4000.4 | GENERATOR AIR COOLERS | | | | | - | |
| | Transport ashore and chemically clean.Pressure test,coated. | set | 780 | | 40% | - | |
| | | | | | | - | |
| 4000.5 | MAIN ENGINE GOVERNOR OVERHAUL | | | | | - | |
| | Type :PGA 820e Spare part supplied by owner,repairs to be extra. | set | 2860 | | 0% | - | |
| | | | | | | - | |
| 4000.6 | ALTERNATOR GOVERNOR OVERHAUL | | | | | - | |
| | Type: Woodward UG8.Spare part supplied by owner,repairs to be extra. | set | 1100 | | 0% | - | |
| | | | | | | - | |
| 4000.7 | FRESH WATER GENERATOR | | | | | - | |
| | Disconnect the pipe work and remove heat exchanger.Transport unit to workshop and chemical clean..Pressure test.Fit back in position onboard and test | set | 1980 | | 40% | - | |
| | Clear any blocked tubes and if unable to clear put in a yard manufactured plug | pc | 55 | | 0% | - | |
| | Plug tube with copper & stainless plug USD10/pc | | | | | - | |
| | | | | | | - | |
| 4000.8 | GEISLINGER COUPLING | | | | | - | |
| | The main engine Geislinger coupling is to be removed from the engine and taken to a shore workshop. | job | 1320 | 1 | 40% | 792 | Service engineer to be arranged by owner . |
| | Labour and equipment to be provided to assist the service engineer to open the coupling and renew the various internal parts. | | | | | - | |
| | If any machining will be required to the coupling.To be quoted on spot. | | | | | - | |
| | | | | | | - | |
| 4000.9 | SEA WATER VALVE REPAIRS | | | | | - | |
| | The following ships valves to be overhauled.Pls refer to our attached valves tariff. | | | | | - | |
| | | | | | | - | |
| 4000.10 | BALLAST EDUCTOR PORT AND STARBOARD | | | | | - | |
| | Port and starboard eductors situated below floor plate level to be removed from the pipe line checked internally. | pc | 680 | 2 | 40% | 816 | Any repair to be charged extra |
| | Inlet and outlet valves to be overhauled. | | | | | - | Pls refer to our attached valves |
| | | | | | | - | |
| 4000.11 | TURBO ALTERNATOR | lumpsum | 6532 | | 40% | - | |
| | Service engineer to attend ( Owners arrangement ) | | | | | - | |
| 4000.11.1 | Supply labour and lifting equipment to lift the top half of turbine cover and gear castings.Clean all parts,check all bearings for wear,renew all gland seals(Owner supply) | | | | | - | |
| 4000.11.2 | Drain sump and open gear case,clean internally without leaving lint on surfaces.Dismantle and examine LO pump and coupling | | | | | - | |
| 4000.11.3 | Remove turbine rotor to workshop and ash blast | | | | | - | |
| | Build up the gland areas by chrome welding as required | | | | | - | To be extra quoted on spot. |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---|---|---|---|---|---|---|---|
| | Check trueness of shaft and carry out dynamic balancing. Return to vessel and refit. | | | | | | |
| 4000.11.4 | Inspect top and bottom halves of casing.If required remove and take to workshop and ash blast sections. On completion refit. | | | | | - | |
| 4000.11.5 | Stem regulating valve to be remove and opened for inspection. | | | | | | |
| | Any damaged or worn parts to be made good. | | | | | - | To be quoted on spot. |
| | | | | | | - | |
| 4000.12 | TURBO GENERATOR GOVERNOR UG8 | | | | | - | |
| | Remove from the unit and landed ashore for service.Bench tested and reinstalled. | set | 1100 | | 0% | - | |
| 4000.13 | TURBO GENERATOR CONDENSER RETUBE | | | | | -\| | |
| | The main dondenser of turbo alternator to be opened and cleaned | set | 980 | | 40% | - | |
| | The tubes to be replaced 100 tubes 20mm dia x 2m length.Tubes to be supplied by owner. | pc. | 55 | 100 | 0% | 5,500 | |
| | | | | | | - | |
| 4000.14 | STEERING GEAR | | | | | - | |
| | Servo slide to be opened for examination and cleaning.Packing to be inspected and replaced as necessary with owners spare. | pc | 780 | | 40% | - | |
| | | | | | | - | |
| 4000.15 | BOILER HOT WELL | | | | | - | |
| | Boiler hot well has a capacity of 2.5cum.UT gauging to be taken on sides and bottom | point | 1.2 | | 0% | - | Min 50 points |
| | New shell plating to be installed.Estimate 10sqm 10mm plate. | sq | 1.5 | | 0% | | |
| | Various pipe connections and fitting to be cropped and reinstalled. | lumpsum | 438 | 1 | 40% | 263 | |
| | | | | | | - | |
| 4000.16 | ER SW LINE VALVES | | | | | - | |
| | Valves to be opened and overhauled total 39 pcs.pls refer to our attached valves tariff | total | 6617 | 1 | 40% | 3,970 | |
| | | | | | | - | |
| 4000.17 | MAIN ENGINE CONTROL SYSTEM  B7W 5L80GFC | | | | | - | |
| | Arranged by owner.Machining or cleaning of the pneumatic parts to be quoted on spot. | | | | | - | |
| | | | | | | - | |
| | 5000 PIPEWORK | | | | | - | |
| 5000.1 | HATCH COVER HYDRAULIC PIPES | | | | | - | |
| | HATCH 1 | | | | | | |
| | Hydraulic pipe 25mm(25/17) - 55 Mtrs | m | 22 | 55 | 40% | 658 | |
| | Hydraulic pipe 20mm(20/14) - 120 Mtrs | m | 20 | 120 | 40% | 1,440 | |
| | Coupling for 25mm pipe with ferules - 23 pcs | pc | 10 | 23 | 0% | 230 | |
| | Coupling for 20mm pipe with ferules - 42 pcs | pc | 8 | 42 | 0% | 336 | |
| | T coupling for 25mm pipe - 4pcs | pc | 10 | 4 | 0% | 40 | |
| | T coupling for 20mm pipe - 18pcs | pc | 8 | 18 | 0% | 144 | |
| | Rubber hoses 20mm with one end elbow and straight coupling - | pc | 20 | 6 | 0% | 120 | |
| | | | | | | | |
| | HATCH 2 | | | | | | |
| | Hydraulic pipe 25mm(25/17) - 60 Mtrs | m | 22 | 60 | 40% | 792 | |
| | Hydraulic pipe 20mm(20/14) - 115 Mtrs | m | 20 | 115 | 40% | 1,380 | |
| | Coupling for 25mm pipe with ferules - 23 pcs | pc | 10 | 23 | 0% | 230 | |
| | Coupling for 20mm pipe with ferules - 42 pcs | pc | 8 | 42 | 0% | 336 | |
| | T coupling for 25mm pipe - 4pcs | pc | 10 | 4 | 0% | 40 | |
| | T coupling for 20mm pipe - 18pcs | pc | 8 | 18 | 0% | 144 | |
| | Rubber hoses 20mm with one end elbow and straight coupling - | pc | 20 | 6 | 0% | 120 | |
| | | | | | | | |
| | HATCH 3 | | | | | | |
| | Hydraulic pipe 25mm(25/17) - 55 Mtrs | m | 22 | 55 | 40% | 726 | |
| | Hydraulic pipe 20mm(20/14) - 120 Mtrs | m | 20 | 120 | 40% | 1,440 | |
| | Coupling for 25mm pipe with ferules - 23 pcs | pc | 10 | 23 | 0% | 230 | |
| | Coupling for 20mm pipe with ferules - 42 pcs | pc | 8 | 42 | 0% | 336 | |
| | T coupling for 25mm pipe - 4pcs | pc | 10 | 4 | 0% | 40 | |
| | T coupling for 20mm pipe - 18pcs | pc | 8 | 18 | 0% | 144 | |
| | Rubber hoses 20mm with one end elbow and straight coupling - | pc | 20 | 6 | 0% | 120 | |
| | | | | | | | |
| | HATCH 4 | | | | | | |
| | Hydraulic pipe 25mm(25/17) - 60 Mtrs | m | 22 | 60 | 40% | 792 | |
| | Hydraulic pipe 20mm(20/14) - 130 Mtrs | m | 20 | 130 | 40% | 1,560 | |
| | Coupling for 25mm pipe with ferules - 23 pcs | pc | 10 | 23 | 0% | 230 | |
| | Coupling for 20mm pipe with ferules - 42 pcs | pc | 8 | 42 | 0% | 336 | |
| | T coupling for 25mm pipe - 4pcs | pc | 10 | 4 | 0% | 40 | |
| | T coupling for 20mm pipe - 18pcs | pc | 8 | 18 | 0% | 144 | |
| | Rubber hoses 20mm with one end elbow and straight coupling - | pc | 20 | 6 | 0% | 120 | |
| | | | | | | | |
| | HATCH 5 | | | | | | |
| | Hydraulic pipe 25mm(25/17) - 55 Mtrs | m | 22 | 55 | 40% | 726 | |
| | Hydraulic pipe 20mm(20/14) - 125 Mtrs | m | 20 | 125 | 40% | 1,500 | |
| | Coupling for 25mm pipe with ferules - 23 pcs | pc | 10 | 23 | 0% | 230 | |
| | Coupling for 20mm pipe with ferules - 42 pcs | pc | 8 | 42 | 0% | 336 | |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---|---|---|---|---|---|---|---|
| | T coupling for 25mm pipe - 4pcs | pc | 10 | 4 | 0% | 40 | |
| | T coupling for 20mm pipe - 18pcs | pc | 8 | 18 | 0% | 144 | |
| | Rubber hoses 20mm with one end elbow and straight coupling - | pc | 20 | 6 | 0% | 120 | |
| | | | | | | | |
| | HATCH 6 | | | | | | |
| | Hydraulic pipe 25mm(25/17) - 55 Mtrs | m | 22 | 55 | 40% | 726 | |
| | Hydraulic pipe 20mm(20/14) - 120 Mtrs | m | 20 | 120 | 40% | 1,440 | |
| | Coupling for 25mm pipe with ferrules - 23 pcs | pc | 10 | 23 | 0% | 230 | |
| | Coupling for 20mm pipe with ferrules - 42 pcs | pc | 8 | 42 | 0% | 336 | |
| | T coupling for 25mm pipe - 4pcs | pc | 10 | 4 | 0% | 40 | |
| | T coupling for 20mm pipe - 18pcs | pc | 8 | 18 | 0% | 144 | |
| | Rubber hoses 20mm with one end elbow and straight coupling - | pc | 20 | 6 | 0% | 120 | |
| | | | | | | | |
| | HATCH 7 | | | | | | |
| | Hydraulic pipe 25mm(25/17) - 60 Mtrs | m | 22 | 60 | 40% | 792 | |
| | Hydraulic pipe 20mm(20/14) - 130 Mtrs | m | 20 | 130 | 40% | 1,560 | |
| | Coupling for 25mm pipe with ferrules - 23 pcs | pc | 10 | 23 | 0% | 230 | |
| | Coupling for 20mm pipe with ferrules – 42 pcs | pc | 8 | 42 | 0% | 336 | |
| | T coupling for 25mm pipe - 4pcs | pc | 10 | 4 | 0% | 40 | |
| | T coupling for 20mm pipe - 18pcs | pc | 8 | 18 | 0% | 144 | |
| | Rubber hoses 20mm with one end elbow and straight coupling - | pc | 20 | 6 | 0% | 120 | |
| | | | | | | | |
| | Pipe clamps for 25mm pipe - 300 pcs | pc | 10 | 300 | 0% | 3,000 | |
| | Pipe clamps for 20mm pipe - 450 pcs | pc | 8 | 450 | 0% | 3,600 | |
| | | | | | | | |
| 5000.2 | SEA WATER PIPES See sketches Sch 40 | | | | | - | |
| | Inlet sea pipe in M.E. fresh water cooler | pc | 866 | 1 | 40% | 520 | |
| | A/C sea water cooling pump discharge pipe | m | 80 | | 40% | - | Length not found,flange and bend pls refer to our attached piping tariff |
| | Delivery A/E sea water cooling pump | m | 80 | | 40% | - | Length not found,flange and bend pls refer to our attached piping tariff |
| | A.C fridge sw cooling pump discharge pipe | pc | 321 | 1 | 40% | 193 | |
| | Cargo Gen. sw cooling pump | pc | 190 | 2 | 40% | 228 | |
| | Ps ballast pump suction pipe | m | 230 | | 40% | - | Length not found,flange and bend pls refer to our attached piping tariff |
| | Turbo alternator sw cooling condenser discharge pipe | pc | 765 | 1 | 40% | 459 | |
| | F.W.G ejector pump delivery pipe | pc | 148 | 1 | 40% | 89 | |
| | | | | | | | |
| | | | | | | | |
| | 6000.0 ELECTRIC/ELECTRONIC REPAIRS/RADIO&NAVIGATION EQUIPMENT | | | | | | |
| | | | | | | | |
| 6000.1 | MAIN ALTERNATORS | | | | | - | |
| | Main alternator to be cleaned,inspected,rotor and stator to be cleaned and windings painted/varnished.Bearing to be checked.Engine to be test run on completion.Bearings renewal by yard to be quoted on spot. | set | 2566 | | 40% | - | |
| | Complete removal from the vessel lifting from engine room and landing ashore for cleaning | set | 3852 | | 40% | - | |
| | | | | | | | |
| 6000.2 | CALIBRATION OF PRESSURE GAUGES/THERMOCOUPLES | | | | | - | |
| a) | Boiler gauge 0-12kg/cm | pc | 80 | | 40% | - | |
| b) | Fuel valve test gauge 0-450kg/cm | pc | 80 | | 40% | - | |
| c) | Hydraulic jack gauge 0-1000kg/cm | pc | 120 | | 40% | - | |
| d) | ME exhaust pyrometers 0-650kg/cm | pc | 80 | | 40% | - | |
| | | | | | | | |
| 6000.3 | LUBRICATING OIL PUMP MOTORS | | | | | - | |
| | Two motors for lub oil pumps to be overhauled | set | 1380 | 2 | 40% | 1,656 | |
| | | | | | | | |
| 6000.4 | ECHO SOUNDER | | | | | - | |
| | Echo sounder transponder to be checked by qualified technician. | set | 720 | | 0% | - | |
| | | | | | | | |
| 6000.5 | SPEEDLOG | | | | | - | |
| | Sensor to be checked by suitable technician. Renewal of owner supplied spares. | set | 720 | | 0% | - | |
| | | | | | | | |
| 6000.6 | SWITCHBOARD | | | | | - | |
| | Switchboard breakers to be tested | set | 580 | | 40% | - | |
| | All switchboard connection to be tested for tightness | panel | 220 | | 40% | - | |
| | | | | | | | |
| 6000.7 | SWITCHBOARD METERS | | | | | - | |
| | Switchboard power meters voltmeters and frequency meter to be tested and stamped | pc | 80 | | 40% | - | |
| | | | | | | | |

| Item No | Jobs Descriptions | Unit | Unit Price | Qty | Discount | Sub Total | Remarks |
|---------|-------------------|------|-----------|-----|----------|-----------|---------|
| | 7000.0 MISCELLANEOUS | | | | | - | |
| | | | | | | - | |
| 7000.1 | HATCH COVER END STOPPERS | | | | | - | |
| | Hatch cover No.1-7 end stoppers to be installed as per the supplied drawings. | pc | 40 | | 0% | - | Owner supply |
| | Stopper yard supply to be quoted | | | | | - | |
| | Staging if required | m3 | 4 | | 40% | - | |
| | | | | | | - | |
| 7000.2 | HOLD SIDE FRAMES TO BE MODIFIED TO URS31 STANDARD | | | | | - | |
| 7000.2.1 | Staging to be provided at minimum to access the lower side brackets in each hold | m3 | 5 | | 40% | - | |
| 7000.2.2 | See attached sheet estimated extent of renewals to bottom end of frame face plates and quote for same.In addition there may be some complete frames to renew. | kg | 1.8 | | 0% | - | Pls refer to our steel tariff abt.13tons |
| | | | | | | - | |
| 7000.3 | MAIN GENERATOR SET EXCHANGE B&W 5T23U1-2 | | | | | - | |
| | Full overhaul of above engine type in situ. | set | 6300 | | 40% | - | |
| | Complete removal of generator | set | 25000 | | 40% | - | Different type to be quoted after being advised spec. |

## Pipe Work (MS,Schedule 40)

Pipe renewal including bolt, nut and gasket, excluding flange and bent

| Dia of pipe | | Pipe renewal (m) | | Bend | Insulation | Flange |
|---|---|---|---|---|---|---|
| mm | inch | Steel | Copper | (Pc) | (m) | (Pc) |
| <25 | <1 | 17 | 46 | 7 | 7 | 5 |
| 40 | 1.5 | 24 | 72 | 9 | 9 | 8 |
| 50 | 2 | 30 | 90 | 11 | 11 | 10 |
| 65 | 2.5 | 40 | 118 | 15 | 14 | 13 |
| 80 | 3 | 48 | 135 | 17 | 16 | 15 |
| 90 | 3.5 | 56 | 160 | 21 | 20 | 18 |
| 100 | 4 | 65 | 184 | 23 | 21 | 20 |
| 125 | 5 | 80 | 226 | 30 | 27 | 25 |
| 150 | 6 | 96 | | 33 | 34 | 30 |
| 200 | 8 | 140 | | 56 | 50 | 45 |
| 250 | 10 | 185 | | 74 | 67 | 60 |
| 300 | 12 | 230 | | 92 | 84 | 75 |
| 350 | 14 | 283 | | 120 | | 80 |
| 400 | 16 | 326 | | 154 | | 100 |
| 450 | 18 | 380 | | 199 | | 120 |
| 500 | 20 | 420 | | 268 | | 140 |
| 550 | 22 | 468 | | 344 | | 212 |
| 600 | 24 | 503 | | 404 | | 243 |
| 650 | 26 | 549 | | 474 | | 284 |

Note:

(1)  For pipe length under one meter, price shall be applied as one meter, for pipe length is over one meter, the calculation shall be made actual length.

(2)  For pipe 's Dia which is between two specified as above, the rate of bigger shall be applied

(3)  Above price exclude staging, pressure test, accessory work, blasting and painting

(4)  Surcharged to be applied as follows:

| | |
|---|---|
| Engine room and pump room to be surcharged | 25% |
| Cargo hold to be surcharged | 10% |
| Topside tank, fore/aft peak tanks to be surcharged | 25% |
| Double bottom tank and pipe tunnel to be surcharged | 35% |
| Galvanized pipe to be surcharged | 25% |
| Acid treated pipe to be surcharged | 15% |
| SCH 80 to be surcharged | 30% |
| SCH 160 | 60% |

(5)  Removal and refitting the pipe or renewal pipe with owner supply to be charged the percentage as above rate as follows:

| | |
|---|---|
| On deck | 30% |
| Engine room and pump room | 40% |
| Cargo hold | 40% |
| Topside tank, fore/aft peak tank | 50% |
| Double bottom tank and pipe tunnel | 60% |

## Sea Valve

Open up sea valve for survey, grinding in, cleaning and painting. Renewing packing studs/bolt and close up in place

| Dia (mm) | Globe | Gate | Butterfly |
|---|---|---|---|
| 25 | 33 | 44 | 48 |
| 50 | 39 | 55 | 61 |
| 80 | 50 | 66 | 73 |
| 100 | 61 | 83 | 91 |
| 125 | 78 | 114 | 125 |
| 150 | 96 | 144 | 158 |
| 200 | 120 | 180 | 198 |
| 250 | 144 | 216 | 238 |
| 300 | 168 | 252 | 277 |
| 350 | 192 | 288 | 316 |
| 400 | 216 | 336 | 370 |
| 450 | 252 | 384 | 422 |
| 500 | 276 | 432 | 475 |
| 600 | 312 | 492 | 541 |
| 700 | 360 | 564 | 620 |
| 800 | 420 | 600 | 660 |

Note:  (1)    Renewal of valve (with owner supply valve). 80% of above tariff
       (2)    Valve to workshop repair to be surcharged 50%
       (3)    Any repair to be extra

V       Electrical works
1       Motor
A. 1) Disconnect cable, dismount the motor from the base and transport to the
       workshop dispose and clean.
   2) Examine motor insulation, soaked with vanish once and heat-dry.
   3) Renew roller bearing, (owner's supply)
   4) Adjust brush frame center, renew carbon brush (supply) and make refitting.
   5) Assemble and mount on board, connect cable and make running test.
B. 1) Inclusive of working items of A. 1-5.
   2) Examine connecting line, wrap or renew damaged parts.
   3) Paint the motor outfit once (not scraping the old paint).
   4) Machine copper ring, machine and slot commentators.
   5) Rotator (DC) or stator coils rewinding.
   6) Making rotator dynamic and static balance.
   7) Fit and replace the damaged fastenings.
C. 1) Inclusive of all the working items of B.
   2) Renew outer top cover.
   3) renew roller bearing, repair or remetal sliding bearing.
   4) Renew motor outer and inner connecting line.
   5) Renew carbon brush frame, renew damaged brush rod insulation.
      Repair and galvanize brush handler.
   6) Repair or renew inner vane of motor.
   7) Replace 50% fasteners.

Price / per set

| Work item | A | | B | | C | |
|-----------|-----|-----|-----|-----|-----|-----|
| Motor Type | A.C | D.C | A.C | D.C | A.C | D.C |
| ( kw ) | | | | | | |
| to    0.5 | 85 | 163 | 211 | 406 | 254 | 486 |
| to    1.0 | 140 | 269 | 350 | 671 | 419 | 806 |
| to    2.0 | 241 | 339 | 599 | 995 | 719 | 1196 |
| to    5.0 | 281 | 421 | 701 | 1050 | 841 | 1261 |
| to    10. | 421 | 550 | 1050 | 1373 | 1261 | 1647 |
| to    15. | 515 | 757 | 1284 | 1693 | 1541 | 2033 |
| to    20. | 625 | 807 | 1560 | 2015 | 1872 | 2418 |
| to    30. | 679 | 944 | 1693 | 2335 | 2033 | 2802 |
| to    50. | 814 | 1230 | 2031 | 2744 | 2438 | 3294 |
| to    70. | 948 | 1287 | 2365 | 3211 | 2838 | 3853 |
| to    90. | 1083 | 1474 | 2703 | 3678 | 3244 | 4414 |
| to    150 | 1217 | 1658 | 3678 | 4144 | 3649 | 4973 |
| to    200 | 1347 | 1937 | 3546 | 4844 | 4258 | 5811 |

NOTE:
1). Deck motor, blower and low speed motors to 1000 rpm K= 1.25.
2). Multi-speed motor shall be charged according to Max. Output.
3). Dismounting and mounting, refitting, testing and adjusting shall be charged at
    above price.
4). Motor with stopper and clutch shall be charged as K=1.3.
5). Simple dismounting and refitting shall be charged as K=0.3.
6). Accessory work for dismounting motor shall be charged extra.
7). The price is not for explosive-proof or submarine motors.

# EXHIBIT 3

发件人: Marcas Dry Dock Services <drydockservices@mcontract.com>
收件人: ?? <lirong@cosco-shipyard.com>
'yanchongyu@cosco-shipyard.com' <yanchongyu@cosco-shipyard.com>
抄送: Ravano, Matteo - Director Dry Dock Services <matteo.ravano@mcontract.com>
Rouze, Corinne <corinne.rouze@mcontract.com>
McNamara, Ray <Ray.McNamara@vships.com>
Ranjan, Pradeep <pradeep.ranjan@vships.com>
Burton, Christopher <christopher.burton@vships.com>
Korchynskyy,Ivan <Ivan.Korchinskyy@vships.com>
主 题: RE: "UNIVERSAL CHALLENGER" - Drydocking official award letter
日 期: 2006-7-6 20:59:53
附 件: UNIVERSAL CHALLENGER COSCO ZH Dry Docking award LETTER.doc

Monaco, 6 July 2006

TO: COSCO SHIPYARD GROUP - COSCO ZHOUSHAN SHIPYARD

Attn: Mr. Li Rong
FM: Matteo RAVANO  (Director Dry Dock Services)  MARCAS

RE: "UNIVERSAL CHALLENGER" - Drydocking official award letter

Dear Sirs,

    would you please find herewith attached the dry-docking official award letter
confirmation for the repairs of the vessel in reference, which we kindly ask you to confirm in
full by return.

<<UNIVERSAL CHALLENGER COSCO ZH Dry Docking award LETTER.doc>>

Thanks & best regards.

Matteo Ravano
Director Dry Dock Services
MARCAS

P.P.

Livio Milossevich
Estimator Dry Dock Services

MARCAS
Dry Dock Services
"Aigue Marine"
24, Avenue de Fontvieille
98013 Monaco
MONACO

Tel: +377 92051010 (switchboard)
Tel: +377 92051033 (direct)

Fax: +377 92051163
E-mail: drydockservices@mcontract.com
Web:www.marcas.org

MARCAS

This email is confidential and intended solely for the use of the individual to whom it is addressed. If you are not the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error please contact the sender.



**marcas**

Tel 377 92051032 / 33    "Aigue Marine" -24 Av de Fontevieille          Fax :377 92051163

Monaco, 6 July 2006

To :COSCO  SHIPYARD GROUP
    13th Floor International Shipping &
    Finance Center, 720 Pudong Avenue,
    200120 Shanghai, China

    COSCO ZHOUSHAN SHIPYARD
    *HEREAFTER CALLED THE SHIPYARD*


     attention: Mr. Li Rong

  c.c.: Mr. Pradeep Ranjan
        Mr. Chris Burton
        Mr. Ivan Korchynskyy

      c/o V.SHIPS LTD(CYPRUS)

C.C. : Mr. Ray McNAMARA
       Mr. Simon HEMPER

 Fm: Matteo Ravano
     Director Dry Dock Services
     MARCAS Monaco Office


              DRY DOCKING OF
       M.v. UNIVERSAL CHALLENGER
       ---------------------------------------


      WE ARE PLEASED TO AWARD TO COSCO
      ZHOUSHAN SHIPYARD THE DRY DOCKING AND
      REPAIRS OF THE VESSEL M.v.UNIVERSAL
      CHALLENGER MANAGED BY V. SHIPS LTD
      (CYPRUS).
      THE AWARD IS SUBJECT TO ALL PREVIOUS
      CORRESPONDENCE AND AGREEMENT BETWEEN
      MARCAS/V.SHIPS AND COSCO ZHOUSHAN
      SHIPYARD AND RE. TO COSCO ZHOUSHAN

SHIPYARD QUOTATION REF. NO. H 060584
DTD 3rd JULY 2006.


PAYMENT
- - - - - - -
AGREED PAYMENT TERMS ARE :

30 % OF TOTAL AMOUNT - ON VESSEL'S
DEPARTURE.

30 % OF TOTAL AMOUNT - AFTER 60 DAYS
FROM VESSEL'S RE-DELIVERY

40 % OF TOTAL AMOUNT - AFTER 120 DAYS
FROM VESSEL'S

THE FOLLOWING AGREED DISCOUNT WILL BE
APPLIED ON THE FINAL INVOICE:
  • TO APPLY 2% DISCOUNT ON THE FINAL
    INVOICE SUBJECT TO TOTAL REPAIR
    COST IS OVER 1 MILLION USD
  • OR TO APPLY 3% DISCOUNT ON THE
    FINAL INVOICE SUBJECT TO THE TOTAL
    REPAIR COST IS OVER 1,5 MILLION
    USD
AND IT WILL BE GRANTED TO
OWNERS/MANAGERS ACCORDINGLY.


YARD MUST SEND TO V.SHIPS LTD CYPRUS
OFFICE BY FAX AT LEAST 8 DAYS BEFORE
COMPLETION OF WORKS AN ESTIMATE OF
FINAL BILL WITH FULL BANK DETAILS FOR
T.T.REMITTANCE (COPY TO MARCAS DRY
DOCK SERVICES MONACO OFFICE)
THE FINAL BILL MUST BE SENT IN 2 PARTS
- GENERAL SERVICES
- OWNERS REPAIRS


PENALTY/LIQUIDATED DAMAGES
- - - - - - - - - - - - - - - - - - - - - - - - - - -

FOR LATE DELIVERY WILL BE REQUIRED
USD.10,000/DAY,WITH
MAXIMUM LIMIT OF 10%.
WILL NOT BE ALLOWED BONUS FOR EARLY
RE-DELIVERY


SUPERINTENDENT
---------------
MR. IVAN KORCHYNSKYY HAS BEEN
NOMINATED AS THE V.SHIPS ATTENDING
SUPERINTENDENT AND HE WILL LIAISE WITH
YOU ACCORDINGLY.
THE SUPERINTENDENT WILL SIGN FOR WORK
DONE ONLY, WHILE OWNERS AUTHORISE HIM
AND/OR ANY OTHER OWNERS REPRESENTATIVE,
TO SIGN THE REPAIRS INVOICE AFTER THE
NEGOTIATIONS WILL BE FINALISED BETWEEN
THE PARTIES.
PLS SEND THE FINAL INVOICE VIA
V.SHIPS LTD (CYPRUS), COPY TO MARCAS
DRYDOCK SERVICES MONACO OFFICE.

ADDITIONAL WORK
---------------
HAS TO BE CHARGED AT THE PRICE
SCHEDULED AS QUOTED WORK.
ANY EXTRA WORKS MUST BE ESTIMATED AND
SUBMITTED TO THE ATTENDING
SUPERINTENDENT BEFORE AGREEMENT CAN BE
GIVEN TO PROCEED WITH THE WORK AND
COPY OF THE WORK SIGNED AGREEMENT
SHOULD BE SENT TO MARCAS - DRYDOCK
SERVICES AS SOON AS SIGNED.
FAILING THIS NO EXTRA JOB CAN BE
STARTED.
IN CASE AT THE END OF THE REPAIRS THE
YARD WILL CLAIM FOR EXTRA WORKS COSTS
NOT APPROVED AND SIGNED BY THE
SUPERINTENDENT THE OWNER WILL HAVE
RIGHT NOT TO RECOGNISE SUCH EXPENSES.


CANCELLED WORK
---------------
WILL NOT BE SUBJECT TO ANY PENALTY.

HOLIDAYS
---------
PLEASE CONFIRM THAT IF ANY NATIONAL
HOLIDAYS OCCUR DURING THE PERIOD
OF THE REPAIR EVENT, THESE WILL NOT
EXTEND THE REPAIR TIME.

TIME
----
VSL ETA IS ON OR ABOUT RANGE 25th-27th
JULY 2006.
THE EXACT ETA OF THE VESSEL WILL BE
KEPT UPDATED BY V.SHIPS LTD (CYPRUS).
THE TOTAL EXPECTED PERIOD IN SHIPYARD IS
38 RUNNING DAYS, OF WHICH 5 DAYS IN
DRYDOCK. HOWEVER THE RE-DELIVERY TIME
WILL BE DISCUSSED & CONFIRMED DURING
FIRST MEETING IN SHIPYARD WITH ATTENDING
SUPERINTENDENT AFTER REVIEW OF THE SCOPE
OF WORK. PLEASE CONFIRM.
THE VSL MUST HAVE ACCESS TO GOOD
CRANEAGE AND NOMINATED SHIP REPAIR
MANAGER MUST HAVE PREVIOUS BULK
CARRIER EXPERIENCE.
PLEASE CONFIRM THAT THE ETA OF VESSEL
IS ACCEPTABLE AND THAT WORKS WILL
COMMENCE IMMEDIATELY UPON VESSEL'S
ARRIVAL.
VSL IS A BULK CARRIER AND WILL ARRIVE
GASFREE FOR HOTWORK. PLS ARRANGE PORT
CHEMIST TO VERIFY/CERTIFY GAS FREE FOR
REPAIRS AND HOT WORKS.

TERMS AND CONDITIONS
--------------------
MARCAS / V.SHIPS STANDARD TERMS &
CONDITIONS APPLY.

CREW TO WORK
------------
DURING THE REPAIRS, WHILST THE SHIP IS
IN THE YARD, THE CREW WILL BE

WORKING ONBOARD, AND WILL NOT SUFFER
ANY RESTRICTIONS FROM THE YARD IN
DOING THIS. OWNERS MAY PLAN AN SGM
TEAM TO CONTINUE MAINTENANCE WORKS
DURING YARD STAY.
PLEASE ALSO CONFIRM OWNERS SUB-
CONTRACTORS AND MANUFACTURERS SERVICE
ENGINEERS WILL BE PERMITTED TO WORK AT
YARD WITHOUT BEING SUBJECT TO ANY
SURCHARGES.
ALL THESE WORKS WILL BE SUBJECT TO
YARD SAFETY REGS.


ARRIVALS
--------
THE SHIP IS PROGRAMMED TO ARRIVE AT
YOUR YARD VSL ETA IS ON OR ABOUT RANGE
25th-27th  JULY 2006.
PLEASE CONFIRM THAT A DRY-DOCK WILL BE
KEPT AVAILABLE FOR THE VESSEL FOR THAT
TIME.
V.SHIPS LTD (CYPRUS), WILL ADVISE YOU
OF EXACT ARRIVAL TIME NEARER TO THE
DAY AND UPDATE YOU OF ANY CHANGES.
PLEASE BE IN CONTACT WITH FLEET
MANAGER MR.CHRIS BURTON FOR THIS
MATTER.

PLS CONFIRM CLEAR RECEIPT OF THIS
LETTER AND LET US HAVE YOUR AGREEMENTS
TO ITS CONTENTS AS SOON AS POSSIBLE.

SPECIAL INSTRUCTION
-------------------
AS PER COMPANY POLICY, WE REQUIRE
CONFIRMATION THAT VESSEL WILL BE
DOCKED ALONE WITHOUT SHARING THE DRY-
DOCK WITH ANOTHER VESSEL AND NOT
BERTHED IN DOUBLE BANKING.
PLEASE ADVISE.


YOURS FAITHFULLY
MARCAS SA AS AGENTS ON BEHALF OF
V.SHIPS LTD (CYPRUS) AS AGENTS AND
MANAGERS ONLY FOR AND ON BEHALF OF THE

OWNERS, BULK CONTAINER SHIPPING AND THE
VESSEL <u>UNIVERSAL CHALLENGER</u>.

MATTEO RAVANO
DIRECTOR DRY DOCK SERVICES
MARCAS

# EXHIBIT 4

02-AUG-2007  10:37  FROM  HFWS&T        TO  900862158871810      P.0

## Tina Argent

| | |
|---|---|
| From: | Tina Argent on behalf of MARCUS BOWMAN |
| Sent: | 01 August 2007 14:30 |
| To: | 'melody@handylawfirm.com' |
| Cc: | MARCUS BOWMAN |
| Subject: | UNIVERSAL CHALLENGER - Contract dd 6/7/06 - Your Ref: J07103-00 |

We refer to the above matter and hereby give you notice that our clients have today appointed Mr Mark Hamsher of 18c Ensign Street, London E1 8JD as their arbitrator for all disputes arising under the above contract. In accordance with paragraph 29 of the VShips standard Terms & Conditions we call upon you to appoint your clients' arbitration within 14 days and look forward to hearing from you in this regard.

Regards

Marcus Bowman
HOLMAN FENWICK & WILLAN
Direct Tel: + 44 207 264 8551
email: marcus.bowman@hfw.co.uk
www.hfw.com

01/08/2007

# EXHIBIT 5

THIS IS TO CERTIFY that this document is a true copy of the original

*[signature]*

Registrar of Bahamian Ships
London

# CHEESWRIGHTS
## NOTARIES PUBLIC

10 Philpot Lane London EC3N 8BR
Telephone: 020 7623 9477 (or) 07000 NOTARIES

Facsimile: 020 7623 5428
E-mail: notary@cheeswrights.co.uk
www.cheeswrights.co.uk
DX 627/London City EC3

TO ALL TO WHOM THESE PRESENTS SHALL COME, I EDWARD GARDINER of the City of London NOTARY PUBLIC by royal authority duly admitted and sworn DO HEREBY CERTIFY that I was present and did see MOHAMMED NAJEB AL ASSAF duly authorised president/director of the company styled BULK CONTAINER SHIPPING INC. of Nassau, the Bahamas (hereinafter called "the Company") seal and as and for its act and deed in due form of law sign and deliver the instrument hereunto annexed and that the signature subscribed to the said instrument for and on behalf of the Company is of the own, true and proper handwriting of the said president/director, acting pursuant to a resolution of a meeting of the board of directors of the Company dated 15th March 2004.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office at London aforesaid this twenty third day of March in the year two thousand and four.

*[signature]* Edward Gardiner

N P Ready
Ruth M Campbell   J B Burgess   E Gardiner
A J Claudet   I A Rogers

and at: 29th Floor One Canada Square Canary Wharf London E14 5DY Telephone: 020 7712 1565 Facsimile: 020 7712 1501

THIS IS TO CERTIFY that this document is a true copy of the original



Registrar of Bahamian Ships
London

# CHEESWRIGHTS
## NOTARIES PUBLIC

10 Philpot Lane  London  EC3M 8BR
Telephone: 020 7623 9477 (or) 07000 NOTARIES

Facsimile: 020 7623 5428
E-mail: notary@cheeswrights.co.uk
www.cheeswrights.co.uk
DX 627/London City EC3

TO ALL TO WHOM THESE PRESENTS SHALL COME, I RUTH MARGARET CAMPBELL of the City of London NOTARY PUBLIC by royal authority duly admitted and sworn DO HEREBY CERTIFY that I was present and did see MOHAMMED NAJEB AL ASSAF duly authorised president/director of the corporation styled BULK CONTAINER SHIPPING INC. of Nassau, the Bahamas (hereinafter called "the Corporation") seal and as and for its act and deed in due form of law sign and deliver the instrument hereunto annexed and that the signature subscribed to the said instrument for and on behalf of the Corporation is of the own, true and proper handwriting of the said president/director, acting pursuant to a resolution of a meeting of the board of directors of the Corporation dated 21ˢᵗ January 2004.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office at London aforesaid this thirtieth day of January in the year two thousand and four.



N P Ready
Ruth M Campbell   J B Burgess   E Gordon
A J Claudet   J A Rogers


SCRIVENER
NOTARIES

and at: 39th Floor One Canada Square Canary Wharf London E14 5DY Telephone: 020 7712 1565 Facsimile: 020 7712 1501

Companies House Direct                                                            Page 1 of 2

    **COMPANY APPOINTMENTS**    

| | |
|---|---|
| **Registered No.:** | 02290295 |
| **Name:** | COMMODITY UNIVERSAL LIMITED |
| **Address:** | UNIT 14 |
| | 210 SHEPHERDS BUSH ROAD |
| | HAMMERSMITH |
| | LONDON W6 7NL |

Company Appointments: 4 / Resignations: 1

**Exclude**   Resignations

    To view details of other appointments held, click on the appropriate underlined name.


**ASSAF, MAHA**                                      SECRETARY
ASSAF BUILDING GHEZZAWI 2                            Appointed: pre 28/02/1993
VILLAT GHARBIEH MAZEH PO BOX 5039                   Nationality: SYRIAN
DAMASCUS
SYRIA
Date of Birth: 20/01/1960
Company Appointments: 3

**ASSAF, MAHA**                                      DIRECTOR
ASSAF BUILDING GHEZZAWI 2                            Appointed: pre 28/02/1993
VILLAT GHARBIEH MAZEH PO BOX 5039                   Nationality: SYRIAN
DAMASCUS
SYRIA
Date of Birth: 20/01/1960
Company Appointments: 3

**ASSAF, MOHAMAD NAJIB**                             DIRECTOR
ASSAF BUILDING GHEZZAWI 2                            Appointed: pre 28/02/1993
VILLAT GHARBIEH-MAZEH PO BOX 5039                   Nationality: SYRIAN
DAMASCUS
SYRIA
Date of Birth: 10/02/1941
Company Appointments: 2

**SHAKER, KHALIDA**                                  DIRECTOR
ASSAF BUILDING GHEZZAWI 2                            Appointed: pre 28/02/1993
VILLAT GHARBIEH-MAZEH PO BOX 5039                   Nationality: SYRIAN
DAMASCUS
SYRIA
Date of Birth: 01/01/1955
Company Appointments: 1

**ASSAF, SALWA**                                     DIRECTOR
                                                    Appointed: pre 28/02/1993
ASSAF BUILDING GHEZZAWI 2                            Resigned: 10/02/2003
VILLAT GHARBIEH MAZEH PO BOX 5039                   Nationality: SYRIAN
DAMASCUS

Companies House Direct

SYRIA
**Date of Birth:** 01/09/1937
**Company Appointments:** 1

Companies House Direct                                                    Page 1 of 1

          **PERSONAL APPOINTMENTS WITH**          
                                   **LIMITED COMPANIES**

                                                                    Go Back

| | |
|---|---|
| **Name:** | MOHAMAD NAJIB ASSAF |
| **Nationality:** | SYRIAN |
| **Latest Address:** | ASSAF BUILDING GHEZZAWI 2 |
| | VILLAT GHARBIEH-MAZEH PO BOX 5039 |
| | DAMASCUS |

**Date of Birth:**    10/02/1941

**Company Appointments: Current: 2**

To view company details, click on the appropriate company number.
Click HERE to include Resigned and Dissolved appointments

| | |
|---|---|
| **DIRECTOR** | **Appointed: pre 28/02/1993** |
| **Occupation:** | DIRECTOR |
| **Company Number:** | 02290295 |
| **Company Name:** | COMMODITY UNIVERSAL LIMITED |
| | Active |

| | |
|---|---|
| **DIRECTOR** | **Appointed: pre 31/07/1991** |
| **Occupation:** | MERCHANT |
| **Company Number:** | 01446035 |
| **Company Name:** | AYDIN U.K. LIMITED |
| | Active |

*This screen does not include appointments with SE companies or LLP's.*

Companies House Direct

Page 1 of 1

 

**COMPANY DETAILS**

**Name & Registered Office:**
COMMODITY UNIVERSAL LIMITED
UNIT 14
210 SHEPHERDS BUSH ROAD
HAMMERSMITH
LONDON W6 7NL
**Status:** Active

**Company No.:** 02290295

**Date of Incorporation:** 26/08/1988
**Country of Origin:** United Kingdom

---

**Company Type:** Private Limited Company
**Nature Of Business (SIC(03)):**
9305 - Other service activities

---

**Accounting Reference Date:** 31/12
**Last Accounts Made Up To:** 31/12/2006 (TOTAL EXEMPTION FULL)
**Next Accounts Due:** 31/10/2008
**Last Return Made Up To:** 28/02/2007
**Next Return Due:** 27/03/2008

---

**Mortgage: Number of Charges:** ( 0 outstanding / 0 satisfied / 0 part satisfied )
**Last members list:** 28/02/2007

---

**Previous Names**
No previous name information has been recorded over the last 20 years.

Companies House Direct - Filing History                    Page 1 of 2

    **COMPANY FILING HISTORY**    

**Company Number:**  02290295
**Company Name:**    COMMODITY UNIVERSAL LIMITED

Use the tick boxes to select documents from the list below and click on 'Order' to complete your order.

**Exclude**  Allotment Of Shares                              **Order**

| Select | | Type | Date | Description |
|---|---|---|---|---|
| 📄 | ☐ | AA | 07/06/2007 | TOTAL EXEMPTION FULL ACCOUNTS MADE UP TO 31/12/06 |
| 📄 | ☐ | 363s | 29/03/2007 | RETURN MADE UP TO 28/02/07; FULL LIST OF MEMBERS |
| 📄 | ☐ | AA | 11/05/2006 | TOTAL EXEMPTION FULL ACCOUNTS MADE UP TO 31/12/05 |
| 📄 | ☐ | 363s | 12/04/2006 | RETURN MADE UP TO 28/02/06; FULL LIST OF MEMBERS |
| 📄 | ☐ | AA | 23/09/2005 | TOTAL EXEMPTION FULL ACCOUNTS MADE UP TO 31/12/04 |
| 📄 | ☐ | 363s | 04/04/2005 | RETURN MADE UP TO 28/02/05; FULL LIST OF MEMBERS |
| 📄 | ☐ | AA | 04/06/2004 | TOTAL EXEMPTION FULL ACCOUNTS MADE UP TO 31/12/03 |
| 📄 | ☐ | 363s | 24/05/2004 | RETURN MADE UP TO 28/02/04; FULL LIST OF MEMBERS |
| 📄 | ☐ | 288b | 24/05/2004 | DIRECTOR RESIGNED |
| 📄 | ☐ | AA | 05/08/2003 | TOTAL EXEMPTION FULL ACCOUNTS MADE UP TO 31/12/02 |
| 📄 | ☐ | 363s | 15/04/2003 | RETURN MADE UP TO 28/02/03; FULL LIST OF MEMBERS |
| 📄 | ☐ | AA | 08/08/2002 | TOTAL EXEMPTION FULL ACCOUNTS MADE UP TO 31/12/01 |
| 📄 | ☐ | 363s | 13/03/2002 | RETURN MADE UP TO 28/02/02; FULL LIST OF MEMBERS |
| 📄 | ☐ | AA | 02/10/2001 | TOTAL EXEMPTION FULL ACCOUNTS MADE UP TO 31/12/00 |
| 📄 | ☐ | 363s | 25/04/2001 | RETURN MADE UP TO 28/02/01; FULL LIST OF MEMBERS |
| 📄 | ☐ | AA | 18/09/2000 | FULL ACCOUNTS MADE UP TO 31/12/99 |
| 📄 | ☐ | 363s | 17/03/2000 | RETURN MADE UP TO 28/02/00; FULL LIST OF MEMBERS |
| 📄 | ☐ | AA | 17/11/1999 | FULL ACCOUNTS MADE UP TO 31/12/98 |
| 📄 | ☐ | 363s | 30/03/1999 | RETURN MADE UP TO 28/02/99; FULL LIST OF MEMBERS |
| 📄 | ☐ | AA | 26/07/1998 | FULL ACCOUNTS MADE UP TO 31/12/97 |
| 📄 | ☐ | 363s | 17/03/1998 | RETURN MADE UP TO 28/02/98; NO CHANGE OF MEMBERS |
| 📄 | ☐ | AA | 26/08/1997 | ACCOUNTS FOR 'SMALL' CO. MADE UP TO 31/12/96 |
| 📄 | ☐ | 363s | 21/04/1997 | RETURN MADE UP TO 28/02/97; NO CHANGE OF MEMBERS |
| 📄 | ☐ | AA | 12/09/1996 | FULL ACCOUNTS MADE UP TO 31/12/95 |
| 📄 | ☐ | 363s | 24/04/1996 | RETURN MADE UP TO 28/02/96; FULL LIST OF MEMBERS |
| 📄 | ☐ | AA | 12/07/1995 | FULL ACCOUNTS MADE UP TO 31/12/94 |
| 📄 | ☐ | 363s | 21/04/1995 | RETURN MADE UP TO 28/02/95; NO CHANGE OF MEMBERS |
| | ☐ | AA | 16/09/1994 | ACCOUNTS FOR 'SMALL' CO. MADE UP TO 31/12/93 |

| | | | |
|---|---|---|---|
| | ELRES | 16/09/1994 | S386 DISP APP AUDS 14/08/94;<br>S252 DISP LAYING ACC 14/08/94 ;<br>S366A DISP HOLDING AGM 14/08/94 |
| | 363s | 17/03/1994 | RETURN MADE UP TO 28/02/94; NO CHANGE OF MEMBERS;<br>DIRECTOR'S PARTICULARS CHANGED |
| | AA | 10/11/1993 | FULL ACCOUNTS MADE UP TO 31/12/92 |
| | 363a | 04/03/1993 | RETURN MADE UP TO 28/02/93; FULL LIST OF MEMBERS |
| | AA | 27/04/1992 | FULL ACCOUNTS MADE UP TO 31/12/91 |
| | 363s | 27/04/1992 | RETURN MADE UP TO 28/02/92; NO CHANGE OF MEMBERS |
| | AA | 08/07/1991 | FULL ACCOUNTS MADE UP TO 31/12/90 |
| | 363a | 21/03/1991 | RETURN MADE UP TO 31/01/91; NO CHANGE OF MEMBERS |
| | 363a | 21/03/1991 | RETURN MADE UP TO 31/01/91; NO CHANGE OF MEMBERS |
| | AA | 25/09/1990 | FULL ACCOUNTS MADE UP TO 31/12/89 |
| | 363 | 26/04/1990 | RETURN MADE UP TO 28/02/90; FULL LIST OF MEMBERS |
| | 288 | 28/10/1988 | DIRECTOR RESIGNED; NEW DIRECTOR APPOINTED;SECRETARY RESIGNED; NEW SECRETARY APPOINTED |
| | 288 | 13/09/1988 | DIRECTOR RESIGNED; NEW DIRECTOR APPOINTED |
| | 287 | 13/09/1988 | REGISTERED OFFICE CHANGED ON 13/09/88 FROM:<br>4 BISHOPS AVENUE<br>NORTHWOOD<br>MIDDLESEX<br>HA6 3DG |
| | NEWINC | 26/08/1988 | INCORPORATION DOCUMENTS<br>CERTIFICATE OF INCORPORATION<br>STATEMENT OF DIRECTORS & REGISTERED OFFICE<br>DECLARATION OF COMPLIANCE<br>MEMORANDUM OF ASSOCIATION<br>ARTICLES OF ASSOCIATION |

# EXHIBIT 6

**COMMODITY UNIVERSAL LIMITED**
14 CAMBRIDGE COURT, 210 SHEPHERDS BUSH ROAD
LONDON W6 7NJ

MICHAEL J. FORDHAM

TEL: (+44) 020 7371 6188
FAX: (+44) 020 7603 5737
TLX: 295559 CMUVLG
EMAIL: michael.fordham@which.net

Fax: 021 503685P2

Attn: 同唇钱 钟锋

守挑 "邮车 联车 电场 旦地址

# EXHIBIT 7

| 发件人: | "Michael" <michael.fordham@which.net> |
|---|---|
| 收件人: | "Jony-Guo" <guozhiqiang@cosco-shipyard.com>; "Matteo - Director Dry Dock Services Ravano" <matteo.ravano@mcontract.com>; "Ivan Korchynskyy" <Ivan.Korchinskyy@vships.com> |
| 抄送: | "'Haozenghui@Cosco-Shipyard. Com'" <'haozenghui@cosco-shipyard.com'>; "Luwenbin@Cosco-Shipyard. Com" <luwenbin@cosco-shipyard.com>; "Yanchongyu" <yanchongyu@cosco-shipyard.com> |
| 发送时间: | 2007年2月7日 16:44 |
| 主题: | (瑞星提示-此邮件可能是垃圾邮件)RE: MV UNIVERSAL CHALLENGER |

Yes, Mr Guo I will get the reference to you once payment done by owner - will follow this today and revert to you.


Michael

-----Original Message-----
From: Jony-Guo [mailto:guozhiqiang@cosco-shipyard.com]
Sent: 07 February 2007 08:35
To: michael.fordham@which.net; Matteo - Director Dry Dock Services
Ravano; Ivan Korchynskyy
Cc: 'Haozenghui@Cosco-Shipyard. Com'; Luwenbin@Cosco-Shipyard. Com;
Yanchongyu
Subject: Re: MV UNIVERSAL CHALLENGER


Good day Michael,
Further to our previous tele-con last week, pls kindly advise when shall the payment be settled.
Pls sent us the bank slip if you already arranged.
Waiting your prompt reply.
Thanks and best regards.

Guo zhiqiang/Project manager
Cosco zhoushan shipyard
2007.02.07
----- Original Message -----
From: "michael (mjf out of office)" <michael.fordham@which.net>
To: "Jony-Guo" <guozhiqiang@cosco-shipyard.com>; "Matteo - Director Dry Dock Services
Ravano" <matteo.ravano@mcontract.com>; "Ivan Korchynskyy" <Ivan.Korchinskyy@vships.com>
Cc: "'Haozenghui@Cosco-Shipyard. Com'" <'haozenghui@cosco-shipyard.com'>;
"Luwenbin@Cosco-Shipyard. Com" <luwenbin@cosco-shipyard.com>; "Yanchongyu"
<yanchongyu@cosco-shipyard.com>
Sent: Wednesday, January 31, 2007 12:31 AM
Subject: Re: MV UNIVERSAL CHALLENGER


> Hi again,
>
> Further to our telecon earlier today pleased be advised that a further payment will be made this
week.   I have asked owner to remit $300k asap and a further similar remittance next week.
>
> Will advise you when transfer(s) made.
>

>
> Bregds
>
> Michael
>
>
>
> Away from my desk - sent by BlackBerry!
>
> -----Original Message-----
> From: "Jony-Guo" <guozhiqiang@cosco-shipyard.com>
> Date: Tue, 30 Jan 2007 08:26:28
> To:<michael.fordham@which.net>,<matteo.ravano@mcontract.com>,"Korchynskyy, Ivan"
<Ivan.Korchinskyy@vships.com>
> Cc:haozenghui <haozenghui@cosco-shipyard.com>,<luwenbin@cosco-
shipyard.com>,"yanchongyu" <yanchongyu@cosco-shipyard.com>
> Subject: MV UNIVERSAL CHALLENGER
>
> TO: V.SHIPS(CYPRUS)
> MARCAS
> Attn: Mr Ivan
> Mr Ravano
> Mr Michael
> Subject: Second payment of MV UNIVERSAL CHALLENGER
>
> Good day Gents,
> Further to our kinds of tele-con these days, appreciate if you can arrange the second payment to
our yard account within this week, as discussed and agreed the kind owner will arrange part of
estimated repair cost as the second payment before finish the final negotiation.
> Fyi, it will be highly appreciated if we can get the further informations regarding the final
discussion.
> Yours faithfully.
>
> Guo zhiqiang/Project manager
> Cosco zhoushan shipyard
> 2007.01.30
>
> Haozenghui
> Manager of Commercial Dept.
> MP: +13905808087
> E-mail: haozenghui@cosco-shipyard.com: <mailto:haozenghui@cosco-shipyard.com>
>
>
> Guozhiqiang
> Project Manager
> Tel: +86 580 6189276
> Fax: +86 580 6189273
> (For emergency case pls.fax to: +86 580 6189273)
> MP: +86 13567676613
> E-mail: guozhiqiang@cosco-shipyard.com: <mailto:guozhiqiang@cosco-shipyard.com>
> Add: Liuheng town, Putuo district, Zhoushan,
> Zhejiang province, CHINA.
> Post : 316131

2007-8-3

发件人：    "Michael" <michael.fordham@which.net>
收件人：    "Jony-Guo" <guozhiqiang@cosco-shipyard.com>
抄送：      "haozenghui???" <haozenghui@cosco-shipyard.com>; <luwenbin@cosco-shipyard.com>;
           "yanchongyu" <yanchongyu@cosco-shipyard.com>
发送时间：  2007年2月9日 20:20
主题：      (瑞星提示-此邮件可能是垃圾邮件)RE: MV UNIVERSAL CHALLENGER

Hello Mr Guo,

Very sorry for the delay in getting back to you - unfortunately the Owner was travelling extensively and has only now returned to his office.

As I agreed with you $300K will be remitted ASAP and I will advise T/T refs early next week when I have these references from bankers - a further similar remittance will follow soon thereafter.

Reverting

Michael


-----Original Message-----
From: Jony-Guo [mailto:guozhiqiang@cosco-shipyard.com]
Sent: 09 February 2007 05:39
To: michael.fordham@which.net
Cc: haozenghui???; luwenbin@cosco-shipyard.com; yanchongyu
Subject: RE: MV UNIVERSAL CHALLENGER


Sorry to trouble you again, pls kindly advise us the schedule.

Guo zhiqiang
2007.02.09

| | |
|---|---|
| 发件人: | "Michael" <michael.fordham@which.net> |
| 收件人: | "Jony-Guo" <guozhiqiang@cosco-shipyard.com> |
| 抄送: | "yanchongyu" <yanchongyu@cosco-shipyard.com>; "haozenghui???" <haozenghui@cosco-shipyard.com> |
| 发送时间: | 2007年2月12日 17:08 |
| 主题: | (瑞星提示-此邮件可能是垃圾邮件)RE: MV UNIVERSAL CHALLENGER |

Hi again,

No trouble Mr Guo.

I have seen a remittance to you this morning of $300K to COSCO bankers from Owners bankers.

Once I have the full detail in front of me I will pass same to you in order that you may trace same.


Reverting


Michael



-----Original Message-----
From: Jony-Guo [mailto:guozhiqiang@cosco-shipyard.com]
Sent: 12 February 2007 08:09
To: michael.fordham@which.net
Cc: yanchongyu; haozenghui???
Subject: RE: MV UNIVERSAL CHALLENGER


Hi Michael,
Again to trouble you, pls kindly advise us.
Thanks and regards.

Guo zhiqiang/Project manager
Cosco zhoushan shipyard
2007.02.12 (monday)

----- Original Message -----
From: "Michael" <michael.fordham@which.net>
To: "Jony-Guo" <guozhiqiang@cosco-shipyard.com>
Cc: "haozenghui???" <haozenghui@cosco-shipyard.com>; <luwenbin@cosco-shipyard.com>;
"yanchongyu" <yanchongyu@cosco-shipyard.com>
Sent: Friday, February 09, 2007 8:20 PM
Subject: RE: MV UNIVERSAL CHALLENGER


Hello Mr Guo,

2007-8-3

Very sorry for the delay in getting back to you - unfortunately the Owner was travelling extensively and has only now returned to his office.

As I agreed with you $300K will be remitted ASAP and I will advise T/T refs early next week when I have these references from bankers - a further similar remittance will follow soon thereafter.

Reverting

Michael

-----Original Message-----
From: Jony-Guo [mailto:guozhiqiang@cosco-shipyard.com]
Sent: 09 February 2007 05:39
To: michael.fordham@which.net
Cc: haozenghui???; luwenbin@cosco-shipyard.com; yanchongyu
Subject: RE: MV UNIVERSAL CHALLENGER

Sorry to trouble you again, pls kindly advise us the schedule.

Guo zhiqiang
2007.02.09

发件人:    "Michael" <michael.fordham@which.net>
收件人:    "jony-guo" <guozhiqiang@cosco-shipyard.com>
发送时间:  2007年2月15日 23:27
主题:      (瑞星提示-此邮件可能是垃圾邮件)MV UNIVERSAL CHALLENGER DD REPAIR IN COSCO ZHOUSHAN
           SHIPYARD ¬

Hi,

Very sorry for the delay in getting this to you.

The reference for the $300,000 owners remittance is IBAN CY23 1240 0100 0000 0000 1328 5201

Lebanon & Gulf Bank Cyprus Branch to Citibank NYC SwiftCITIUS33 F/O shanghai Pudong Development
Bank.

Grateful you ackn safe receipt of these funds.

Meanwhile may I wish you and all your colleagues an enjoyable Chinese New Year celebration this coming
weekend!

Happy Year of the Pig!

Bregds

Michael

-----

2007-8-3

发件人：    "Jony-Guo" <guozhiqiang@cosco-shipyard.com>
收件人：    <michael.fordham@which.net>
抄送：      "haozenghui郝增辉" <haozenghui@cosco-shipyard.com>; <luwenbin@cosco-shipyard.com>;
            "yanchongyu" <yanchongyu@cosco-shipyard.com>
发送时间：  2007年2月16日 8:15
主题：      Re: MV UNIVERSAL CHALLENGER DD REPAIR IN COSCO ZHOUSHAN SHIPYARD –

Good day Michael,
Thanks for your below msg, will infrom you when we get the payment, also thanks a lot for your
wishes.
Fyi. pls advise the schedule for the coming next $300,000.00
Thanks again and best wishes.

Guo zhiqiang/Project manager
Cosco zhoushan shipyard
2007.02.16


----- Original Message -----
From: Michael
To: jony guo
Sent: Thursday, February 15, 2007 8:27 PM
Subject: MV UNIVERSAL CHALLENGER DD REPAIR IN COSCO ZHOUSHAN SHIPYARD –

Hi,

Very sorry for the delay in getting this to you.

The reference for the $300,000 owners remittance is IBAN CY23 1240 0100 0000 0000 1328 5201

Lebanon & Gulf Bank  Cyprus Branch to Citibank NYC SwiftCITIUS33 F/O shanghai Pudong Development
Bank.

Grateful you ackn safe receipt of these funds.


Meanwhile may I wish you and all your colleagues an enjoyable Chinese New Year celebration this coming
weekend!

Happy Year of the Pig!


Bregds


Michael

        -----

# EXHIBIT 8

上海浦东发展银行外汇业务 贷记通知　　舟山　　如凭证业务编号
相同，系重复打
日期：2006年10月27日　　　　　印，仅一份有效

户　　名：中远船务工程集团有限公司　　　　**COPY**

账　　号：75041495300000068

业务编号：JR75040600001501　　　　　起息日：2006年10月27日
摘　　要：/546030102 ECHEX ESTABLISHMENT 14 CAMBRIDGE COURT LONDON W6 7HJ
/BNF/LESS FEES /ACC/DK AND NUMBER 3 ZHONGSHAN //SQUARE, DALIAN CHINA
/ABN/M/V UNIVERSAL CHALLENGER DRY DOCK BNY CUST RRN - FT5061026483920E
USD 599967.50

金　　额：美元伍拾玖万玖仟玖佰陆拾柒元伍角

经办：孔令铭　　　　复核：李颖　　　　打印：李颖　　　　（盖章有效章）

# EXHIBIT 9

( 'G' )

Form. No. (j) - i MORTGAGE (to secure Account Current, & c.)

THIS IS TO CERTIFY that this document is a true copy of the original

(Body Corporate)
Registrar of Bahamian Ships
London

| Official number | Name of Ship | No, Year and Port of Registry | Whether sail, steam or motor | Horse Power |
|---|---|---|---|---|
| 727457 | "UNIVERSAL CHALLENGER" | L7/1996/Nassau | Motor | 9,268KW |

| | Metres | Tenths | |
|---|---|---|---|
| Length, from forepart of stem, to the aft side of the head of the stern post | 214 | | Gross .. .. 35,809 .. .. .. .. .. .. .. .. |
| Main breadth to outside of plating | 32 | 2.4 | Number of Tons |
| Depth in hold from tonnage deck to ceiling amidships | 18 | 0.1 | Register .. 22,192 .. .. .. .. .. : .. .. |

and as described in more detail in the Certificate of the Surveyor and the Register Book.

Whereas (a) there is an Account Current between BULK CONTAINER SHIPPING INC. (the "Mortgagor") whose principal place of business is at Bahamas International Trust Building, Bank Lane, PO Box N-8188, Nassau, the Bahamas and BANQUE BANORABE acting through its London Branch at 195 Brompton Road, London SW3 1LZ (the "Mortgagee") regulated by a secured loan facility agreement dated 26th January 2004 (hereinafter as the same may from time to time be amended, varied or supplemented called the "Agreement") made between the Mortgagor and the Mortgagee and WHEREAS the Mortgagor and the Mortgagee have executed a deed of covenants dated 30th January 2004 (hereinafter as the same may from time to time be amended, varied or supplemented called the "Deed of Covenants") and WHEREAS pursuant to the Agreement the Mortgagor has agreed to execute this Mortgage in favour of the Mortgagee for the purpose of securing payment by the Mortgagor to the Mortgagee of all sums for the time being owing to the Mortgagee in the manner and at the times set forth in the Agreement and the Deed of Covenants and WHEREAS the amount of principal and interest due at any given time can be ascertained by reference to the Agreement, the Deed of Covenants and to the books of account (or other accounting records) of the Mortgagee.

Now we the (b) said Bulk Container Shipping Inc. in consideration of the premises for ourselves and our successors, covenant with the said (c) Banque Banorabe and (d) its assigns, to pay to him or them or it the sums for the time being due on this security, whether by way of principal or interest, at the times and manner aforesaid. And for the purpose of better securing to the said (c) Banque Banorabe the payment of such sums as last aforesaid, we do hereby mortgage to the said (c) Banque Banorabe all 64/64th shares, of which we are the Owners in the Ship above particularly described, and in her boats, guns, ammunition, small arms, and appurtenances.

Lastly, we for ourselves and our successors, covenant with the said (c) Banque Banorabe and (d) its assigns that we have power to mortgage in manner aforesaid the above-mentioned shares, and that the same are free from incumbrances (e)

In witness whereof we have caused this mortgage to be executed this ......thirtieth...... day of ...January...... Two thousand and four

signed, sealed and delivered as a Deed

by BULK CONTAINER SHIPPING INC. ......

acting by its duly authorized signatory in the presence of:......

Notary Public London, England
(RUTH M. CAMPBELL)

(a) Here state by way of recital that there is an account current between the Mortgagor (describing the Company and giving its address), and the Mortgagee (giving address and description – if the Mortgagee is a Body Corporate the full title and address must be given, and if joint Mortgagees are concerned they must be so described), and describe the nature of the transaction so as to show how the amount of principal and interest due at any given time is to be ascertained, and the manner and time of payment. (b) Name of the Company. (c) Full name of Mortgagees. (d) "his", "their" or "its". (e) If any prior incumbrances exist, "save as appears by the Registry of the said Ship". * Signatures and description of witnesses, i.e., Director, Secretary, etc. (as the case may be).

NOTE - The prompt registration of a Mortgage Deed at the Office of the Original Registrar is essential to the security of Mortgagee, as a Mortgage takes its priority from the date of production for registry, not from the date of the instrument.
NOTE - Registered Mortgagors or Mortgagees are reminded of the importance of keeping the Registrar of Bahamian Ships informed of any change of residence on their part.



Entered this 30 day of January 2004
at 15:35 am/pm
Registrar of Bahamian Ships
London



REGISTRAR OF BAHAMIAN SHIPS

30 JAN 2004

LONDON ENGLAND

NP\3069101.1

N.E   in the case of Transfer it must be made by indorsement in one of the following forms:-

## TRANSFER OF MORTGAGE - by Individual or Joint Mortgagees

(a) "I" or "we"

(b) "me" or "us"

(c) "him", "them" or "it"
(d) "my" or "our"

(e) Name, address and
description of witness

(a) ............ the within-mentioned ......................................................
in consideration of ...............................................................................
this day paid to (b) ............ by ..........................................................
..................................................................................................
hereby transfer to (c) ........ the benefit of the within-written security. In witness whereof (a) ...................
have hereunto subscribed (d) ................ name    and affixed (d) ...... seal .................... this ...........
day of .............................................. one thousand nine hundred and .......................................
Executed by the above-named .................................... )
............................................................................ )

in the presence of (e)

## TRANSFER OF MORTGAGE - by Body Corporate

(c) "Him", "them" or "it"

The within mentioned ............................................................
in consideration of ...............................................................................
this day paid to it by .............................................................................
hereby transfer to (c) ...................... the benefit of the within-written security. In witness whereof we have
hereunto affixed our common seal this ........................ day of .................................... one thousand
nine hundred and ................

The Common Seal of the ........................................ )

was affixed in the presence of *                       )
............................................................................ )
............................................................................ )
............................................................................ )

*N.B. - In case a Mortgage is paid off, a Memorandum of its Discharge in one of the
following forms must be used.*

### By Individual or Joint Mortgagees

Received the sum of ...............................................................................
in discharge of this within written security. Dated at ..........................................
this ................................................ day of ............................................ 19.....
Witness (e) ...............................................    .......................................................
of ........................................................    .......................................................

### By Bodies Corporate

Received the sum of...............................................................................

in discharge of the within-written security. In witness whereof we have hereunto affixed our common seal
this .......................................... day of ............................................ 19..... at .................................

The Common Seal of the ........................................ )
............................................................................ )
was affixed in the presence of * ................................ )
............................................................................ )
............................................................................ )
............................................................................ )

* Signatures and description of witness, i.e., Director, Secretary, etc., (as the case may be).

\KB01\1534.1

THIS IS TO CERTIFY that this document is a true
copy of the original

Registrar of Bahamian Ships
London

\PD069101.1



**COMMONWEALTH OF THE BAHAMAS**

Form. No. (j) - i MORTGAGE (to secure Account Current, & c.)

THIS IS TO CERTIFY that this document is a true copy of the original
(Body Corporate)

Registrar of Bahamian Ships
London

| Official number | Name of Ship | No, Year and Port of Registry | Whether sail, steam or motor | Horse Power |
|---|---|---|---|---|
| 727457 | UNIVERSAL CHALLENGER | L7/1996/Nassau | Motor | 9,268KW |

"H"

| | Metres | Tenths | | |
|---|---|---|---|---|
| Length, from forepart of stem, to the aft side of the head of the stern post | 214 | 3.7 | Number of Tons | Gross .. .. 35,809 .. .. .. .. .. .. .. |
| Main breadth to outside of plating | 32 | 2.4 | | Register .. 22,192 .. .. .. .. .. .. |
| Depth in hold from tonnage deck to ceiling amidships | 18 | 0.1 | | |

and as described in more detail in the Certificate of the Surveyor and the Register Book.

Whereas (a) pursuant to a credit facility letter dated 28 January 2004 issued by BLOM BANK SAL acting through its office at BLOM Bank's Building, Rashid Karami Street, Verdun, Beirut, Lebanon (hereinafter called the "Mortgagee") in favour of ASSAF INVEST LIMITED, a company incorporated according to the laws of Jersey, Channel Islands, on 23 December 2003 with registered number 85760 (hereinafter called the "Borrower"), there is an Account Current between the Borrower and the Mortgagee and WHEREAS it is a condition of the use of the facility under the said credit facility agreement that (i) BULK CONTAINER SHIPPING INC. a company incorporated in the Bahamas whose registered office is at Bahamas International Trust Building, Bank Lane, PO Box N-8188, Nassau, Bahamas (hereinafter called the "Mortgagor") execute this Mortgage in favour of the Mortgagee and enter into a deed of covenant bearing even date herewith to which document the Mortgagor and the Mortgagee are parties and (ii) the Mortgagor enter a guarantee dated  23 MARCH 2004 in respect of the obligations of the Borrower (the said credit facility letter, guarantee and deed of covenants as the same may from time to time be supplemented and/or amended are hereinafter called the "Credit Facility Letter", the "Guarantee" and the "Deed of Covenants" respectively), the Mortgage, the Deed of Covenants and the Guarantee being for the purpose of securing payment of all sums for the time being owing to the Mortgagee in the manner and at the times set forth in the Credit Facility Letter, the Deed of Covenants and the Guarantee and WHEREAS the amount of the principal and the interest and other moneys due to the Mortgagee at any given time can be ascertained by reference to the Credit Facility Letter, the Deed of Covenants and the Guarantee and/or to the books of account (or other accounting records) of the Mortgagee.

Now we the (b) said Bulk Container Shipping Inc. in consideration of the premises for ourselves and our successors, covenant with the said (c) BLOM BANK SAL and (d) its assigns, to pay to him or them or it the sums for the time being due on this security, whether by way of principal or interest, at the times and manner aforesaid. And for the purpose of better securing to the said (c) BLOM BANK SAL the payment of such sums as last aforesaid, we do hereby mortgage to the said (c) BLOM BANK SAL all 64/64th shares, of which we are the Owners in the Ship above particularly described, and in her boats, guns, ammunition, small arms, and appurtenances.

Lastly, we for ourselves and our successors, covenant with the said (c) BLOM BANK SAL and (d) its assigns that we have power to mortgage in manner aforesaid the above-mentioned shares, and that the same are free from incumbrances (e) save as appears by the Registry of the said Ship

In witness whereof we have caused this mortgage to be executed this TWENTI THIRD  day of  MARCH  Two thousand and four

signed, sealed and delivered as a Deed ............................................................................

by BULK CONTAINER SHIPPING INC .......................................................................................

acting by its duly authorised signatory in the presence of:— Edward Gard      Notary Public London, England
(Edward Gardiner)

| REGISTRAR OF BAHAMIAN SHIPS |
|---|
| 2 3 MAR 2004 |
| LONDON ENGLAND |

(a) Here state by way of recital that there is an account current between the Mortgagee (describing the Company and giving its address), and the Mortgagor (giving address and description - if the Mortgagee is a Body Corporate the full title and address must be given, and if joint Mortgagees are concerned they must be so described), and describe the nature of the transaction so as to show how the amount of principal and interest due at any given time is to be ascertained, and the manner and time of payment. (b) Name of the Company. (c) Full name of Mortgagee. (d) "his", "their" or "its". (e) If any prior incumbrance add, "save as appears by the Registry of the said Ship". * Signatures and description of witness i.e., Director, Secretary, etc. (as the case may be).

NOTE – The prompt registration of a Mortgage Deed at the Office of the Registrar is essential to the security of Mortgagee. A Mortgage takes its priority from the date of production for registry, not from the date of the instrument.

NOTE – Registered Mortgagees or Mortgagees are reminded of the importance of keeping the Registrar of Bahamian Ships informed of any change of residence on their part.

Entered this 23 day of March 2004
at 11:58 am / pm
Registrar of Bahamian Ships
London

\P1\3080509.1

N.E   In the case of Transfer it must be made by Indorsement in one of the following forms:-

## TRANSFER OF MORTGAGE - by Individual or Joint Mortgagees

(a) "I" or "we"

(b) "me" or "us"

(c) "him", "them" or "it"
(d) "my" or "our"

(e) Name, address and
description of witness

(a) ............. the within-mentioned ................................................................
in consideration of ......................................................................................
this day paid to (b) ............ by ....................................................................
................................................................................................................
hereby transfer to (c) ........ the benefit of the within-written security. In witness whereof (a) .....................
have hereunto subscribed (d) ............... name     and affixed (d) ...... seal ........................ this .............
day of .................................................... one thousand nine hundred and .................................
Executed by the above-named ............................................... }
................................................................................................... }

in the presence of (e)

## TRANSFER OF MORTGAGE - by Body Corporate

(c) "Him", "them" or "it"

The within mentioned ....................................................................................
in consideration of ........................................................................................
this day paid to it by ......................................................................................
................................................................................................................
hereby transfer to (c) ................... the benefit of the within-written security. In witness whereof we have
hereunto affixed our common seal this ..................... day of ................................ one thousand
nine hundred and ..................

The Common Seal of the .......................................... }
................................................................................. }
was affixed in the presence of * ................................. }
................................................................................. }
................................................................................. }
................................................................................. }

*N.B. - In case a Mortgage is paid off, a Memorandum of its Discharge in one of the
following forms must be used.*

## By Individual or Joint Mortgagees

Received the sum of .........................................................................................
in discharge of this within written security. Dated at ..............................................................
this .............................................. day of .......................................... 19.....
Witness (e) ..........................................................     ...........................................................
of .................................................................

## By Bodies Corporate

Received the sum of............................................................................................

in discharge of the within-written security. In witness whereof we have hereunto affixed our common seal
this ........................................... day of ............................................ 19..... at ..............................

The Common Seal of the .......................................... )
................................................................................. )
was affixed in the presence of * .................................. )
................................................................................. )
................................................................................. )
................................................................................. )

* Signatures and description of witness, i.e., Director, Secretary, etc., (as the case may be).

THIS IS TO CERTIFY that this document is a true
copy of the original

Registrar of Bahamian Ships
London